**QUAKER STATE MINIT–LUBE, INC., Plaintiff,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, et al., Defendants.**

**Civ. No. 91–C–461J.**

United States District Court, D. Utah, Central Division.

March 21, 1994.

## MEMORANDUM OPINION AND ORDER

JENKINS, District Judge.

This matter is now before this court on cross-motions for summary judgment filed by

plaintiff Quaker State Minit–Lube, Inc. ("Quaker State"), and defendants Liberty Mutual Insurance Company ("Liberty Mutual"), Fireman's Fund Insurance Company, American Insurance Company, National Surety Corporation (collectively "Fireman's Fund") and Unigard Insurance Company ("Unigard"). The parties have submitted a series of lengthy memoranda, supported by voluminous appendices of exhibits, documents, excerpts of deposition testimony, and an array of unpublished court decisions, articles and texts. The motions were heard on March 29, 1993. Since the hearing, the parties' moving papers have been augmented by a series of supplemental citations and copies of cases forwarded by counsel. The Court has reviewed and considered the materials submitted and the arguments made by counsel, and now rules as follows:

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This action arises out of the efforts of business, firmly prodded by public mandate and administrative enforcement action, to attempt to clean up the mess left by an industrial enterprise, now defunct, which engaged in the discharge of contaminated oils and toxic chemicals upon land. It arises as well out of the efforts of insurance carriers, who profit by reason of their paid-for promises to assume the risks of others, to write those promises as narrowly as possible. It is a case about cost, about consequence, and about who will, as a matter of public policy, ultimately bear the economic burden of the wrongful conduct of others, now defunct.

This action concerns a 6.6–acre industrial oil refining facility located at 1628 North Chicago Street, Salt Lake City, Utah, which until its closure in 1988, was operated purportedly for the purposes of re-refining and recovery of used automobile and industrial oils. The facility was originally owned and operated as an oil refinery by O.C. Allen Oil Company from 1953 to 1968. In 1968, Flin-

co, Inc. purchased and began operating the facility. In 1978, it was purchased by Axel Johnson, Inc. and was operated by Ekotek, Inc., a *Delaware* corporate subsidiary of Axel Johnson, Inc. *See* EPA Administrative Order on Consent for Emergency Surface Removal, dated August 1, 1989 (Docket No. CERCLA VIII–89–25), at 4 (annexed as Exhibit 4 to the Memorandum of Defendants Fireman's Fund Insurance Company, American Insurance Company and National Surety Corporation in Support of Motion for Summary Judgment, dated January 15, 1993 (hereinafter "Fireman's Fund Mem.")).

Following the purchase of the property by Steven Self and Steven Miller in 1981, Ekotek, Inc., a *Utah* corporation ("Ekotek"), operated the facility until its bankruptcy in 1987. The facility was last operated by an entity known as Petrochem Recycling Corporation, which also purported to engage in the oil recovery/re-refining and recycling business, until February 1988, when all operations ceased. *Id.*

Quaker State owns and operates a series of "convenience automobile service centers," which provide simple vehicle maintenance services, including engine oil changes. Beginning in 1977 and continuing through April of 1985, Quaker State sold drain oil[1] collected at its service centers to Ekotek. In the ordinary course of dealing between Quaker State and Ekotek, Ekotek trucks would collect drain oil from storage tanks located at the Quaker State service centers and transport it to the Ekotek re-refining facility where it would be transferred to large storage tanks for later processing. *See* "Statement of Facts," Plaintiff's Memorandum Brief in Support of Motion for Partial Summary Judgment, dated January 15, 1993 ("Quaker State Mem."), at ¶¶ 5–6.

Prior to the commencement of remedial action by the United States Environmental Protection Agency ("EPA") at the 1628 North Chicago Street site (hereinafter re-

---

1. While Quaker State disputes the defendants' characterization of this material as "waste oil," preferring "automotive crank case and differential oil," it seems fairly clear that the material collected by Ekotek from Quaker State's storage tanks was not commercially salable or useable as a lubricant, *e.g.*, as automotive crank case or differential oil in its then-existing condition. Presumably, that is why Ekotek was collecting it. For the sake of clarity, the Court shall refer in the text of this opinion to Quaker State's oil change by-product as "drain oil."

ferred to as the "Ekotek Site"), it was observed that an estimated 500,000 gallons of liquid "containing varying concentrations of hazardous substances" was held in approximately 60 above-ground storage tanks ranging in size from 2,900 to 87,000 gallons, including twelve 20,000-gallon tanks located on the site, along with another 475 drums and approximately 1,500 smaller containers found in five warehouse buildings. *See* EPA Administrative Order on Consent for Emergency Surface Removal (Exhibit 4 to the Fireman's Fund Mem.), at 6. "Approximately 200,000 gallons of flammable liquids ... [we]re contained in 32 tanks and 69 drums." *Id.* at 9. Also found on the Ekotek Site were three surface impoundment areas, "numerous piles and pits of waste material," underground tanks and an underground drain field. "EPA Findings of Fact" at ¶ 11, EPA Administrative Order on Consent for Remedial Investigation/Feasibility Study, dated July 10, 1992, (Docket No. CERCLA (106) VIII–92–21) (annexed as Exhibit 5 to the Fireman's Fund Mem.), at 4.

> Contaminants associated with these on-site sources include a wide range of organic substances such as chlorinated solvents and other volatile organic compounds (acetone, vinyl chloride, 1, 1–dichloroethane, 1, 1, 1–trichloroethane), polynuclear aromatic hydrocarbons (2–methylnapthalene), phthalates, pesticides (chlordane, endrin, 4, 4–DDE, 4, 4–DDT) PCBs (Aroclor 1260), dioxin (2, 3, 7, 8–TCDD) and furans. Arsenic, chromium, lead, and mercury are also present in on-site primary and secondary sources.

*Id.*

Quaker State's initial summary judgment memorandum details a number of incidents in which oil or toxic materials (such as acid sludge produced in the re-refining process) were discharged or released upon the land or into the water at the Ekotek Site. *See* Quaker State Mem. at 3–9, ¶¶ 7–22.

> [O]n two separate occasions, accidents in connection with loading and unloading of Union Pacific Rail Road cars with used oil led to 12,000 gallons of oil being spilled on the property.... The great majority of this oil went underground in a deep trench

designed to collect rainwater runoff from the rail siding at the property; the amount recovered is unknown.

> [R]efinery accidents over the course of the years contributed very large volumes to the spillage total.... Volumes lost as the result of tank overflows from operator error and spills from trucks resulting from driver error were substantial....

> Prior to 1967, acid sludge produced in the rerefining process was discharged into a pit on the property. The pit was covered over in 1967, but no effort was made at the time to remove sludge residue remaining in the pit....

> The rerefining process used clay as a filtration substance to remove impurities from the oil. Oil and clay were mixed together, and the oil was then squeezed out of the clay in a rotary vacuum filter. The spent clay was accumulated on the ground in the refinery area and periodically carted to landfills. Witnesses differed on the amount of oil remaining in the spent clay and whether oil leaked out of the pile....

*Id.* at 10–11, 13, 15 (citations omitted). Deposition testimony of former refinery employees related numerous incidents of the discharge of oil and other materials onto the Ekotek Site property:

> *James Blaser* recalls that in early 1985 there was a large spill when a manhole was left off a tank and product flowed from the tank all the way to the west end of the site. He also recalls two or three incidents when tank 52 accidently overflowed approximately 500 gallons caused by water in the hot oil resulting in the oil foaming out the top of the tank.... Jim Blaser also states that he does not believe that there was any year when there wasn't an accidental spill/mishap at the site....

> *Scott Adair* recalls that in 1980 or 1981 there were times when there were runovers in the processing area large enough that they went across the street.... He also recalls that there were occurrences between 1978 and 1983, happening once or twice a year, of overflows during the loading of acid sludge onto trucks. These spills, on occasions, were large enough that

they flowed down the road and would have involved 500 to 2,000 gallons of oil and acid mixture....

*Alex Bloomfield* recalls that there were significant tank spills in each and every year he was at Ekotek, 1978 through 1985....

*Id.* at ¶¶ 19–21 (citations omitted); *cf.* Quaker State Minit–Lube's Response in Opposition to Defendants' Motions for Summary Judgment, dated February 26, 1993 ("Quaker State Opp.Mem.") at 3–42; Quaker State Minit–Lube's Reply Memorandum in Further Support of Motion for Partial Summary Judgment, dated March 10, 1993 ("Quaker State Reply Mem.") at 3–11, ¶¶ 2–16. The defendants' summary judgment memoranda set forth additional facts detailing similar events:

Scott Adair who started work in 1978 testified ... that during cold weather people draining sludge from a tank to a truck would get cold and leave to go inside and allow the sludge to drain into the truck and sludge could overflow the truck.... He testified that ... "when all of the sludge drained out then it was just thin oil, acid treated oil ... and it would fill that semi truck up in just about a minute or two." ... It would then overflow "and it would be a river running along that roadway." ...

Joint Memorandum of Defendants in Opposition to Plaintiff's Motion for Partial Summary Judgment, dated February 26, 1993 ("Defs.Joint Mem.") at 6–7, ¶ 4(g).

Ekotek's wastewater treatment system was fraught with a history of oil[-]contaminated effluent discharged into the Salt Lake sewer system....

Beginning in November, 1980, acid sludge from the oil dehydration process was discharged directly on the ground in a large, unlined, earthen pit north of the plant's Administration building....

Over a period of years, sludge was hauled daily to the acid sludge pit and mixed with lime to neutralize the sludge.... The acid sludge/lime mixture could sit onsite from anywhere up to a one-month period, until it was transported offsite to a landfill facility.... Ekotek con-tinued this cycle of dumping and then disposing of acid sludge until at least 1985.... Sludges remained onsite, however, until removal procedures were instituted by the EPA in 1988....

The plate and frame filters would regularly "squirt oil all over the place" in the course of day-to-day operations....

Former process operators testified that the inferior and outdated equipment used to recycle the waste oil contributed heavily to the persistent discharge of contaminants onto the site.... Broken or leaking process equipment was not repaired or replaced unless absolutely necessary.... In fact, leaking pumps were a facet of everyday operations at the plant....

Plant operators and supervisors have testified at length concerning the ongoing failure of [facility] personnel from 1967 to 1988 to keep the site clean by failing to: empty buckets full of oil; pump oil out of the catch basins designed to contain runoff and rainwater; and clean up spilled oil and oil leaking onto the ground from trucks, pumps and plant machinery....

Oily water regularly and routinely ran over from tanks, valves, dump trucks, catch basins and earthen berms.... Back-ups of oily water in the east tank area and the wrecking yard to the extreme far north of the site occurred systematically....

[T]wo large retention areas in the northwest portion of the Ekotek site experienced frequent overflows of oil that contaminated the soil....

Fireman's Fund Mem. at 9–18, ¶¶ 18, 20–21, 28, 35–36, 38–39 (citations omitted). *Accord,* Defendant Liberty Mutual Insurance Company's Memorandum in Support of Motion for Summary Judgment, dated January 14, 1992 ("Liberty Mutual Mem.") at 11–27, ¶¶ 8–47.

It is uncontroverted that as a consequence of numerous such incidents occurring during the years the Ekotek facility was in operation, the soil at the Ekotek Site as well as surface water and ground water on and near the Ekotek Site have become significantly contaminated with oil and other toxic substances:

The volatile organic data indicates that soils and groundwater are contaminated with both petroleum and chlorinated volatile compounds. . . .

. . . .

The oil and grease analysis likewise indicates a pattern of contamination with oil that extends site[-]wide and beyond. . . .

. . . .

Soils, liquids and sludges over much of the site are contaminated with petroleum and petroleum[-]derived volatile and semi-volatile compounds.

The soil, sludges and groundwater at the site are also contaminated with compounds not typically associated with petroleum hydrocarbons including chlorinated volatile organic compounds (especially TCE and PCE) and PCBs (Aroclor 1260). . . .

Office of Emergency & Remedial Response, U.S. Environmental Protection Agency, *Final Report for Petrochem Site Investigation, Salt Lake City, Utah* (annexed as Exhibit 10 to the Fireman's Fund Mem), at §§ 4.0, 5.0. "Contaminated soils and sediments, as well as contaminants within the shallow ground water aquifer, remain at the Site." EPA Region VIII, Superfund Program Fact Sheet: Petrochem Recycling Corp./Ekotek, Inc. Superfund Site, at 1 (September 1992). *See* Quaker State Mem. at 4, ¶¶ 8–9.

Acting pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9657, the EPA commenced "response" activities involving the Ekotek Site beginning in 1988. The EPA has taken the position that the Ekotek Site qualifies as a CERCLA "facility" (§ 9601(a)) because of its contamination with "hazardous substances" (§ 9601(a)(14)) and that "responsible parties" (§ 9607(a)), including Quaker State, are liable for "response" costs incurred through cleanup efforts at the Ekotek site. *See* EPA Administrative Order on Consent for Remedial Investigation/Feasibility Study, dated

July 10, 1992, (Docket No. CERCLA (106) VIII–92–21) (annexed as Exhibit 5 to the Fireman's Fund Mem.), at 8. By February 1992, the EPA had formally identified 470 entities as "potentially responsible parties" ("PRP"s) in connection with the Ekotek Site, 129 of which had agreed to participate in response activities in accordance with the EPA's Administrative Order on Consent (AOC). EPA Region VIII, Superfund Program Fact Sheet: Petrochem Recycling Corp./Ekotek, Inc. Superfund Site 1 (September 1992). Responsible parties may be held strictly, jointly and severally liable under CERCLA for the costs of response and clean-up. *See generally,* Barr, *CERCLA Made Simple: An Analysis of Cases Under the Comprehensive Environmental Response, Compensation and Liability Act of 1980,* 45 Bus.Law. 923, 968–83 (1990). Further, pursuant to section 105 of CERCLA, 42 U.S.C. § 9605, the Ekotek Site was proposed for placement on the EPA's National Priorities List, or "Superfund List," on July 29, 1991, (*see* 55 Fed.Reg. 35844 (1991)); "Petrochem Recycling Corp./Ekotek, Inc." has since been placed on that list, along with seven other "Superfund" sites found in Utah. 40 C.F.R. Part 300, App. B, at 208 (1993).

Quaker State and a number of other businesses identified by EPA as potentially responsible parties under CERCLA formed the Ekotek Site Remediation [2] Committee, which pursuant to the Administrative Order on Consent entered into with EPA, has funded clean-up activities at the Ekotek Site. By affidavit, Quaker State indicates that as of January 15, 1993, the Committee had expended approximately $10,000,000.00 to pay costs incurred in removing waste materials, equipment and machinery from the Ekotek Site. Affidavit of Shane Smoot, dated January 15, 1993, at ¶ 7. Quaker State estimates that the cost of further investigation, planning and total cleanup of the Ekotek site will exceed $60,000,000.00. *Id.* at ¶¶ 8–9.

---

**2.** The process of cleaning up a site containing soil and water contaminated with toxic or hazardous waste has come to be referred to as "remediation," a synthetic noun heretofore largely unknown to the legal lexicon outside of educational matters, (*see, e.g., Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Frederick L. v. Thomas,* 419 F.Supp. 960, 966 (E.D.Pa.1976); *Merriken v. Cressman,* 364 F.Supp. 913 (E.D.Pa.1973)), at least until ca. 1984. *See, e.g., State of New York v. General Electric Co.,* 592 F.Supp. 291 (N.D.N.Y.1984).

At the times pertinent to this action, Quaker State has maintained an array of policies of comprehensive general liability insurance and primary garage liability insurance, as well as excess, or umbrella policies, all purchased from one or more of the defendants. Not surprisingly, Quaker State is looking to its liability insurance coverage to defray Quaker State's share of the actual and expected costs of cleaning up the Ekotek Site, for which Quaker State assumes liability as a "responsible party" under CERCLA. Quaker State suggests that it had no actual knowledge of the activities at the Ekotek Site which resulted in the contamination. Quaker State Mem. at 9, ¶ 23. Since it has not engaged in the knowing or intentional pollution of the Ekotek Site, Quaker State argues, its strict statutory liability under CERCLA for response and clean-up costs cannot fall within any exclusion or limitation of coverage under the insurance policies purchased from the defendants which otherwise would operate to deny coverage arising from deliberate contamination of the environment. *Id.* at 34–57. Quaker State commenced this action to enforce defendants' obligations to indemnify and defend Quaker State under the terms of their policies.

The summary judgment motions address a series of issues concerning the existence and extent of insurance coverage available to Quaker State: (1) whether "damages" covered under defendants' policies extends to costs of the kind incurred by Quaker State in connection with the cleanup of the Ekotek Site (*see* Part II, *infra*); (2) whether the hazardous waste contamination at the Ekotek Site resulted from an "occurrence" within the meaning of defendants' policies (*see* Part III, *infra*); (3) whether the defendants' duty to defend under their liability policies is triggered by administrative action taken by the

United States Environmental Protection Agency (EPA), where no civil action, or lawsuit, has been filed in court (*see* Part IV, *infra*); (4) whether coverage is excluded by the standard pollution exclusion clause in defendants' comprehensive general liability policies, or whether the discharge of drain oil, acid sludge and other materials by Ekotek comes within the "sudden and accidental" exception to that exclusion (*see* Part V, *infra*); and (5) whether defendants' "garage policies" extend coverage to liability for cleanup costs arising out of discharge of waste oil at third-party-owned sites outside of the garage premises (*see* Part VI, *infra*).[3]

## I. SUMMARY JUDGMENT.

The Tenth Circuit summarized the principles governing summary judgment in a recent case, *Jensen v. Kimble*, 1 F.3d 1073 (10th Cir.1993):

> Rule 56(c) permits summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In analyzing whether summary judgment is appropriate, we must view the evidence in the light most favorable to the non-moving party. *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991).

*Id.* at 1076. "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).[4] The

---

3. Various defendants also raise additional conditions precedent to coverage as grounds for their respective summary judgment motions. *See, e.g.,* Liberty Mutual Mem., at 37–42, 80–88.

4. The moving party's burden under Rule 56 has been described as two-fold:
 > This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party....

> The court need not decide whether the moving party has satisfied his ultimate burden of persuasion unless and until the court finds the moving party has discharged its initial burden of production. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–161, 90 S.Ct. 1598, 1608–1610, 26 L.Ed.2d 142 (1970); 1963 Advisory Committee's Notes on Fed.Rule Civ.Proc. 56(e), ...

*Celotex*, 477 U.S. at 330–31, 106 S.Ct. at 2556 (Brennan, J., dissenting).

initial burden of production imposed by Rule 56(c) requires the moving party to make a prima facie showing that it is entitled to summary judgment. 10A CHARLES A. WRIGHT & ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 2727, at 121 (2d ed. 1983). If the moving party will bear the burden of persuasion at trial on the claim addressed by the motion, "that party must support its motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial." *Celotex*, 477 U.S. at 331, 106 S.Ct. at 2556 (Brennan, J., dissenting). Where the *nonmoving* party bears the burden of persuasion at trial on the claim or issue addressed by the motion,[5] *Celotex* instructs that the moving party may meet its initial burden "by 'showing'—that is, pointing out to the district court—that *there is an absence of evidence* to support the nonmoving party's case." 477 U.S. at 325, 106 S.Ct. at 2554 (emphasis added); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). "[W]e find no express or implied requirement in Rule 56," the Court explained, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original).

Once the moving party has met its initial burden,[6] "the burden shifts back to the nonmoving party to show that there is a genuine issue of material fact. *Bacchus*, 939 F.2d at 891. To discharge its burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions

on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e))." *Jensen v. Kimble*, 1 F.3d at 1077.

As the Court explained in *Celotex:*

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

477 U.S. at 322, 106 S.Ct. at 2552.

Under Utah law, "[t]he interpretation of an unambiguous contract is a question of law to be determined by the court and may be decided on summary judgment. As a general rule, "The construction of an insurance policy is a matter of law." *Grimes v. Swaim*, 971 F.2d 622, 623 (10th Cir.1992). If the policy language is clear and unambiguous, the court must construe it according to its plain and ordinary meaning." *Utah Power & Light Co. v. Federal Ins. Co.*, 983 F.2d 1549, 1553 (10th Cir.1993) (citations omitted).

 Treated as a matter of law, the construction of an insurance contract can be resolved by the Court in the context of a motion for summary judgment. *Adams–Arapahoe Joint School District v. Continental Ins. Co.*, 891 F.2d 772, 774 (10th Cir. 1989). Contract construction remains a question of law even though the parties may disagree about the meaning of the contract, or even though one party may claim that the contract is ambiguous. *Gomez v. American*

---

**5.** If the burden of persuasion at trial would be on the *nonmoving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. See 10A Wright § 2727, pp. 130–131; Louis, Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L.J. 745, 750 (1974).... If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving

party is entitled to summary judgment as a matter of law. *Anderson v. Liberty Lobby, Inc., ante,* [477 U.S. 242] at 249 [106 S.Ct. 2505, 91 L.Ed.2d 202] [(1986)]."
477 U.S. at 331, 106 S.Ct. at 2556 (Brennan, J., dissenting).

**6.** "If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the court need not consider whether the moving party has met its ultimate burden of persuasion." *Celotex*, 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting).

*Electrical Power Service Corp.,* 726 F.2d 649, 651–52 (10th Cir.1984).

## II. RESPONSE AND REMEDIATION COSTS UNDER CERCLA AS "DAMAGES" UNDER DEFENDANTS' CGL POLICIES.

■ Several of the insurance policies at issue in this case are comprehensive general liability, or CGL policies. CGL policies "are standard insurance policies developed by insurance industry trade associations, and these policies are the primary form of commercial insurance coverage obtained by businesses throughout the country." *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.,* 636 So.2d 700, 702 (1993). In their policies, the defendant insurers promise to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage...."

"Damages" is not specially defined by the policies. The defendants now suggest that their promise to pay "damages" does not extend to Quaker State's share of the environmental clean-up costs incurred at the Ekotek Site because those costs are not true legal "damages."

Conversely, Quaker State asserts that the payment EPA seeks under CERCLA, *viz.,* the costs of restoring real property to its natural state, has long been recognized as a measure of legal damages, citing among other authorities, *Ault v. Dubois,* 739 P.2d 1117, 1120 (Utah Ct.App.1987), and *Thorsen v. Johnson,* 745 P.2d 1243, 1244–45 n. 1 (Utah 1987). Policy terms, Quaker State asserts, should be given their plain and commonly understood meaning in ordinary usage, and "damages" as plainly and ordinarily understood, encompasses CERCLA remediation costs as compensation or "estimated reparation in money." Quaker State Mem. at 59–60 (quoting *Webster's Third New International Dictionary* 571 (1986)). No distinction should be made, Quaker State contends, between common-law damages and payments made in compliance with an equitable remedy. *Id.* at 61 (citing *AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 826 nn. 11, 12, 799 P.2d 1253, 1259 nn. 11, 12 (1990)). *See also Aetna Casualty & Sur. Co. v. Pintlar Corp.,* 948 F.2d 1507, 1512–13 & n. 4 (9th Cir.1991). Nor should any distinction be made between judicial and administrative remedies. *Id.* at 62.

Quaker State cites to one unpublished Utah district court opinion [7] and a string of state [8] and federal [9] cases from other jurisdictions standing for the proposition that "damages" for the purpose of CGL coverage includes environmental response costs. *See also Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 75 (E.D.Mich.1987) ("'damages' include money spent to clean up environmental contamination").

7. *Sharon Steel Corp. v. Aetna Casualty & Sur. Co.,* Civil Nos. C–87–2306 & C–87–2311 (Third Dist. Ct., Utah July 20, 1988), *slip op. amended* (Mar. 9, 1989).

8. *Outboard Marine Corp. v. Liberty Mutual Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992); *Coakley and Coakley Landfill, Inc. v. Marine Bonding & Casualty Co.,* 136 N.H. 402, 618 A.2d 777 (1992); *AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 826 nn. 11, 12, 799 P.2d 1253, 1259 nn. 11, 12 (1990); *Aerojet General Corp. v. Superior Court,* 211 Cal. App.3d 216, 257 Cal.Rptr. 621 (1989); *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Engineering Co.,* 326 N.C. 133, 388 S.E.2d 557 (1990); *Boeing Co. v. Aetna Casualty & Sur. Co.,* 113 Wash.2d 869, 784 P.2d 507 (1990); *A.Y. McDonald Indus., Inc. v. Insurance Co. of North America,* 475 N.W.2d 607 (Iowa 1991); *Hazen Paper Co. v. United States Fidelity & Guar. Co.,* 407 Mass. 689, 555 N.E.2d 576 (1990); *Minneso-*

*ta Mining & Mfg. Corp. v. Travelers Indem. Co.,* 457 N.W.2d 175 (Minn.1990); *Compass Ins. Co. v. Cravens, Dargan & Co.,* 748 P.2d 724 (Wyo. 1988); *United States Fidelity & Guar. Co. v. Specialty Coatings Co.,* 180 Ill.App.3d 378, 129 Ill. Dec. 306, 535 N.E.2d 1071 (1989), *app. denied,* 127 Ill.2d 643, 136 Ill.Dec. 609, 545 N.E.2d 133 (1989); *CPS Chem. v. Continental Ins.,* 222 N.J.Super. 175, 536 A.2d 311 (1988); *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.,* 218 N.J.Super. 516, 528 A.2d 76 (1987); *Waste Management Carolinas, Inc. v. Peerless Ins., Inc.,* 72 N.C.App. 80, 323 S.E.2d 726, *rev'd on other grounds,* 315 N.C. 688, 340 S.E.2d 374 (1984); *United States Aviex Co. v. Travelers Ins. Co.,* 125 Mich.App. 579, 336 N.W.2d 838 (1983).

9. *Intel Corp. v. Hartford Acc. & Indem. Co.,* 952 F.2d 1551 (9th Cir.1991); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.,* 944 F.2d 940 (D.C.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1777, 118 L.Ed.2d 435 (1992).

Defendants rely on cases such as *Continental Ins. Co. v. Northeastern Pharmaceutical & Chem. Co.*, 842 F.2d 977 (8th Cir.) (en banc) (applying Missouri law), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (*"NEPACCO"*), and *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987) (applying Maryland law), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988) (*"Armco"*), as expressing the "better reasoned approach" construing "damages" as distinguishing legal claims for monetary damages from costs incurred in response to equitable remedies, including environmental response costs under CERCLA. *See* "Defs. Joint Mem." at 32 & n. 16.[10] In *Armco*, the Fourth Circuit postulated that "[b]lack letter insurance law holds that claims for equitable relief are not claims for damages under liability insurance contracts," and opined that it would be "a great step, and a dangerous one, for courts to begin to construe insurance policies to encompass costs of compliance with injunctive and reimbursement relief." 822 F.2d at 1351, 1353. As used "in the insurance context," the Fourth Circuit concluded, the term "damages" means "damages in the legal sense." *Id.* at 1354.[11] In *NEPACCO*, the Eighth Circuit followed *Armco*:

> In the insurance context, ... the term "damages" is not ambiguous, and the plain meaning of the term "damages" as used in the insurance context refers to legal damages and does not include equitable monetary relief. See *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d [1348] at 1352 [ (4th Cir.1987) ]. The CGL policies require Continental to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies caused by an occurrence." (Emphasis added.) "The obligation of the insurer to pay is limited to 'damages,' a word which has an accepted technical meaning in law." [*Aetna Casualty & Surety Co. v.*] *Hanna*, 224 F.2d [499] at 503 [ (5th Cir.1955) ]. Although not defined in the CGL policies, "[t]he word 'damages' is not ambiguous in the insurance context. Black letter insurance law holds that claims for equitable relief are not claims for 'damages' under liability insurance contracts."

842 F.2d at 986 (quoting *Maryland Casualty Co. v. Armco, Inc.*, 643 F.Supp. 430, 432 (D.Md.1986)).

Further, defendants point to the separate enumeration of "all costs of removal or remedial action" and "any other necessary costs of response" and "damages for injury to, destruction of, or loss of natural resources ..." found in § 107(a)(4)(A), (B) and (C) of CERCLA as evidencing purposeful distinction between "damages" and other CERCLA remedies. Defs.Joint.Mem. at 36–37. In *NEPACCO*, the Eighth Circuit took pains to differentiate the various remedies available under CERCLA, explaining that "[t]he type of relief sought is critical to the insured and the insurer, because under the CGL policies the insurer is liable only for legal damages, not for equitable monetary relief, such as cleanup costs." 842 F.2d at 987.

---

**10.** Defendants also cite to *Crist v. Insurance Co. of North America*, 529 F.Supp. 601 (D.Utah 1982) (J. Winder), as supporting the view that costs associated with equitable relief are not "damages" for insurance purposes. Defs. Joint Mem. at 31. That opinion does not directly address the issue of coverage under the professional malpractice and liability policies at issue in *Crist*. The court simply observes that the insurer's duty to defend in that case "applies, under the terms of the policies, to the damages claims and not to claims seeking an injunctive form of relief." 529 F.Supp. at 604. *Crist* may have some bearing upon the question of an insurer's duty to defend and its liability for defense costs in failing to do so. *See id.* at 604–05; Part IV, *infra*.

**11.** *Armco's* authority has been eroded by subsequent developments. In *Bausch & Lomb, Inc. v. Utica Mutual Ins. Co.*, 330 Md. 758, 625 A.2d 1021 (Ct.App.1993), the Court of Appeals of Maryland declined to adopt the Fourth Circuit's prediction of Maryland law: "To the extent that it suggests that the term 'damages' imports a distinctively legal meaning in insurance matters, *Armco* misperceives the law of Maryland. As discussed earlier, we accord to words their usual and accepted signification. 'Damages' in common usage means the reparation in money for a detriment or injury sustained. The reasonably prudent layperson does not cut nice distinctions between the remedies offered at law and in equity...." 330 Md. at 781–82, 625 A.2d at 1032–33.

Defendants also contend that environmental response costs cannot be treated as "damages" under Utah law, particularly where those costs exceed the diminution in the market value of the property caused by the contamination. They cite to two cases relied upon by Quaker State, *Ault v. Dubois,* 739 P.2d 1117 (Utah Ct.App.1987), and *Thorsen v. Johnson,* 745 P.2d 1243 (Utah 1987), as standing for the proposition that "costs of restoration may not be used as a measure of damages if such costs exceed the loss of value (*i.e.,* damages) sustained by the injured party." Defs. Joint Mem. at 38–39.

The rule of *Ault* and *Thorsen* has been summarized as follows:

> Generally, the measure of damages for tortious injury to real property is the difference between the value of the property immediately before and immediately after the injury. *Thorsen v. Johnson,* 745 P.2d 1243, 1244–45 (Utah 1987); *Ault v. Dubois,* 739 P.2d 1117, 1120 (Utah App.1987); *see also Pitts v. Pine Meadow Ranch, Inc.,* 589 P.2d 767, 769 (Utah 1978). An alternative measure is the cost of restoration, provided that restoration costs do not exceed diminution in value. *See Thorsen,* 745 P.2d at 1244–45 n. 1; *Ault,* 739 P.2d at 1120.

*Henderson v. For–Shor Co.,* 757 P.2d 465, 471 (Utah Ct.App.1988). Of course, *Ault* and *Thorsen* are speaking of damages in the *legal* sense. The argument advanced by the defendants simply begs the question whether "damages" as used in their CGL policies, read in light of Utah law, refers to damages in that sense. Moreover, in relying on *Ault* and *Thorsen,* defendants logically may be forced to concede that at least up to the point that the diminution in value of the property is exceeded, costs of restoration recoverable by EPA under CERCLA *are* legal damages

within their own theory of coverage. *See, e.g., Federal Insurance Company v. Susquehanna Broadcasting Company,* 727 F.Supp. 169 (M.D.Pa.1989); T. Myers, *Insurance Coverage for CERCLA Cleanup Costs: Resolving the Intercircuit Conflict,* 45 ARK. L.REV. 747 (1992).

In *NEPACCO,* the Eighth Circuit noted that "from the viewpoint of the lay insured, the term 'damages' could reasonably include all monetary claims, whether such claims are described as damages, expenses, costs, or losses." 842 F.2d at 985.[12] From this language, Quaker State argues that *NEPACCO,* if anything, indicates the Utah Supreme Court would *not* adopt the narrow, technical reading of "damages" urged by the defendants. Quaker State Opp.Mem. at 85. Quaker State points to cases such as *LDS Hospital v. Capitol Life Ins. Co.,* 765 P.2d 857 (Utah 1988), which in considering the use of the term "accident" in policy language, said:

> "[W]e are guided by the principle that it is the common understanding of the term which must be used and not its technical meanings. The insurance company may, of course, insert in its policy any definition of 'accident' it chooses but, in the absence of doing so, it must accept the common understanding of the term by the ordinary member of the purchasing public."

765 P.2d at 861 (quoting *Harbeintner v. Crown Life Ins. Co.,* 46 Or.App. 579, 612 P.2d 334, 335 (1980)). Thus, Quaker State contends, absent a specific definition in the defendants' CGL policies, "damages" should be construed according to "the common understanding of the term by the ordinary member of the purchasing public" and that as *NEPACCO* suggests, "damages" would "include all monetary claims, whether such claims are

---

**12.** The quoted observation was made in the context of a discussion of whether "damages" was ambiguous:

> Viewed outside the insurance context, the term "damages" is ambiguous: it is reasonably open to different constructions. Webster's Third New International Dictionary 571 (1971) defines "damages" as "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for wrong or injury caused by a viola-

tion of a legal right." The dictionary definition does not distinguish between legal damages and equitable monetary relief. E.g., *New Castle County v. Hartford Accident & Indemnity Co.,* [673 F.Supp. 1359], at 1366 [ (D.Del. 1987) ]. Thus, from the viewpoint of the lay insured, the term "damages" could reasonably include all monetary claims, whether such claims are described as damages, expenses, costs, or losses.

*Id.*

described as damages, expenses, costs, or losses," including CERCLA remediation expenses.

In *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 944 F.2d 940 (D.C.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1777, 118 L.Ed.2d 435 (1992), the United States Court of Appeals for the D.C. Circuit departed from *NEPACCO*'s reading of Missouri law on the issue of covered "damages." Noting that the Missouri cases, *inter alia,* mandate that "[m]eaning of words or terms in an insurance contract is tested by common understanding," and that a conflicting technical meaning of a word shall not be applied "unless it plainly appears that the technical meaning is intended," the D.C. Circuit observed:

> Our difficulty with *NEPACCO* is that it fails to apply these Missouri law principles....
>
> Liability for environmental cleanup costs quite naturally fits this common and ordinary understanding of damages....
>
> [W]ith the exception of NEPACCO, in every case in which the operative state's rules of insurance contract interpretation required—as Missouri's does—resort to the common and ordinary understanding of language, the word "damages" has been construed to cover reimbursement for environmental response costs.... Decisions construing the term differently were apparently governed by state rules of interpretation under which the technical or legal meanings of language controlled.

944 F.2d at 946 (citations omitted).[13] The D.C. Circuit concluded that under Missouri law, "damages" as commonly understood "includes costs the insured is legally obligated to pay ... as reimbursement for [state and federal] activities in remedying environmental harm." *Id.* at 947.

More recently, *Morton International, Inc. v. General Accident Insurance Co. of America,* 134 N.J. 1, 629 A.2d 831 (1993), reached the same conclusion, applying New Jersey law: "The clear weight of authority, however, among both federal and state courts adopts the view that the undefined term 'damages' in CGL policies should be accorded its plain, non-technical meaning, thereby encompassing response costs imposed to remediate environmental damage...." 134 N.J. at 25–26, 629 A.2d at 845 (citations omitted).[14]

---

13. The D.C.Circuit also rejected the insurers' argument that CERCLA should be read to distinguish "response costs" from "damages:"

> It is of no consequence that CERCLA lists separately liability for "all costs of removal or remedial action incurred by the United States Government or a State" (42 U.S.C. § 9607(a)(4)(A)), and liability for "damages for injury to, destruction of, or loss of natural resources" (*id.* § 9607(a)(4)(C)). Other sections treat response costs as a subset of damages. CERCLA provides, for example, that the measure of "damages to natural resources" shall "not be limited to the sums which can be used to replace or restore such resources." 42 U.S.C. § 9607(f)(1). Moreover, courts that have interpreted CERCLA do not seem to distinguish governmental cleanup costs from "damages." The Supreme Court characterized section 107 as providing "liability in damages," and concluded that CERCLA "hold[s] States liable in damages in federal court." *Pennsylvania v. Union Gas. Co.*, 491 U.S. 1, 12, 13, 109 S.Ct. 2273, 2280, 2281, 105 L.Ed.2d 1 (1989). Other courts have also identified CERCLA claims for relief as including cleanup costs "or other damages." ...

*Id.* at 947 (citations omitted).

14. *Morton* cites the following cases: *Aetna Casualty & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1513 (9th Cir.1991) (applying Idaho law); *Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023, 1030 (2d Cir.1991) (applying Vermont law), *cert. denied,* —— U.S. ——, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 944 F.2d 940, 947 (D.C.Cir.1991) (applying Missouri law), *cert. denied,* —— U.S. ——, 112 S.Ct. 1777, 118 L.Ed.2d 435 (1992); *New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1184–91 (3d Cir.1991) (applying Delaware law), *on remand,* 778 F.Supp. 812 (D.Del.1991), *rev'd on other grounds,* 970 F.2d 1267 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993); *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1207 (2d Cir.1989) (applying New York law), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); *Township of Gloucester v. Maryland Casualty Co.*, 668 F.Supp. 394, 400 (D.N.J.1987) (applying New Jersey law); *AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 834–45, 799 P.2d 1253, 1267–78 (1990); *Aerojet-General Corp. v. Superior Court,* 211 Cal.App.3d 216, 257 Cal.Rptr. 621, 628 (1989); *A.Y. McDonald Indus., Inc. v. Insurance Co. of North America,* 475 N.W.2d 607, 615–22 (Iowa 1991); *Hazen Paper Co. v. United States Fidelity & Guar. Co.*, 407 Mass. 689, 555 N.E.2d 576, 582–84 (1990); *United States Aviex Co. v. Travelers Ins.*

Utah law approaches the reading of insurance policies as follows:

> Generally, the interpretation of insurance policy language presents a question of law to be decided by the trial judge using accepted methods of construction. Specifically, the terms of insurance contracts, as well as all contracts, are to be interpreted in accordance with their usually accepted meanings and should be read as a whole, in an attempt to harmonize and give effect to all of the contract provisions. To protect against overreaching insurers and because courts construe contracts against their drafters, ambiguities in the policy are resolved in favor of coverage. Policy language is ambiguous if it is not " 'plain to a person of ordinary intelligence and understanding, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, including the purpose of the policy.' "

*Nielsen v. O'Reilly*, 848 P.2d 664, 665–66 (Utah 1992) (footnote omitted).[15] *Accord, United States Fidelity & Guar. Co. v. Sandt*, 854 P.2d 519, 522 (Utah 1993) ("ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage"). The "usually accepted meanings" of the words in an insurance policy are the ones found in common usage: " 'If a policy of insurance is clear and unambiguous, the words are to be taken and understood in their plain, ordinary and popular sense, as an average or reasonable person with ordinary understanding would construe them.' " *Perkins v. Great–West Life Assurance Co.*, 814 P.2d 1125, 1128–29 (Utah Ct.App.1991) (quoting *Draughon v. CUNA Mutual Ins. Soc'y*, 771 P.2d 1105, 1108 (Utah App.1989)); *accord, United States Fidelity & Guar. Co. v. Sandt*, 854 P.2d at 523 ("the language of an insurance contract must be interpreted as an ordinary purchaser of insurance would understand it").

Read in this fashion, legalistic distinctions between "legal" and "equitable" remedies appear to be immaterial.[16] As the Ninth Circuit explained in *Aetna Casualty & Sur. Co. v. Pintlar Corp.*, "Any definition of 'damages' which is grounded upon the ancient division between law and equity—such as the definition now proffered by the insurers—would hardly be an 'ordinary and accepted meaning' in the eyes of a reasonably prudent lay person." 948 F.2d at 1513 (citations omitted). Similarly, in *Bausch & Lomb, Inc. v. Utica Mutual Ins. Co.*, 330 Md. 758, 625 A.2d 1021 (Ct.App.1993), the Court of Appeals of Maryland said:

> Absent an express provision in the document itself, insurance policy-holders
>
> surely do not anticipate that coverage will depend upon the mode of relief, i.e., a cash payment rather than an injunction, sought by an injured party. Policy-holders will, instead, reasonably infer that the insurer's pledge to pay damages will apply generally to compensatory outlays of various kinds, including expenditures made to comply with administrative orders or formal in-

---

Co., 125 Mich.App. 579, 336 N.W.2d 838, 842–43 (1983); *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 179–84 (Minn.1990); *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g Co.*, 326 N.C. 133, 388 S.E.2d 557, 565–69 (1990); *Boeing Co. v. Aetna Casualty & Sur. Co.*, 113 Wash.2d 869, 784 P.2d 507, 510–15 (1990); *Compass Ins. Co. v. Cravens, Dargan & Co.*, 748 P.2d 724, 729–30 (Wyo.1988).

To *Morton's* list one could add the following: *Bausch & Lomb, Inc. v. Utica Mutual Ins. Co.*, 330 Md. 758, 781–82, 625 A.2d 1021, 1032–33 (Ct.App.1993).

**15.** *See also LDS Hosp. v. Capitol Life Ins. Co.*, 765 P.2d 857, 858 (Utah 1988); *Buehner Block Co. v. UWC Assocs.*, 752 P.2d 892, 895 (Utah 1988); *Allen v. Prudential Property and Casualty Ins. Co.*, 839 P.2d 798, 806–807 (1992); *Hoffman v. Life Ins. Co. of North Am.*, 669 P.2d 410, 417 (Utah 1983); *Phillips v. Utah Local Gov'ts Trust*, 660 P.2d 249, 250 (Utah 1983); *Auto Lease Co. v. Central Mutual Ins. Co.*, 7 Utah 2d 336, 325 P.2d 264, 266 (1958).

**16.** *United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 734 F.Supp. 437 (D.Kan.1990), commented that "[a]s commonly used in the law, damages are distinct from equitable relief or restitution," and consistent with *NEPACCO*, that "CERCLA response costs are not recoverable under CGL insurance." 734 F.Supp. at 449, 450. In affirming summary judgment in favor of the insurer based upon the pollution exclusion, however, the Tenth Circuit did not discuss the district court's view of "damages." *United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 999 F.2d 489, 492–93 (10th Cir.1993).

junctions. The ordinary person understands "damages" as meaning money paid to make good an insured loss. In this context, environmental response costs fall within that definition.

330 Md. at 782, 625 A.2d at 1033 (footnote omitted). The Maryland court correctly points out that "damages," as commonly, plainly or ordinarily understood, is not without limits: "The payment of damages—even broadly defined—remains distinct from other expenditures, such as fines, penalties, or assessments, which would not be covered under the CGL policy." *Id.* To the same effect, *see Independent Petrochemical,* 944 F.2d at 947.

As of the date of this memorandum opinion, the Utah courts have not yet addressed, in a reported case, the question of CERCLA response costs as "damages." Nevertheless, following the reasoning in cases such as *Independent Petrochemical, Morton,* and *Bausch & Lomb* in light of prior pronouncements by the Utah courts concerning insurance policy language,[17] it appears that the Utah courts would construe "damages" as used in defendants' CGL policies to encompass CERCLA environmental response costs.

To the extent the policies' reference to "damages" is ambiguous, the ambiguity must be resolved in favor of coverage. As the Utah Supreme Court explained in *LDS Hospital v. Capitol Life Ins. Co.:*

> [T]his Court, similar to courts in many jurisdictions, has long subscribed to the view that any ambiguity or uncertainty in the language of an insurance policy must be resolved in favor of coverage. Also, since the policy is drawn by the insurer, ambiguities are construed against that party. One acknowledged rationale underlying this sound determination is the need to afford the insured the protection he or she endeavored to secure by paying premiums....

765 P.2d at 858 (footnotes omitted). *See United States Fidelity & Guar. Co. v. Sandt,* 854 P.2d at 522 ("ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage"); *American Casualty Co. v. Eagle Star Ins. Co., Ltd.,* 568 P.2d 731, 734 (Utah 1977) ("[I]f an insurance policy is ambiguous or uncertain, so that it is fairly susceptible to different interpretations, any doubt should be resolved in favor of insurance coverage." (citations omitted)); *Perkins v. Great–West Life Assurance Co.,* 814 P.2d 1125, 1128 (Utah Ct.App.1991).

The proper query concerning ambiguity, as framed by the court in *LDS Hospital,* is " 'Would the meaning [of the language of the insurance contract] be plain to a person of ordinary intelligence and understanding, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in light of existing circumstances, including the purpose of the policy[?].' " *Id.* at 858–59 (quoting *Auto Lease Co. v. Central Mutual Ins. Co.,* 7 Utah 2d 336, 339, 325 P.2d 264, 266 (1958)). *See Dawson v. Dawson,* 841 P.2d 749, 751 (Utah Ct.App.1992). Posing that query in the context of this action, the Court is satisfied that the meaning of "damages," viewed as *LDS Hospital* instructs, would be "plain to a person of ordinary intelligence and understanding." Its plain meaning to such a person would not carry the more subtle, fine-tuned legal distinctions now urged herein by the defendant insurers; it would, as *NEPACCO* suggests, "include *all monetary claims,* whether such claims are described as damages, expenses, costs, or losses." 842 F.2d at 985 (emphasis added).

If, as Quaker State insists, "an insured is entitled to the broadest protection he could have reasonably understood to be provided by the policy," (*Fuller v. Director of Finance,* 694 P.2d 1045, 1047 (Utah 1985)[18]), it

---

**17.** *See, e.g., United States Fidelity & Guar. Co. v. Sandt,* 854 P.2d 519, 521 (Utah 1993); "Since 1921 this Court has expressed its commitment to the principle that 'insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance." (Citations omitted.)

**18.** Defendants' assertion that *Fuller* serves to limit "damages" to " 'compensation' ... of the type sought in traditional legal remedies," be-

follows that Quaker State should be entitled to the broadest protection that reasonably flows from the language of defendants' CGL policies, including coverage for "damages" in the form of expenses incurred in remedial action undertaken consistent with CERCLA requirements.[19]

## III. WHETHER RELEASES OF HAZARDOUS WASTE RESULTING IN PROPERTY DAMAGE AT THE EKOTEK SITE CONSTITUTE ONE OR MORE COVERED "OCCURRENCES."

### A. "Occurrence."

■ Defendants submit that under the insurance policies issued to Quaker State, coverage is available only in the event of an "occurrence," which is defined in the policies as:

an accident, including continuous or repeated exposure to conditions, which re-

sults in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

Fireman's Fund Mem. at 27 (quoting *id.* at Exhibit 19, Fireman's Fund "Master Policy: Minit–Lube" # MXP 5670727 (Sept. 1, 1983—Sept. 1, 1985)). They further contend that "[t]he intentional discharge of contaminants at the Ekotek Site in the regular course of business demonstrates that there was no 'accident' and hence, no 'occurrence,'" regardless of whether the property damage was "neither expected nor intended" from Quaker State's standpoint. Defs. Joint Mem. at 12.

Quaker State contends that as defined, "occurrence" excludes coverage "only for bodily injury or property damage actually expected or intended *by the insured,*" (Quaker State Mem. at 21 (emphasis in original)[20]), and that defendants have failed to carry their burden under Rule 56[21] to show that coverage is excluded under the definition of "oc-

cause it describes damages as "compensation in money *imposed by law* for loss or injury," (Defs. Joint Mem. at 31–32, quoting *Fuller* at 1047·and adding emphasis), simply overloads the *Fuller* court's phraseology.

**19.** The parties have made no substantive effort in the present motions to divide or apportion the actual response costs incurred at the Ekotek Site between expenses arising from restorative work associated with "property damage," *i.e.,* actual contamination at the site, and those arising out of purely preventative activities, *e.g.,* removal of tanks, drums and containers of hazardous waste which has not yet been released or discharged onto the land or into the water. It has been suggested that purely preventative expenditures do not constitute "damages" within CGL policy coverage; they are not restorative costs for the damaged property of a third party, because, by definition, no "damage" has yet occurred. *See* G. Reynolds, Comment, *Comprehensive General Liability Coverage of CERCLA Cleanup Costs: A Proposed Guide to Interpretation,* 2 MD.J.CONTEMP.LEGAL ISSUES 33 (1991). This Court expressly reserves the question of CGL coverage of response costs associated with purely preventative measures for determination upon a more appropriate record.

**20.** Quaker State cites to *James Graham Brown Foundation, Inc. v. St. Paul Fire and Marine Ins. Co.,* 814 S.W.2d 273, 278 (Ky.1991), and *Hecla · Min. Co. v. New Hampshire Ins. Co.,* 811 P.2d 1083 (Colo.1991). However, *Hecla* involved pollution caused by the insured's mining activities, rather than that of a third party to whom hazard-

ous waste had been transferred. Likewise, *City of Johnstown v. Bankers Standard Ins. Co.,* 877 F.2d 1146 (2d Cir.1989), quoted and relied upon by the Colorado court in *Hecla,* involved Johnstown's CERCLA liability arising out of its operation of a municipal landfill. References in those opinions to, *e.g.,* "the insured's intentional act," must thus be read in that context. The court in *Brown Foundation,* noting that the insured had operated the toxic sites in question for a relatively brief period, observed that "[o]ne who is statutorily vicariously liable for the intentional act of another cannot be denied coverage since the defendant does not possess the requisite intent to do injury." 814 S.W.2d at 277 (citing 1A R. LONG, THE LAW OF LIABILITY INSURANCE § 5.06 at 5–54 (1990)).

**21.** *See, e.g., Broderick Inv. Co. v. Hartford Accident & Indem. Co.,* 954 F.2d 601, 606 (10th Cir.1992) (insurer bears burden of proof that insured knew that disposal practices would cause environmental damage) (Colorado law); *Auto–Owners Ins. Co. v. Jensen,* 667 F.2d 714, 720 (8th Cir.1981) ("neither expected nor intended from the standpoint of the insured" is an exclusion for which the insurer bears the burden of proof re: applicability). Defendants dispute this, arguing that the insured bears the burden of proving that a claim comes within coverage under a policy, citing *Fischer & Porter Co. v. Liberty Mutual Ins. Co.,* 656 F.Supp. 132, 140 (E.D.Pa.1986). As explained below, the Court has concluded that the insured bears the burden of proof on "occurrence," including its "neither expected nor intended" limitation. *See* Part III.C *infra.*

currence" because they have failed "to point to any evidence in the record that [Quaker State] expected or intended to cause property damage at the Ekotek [S]ite ..." Quaker State Reply Mem. at 12. " 'The occurrence clause provides coverage when the damage was unexpected and unintended, though caused by an intentional act....' " *Id.* at 13 (quoting *New Castle County v. Hartford Accident & Indem. Co.,* 970 F.2d 1267, 1269 (3d Cir.1992)).

### B. History and Rules of Construction.

The adoption of the term "occurrence" to define coverage of a loss represents one step in the continuing evolution of standard CGL insurance policies:

> After 1966, the term "occurrence" replaced the term "accident," in the standard CGL policy as the event triggering coverage. The "occurrence" language is generally understood to offer broader coverage than that offered by the former term, "accident." 11 G. Couch, *Couch on Insurance 2d* § 44:285 at 437 (1982). The change to occurrence-based coverage was made in response to the need for coverage against damages resulting from continued or repeated exposure....

*United States Fidelity & Guar. Co. v. Morrison Grain Co.,* 734 F.Supp. 437, 443 (D.Kan. 1990); *accord,* 1 R. LONG, THE LAW OF LIABILITY INSURANCE § 1.21, at 1–88 (1990); 7A J. APPLEMAN, INSURANCE LAW AND PRACTICE §§ 4492–93 (Berdal ed. 1979).[22] Adopting the concept of "occurrence" in order to broaden the available coverage was wholly consistent with the overall purpose of a CGL policy:

> The primary purpose of a comprehensive general liability policy is to provide broad comprehensive insurance. Obviously the very name of the policy suggests the expectation of maximum coverage. Consequently the comprehensive policy has been one of the most preferred by businesses

and governmental entities over the years because that policy has provided the broadest coverage available. All risks not expressly excluded are covered, including those not contemplated by either party. See The Applicability of General Liability Insurance to Hazardous Waste Disposal, 57 S.Cal.Law Review 745 (1984).

*James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.,* 814 S.W.2d 273, 278 (Ky.1991). Moreover, "[c]ourts and commentators alike are in agreement that the term 'occurrence' is to be broadly and liberally construed in favor of extending coverage to the insured." *Id.* (citing *Buckeye Union Ins. Co. v. Liberty Solvent & Chem. Co., Inc.,* 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984)). As a general rule, "the insured is entitled to all the coverage he may reasonably expect under the policy. Only an unequivocal, conspicuous and plain and clear manifestation of the company's intent to exclude coverage will defeat this expectation." *Id.* at 277 (citations omitted); *accord, United States Fidelity & Guar. Co. v. Sandt,* 854 P.2d at 522–23.

### C. Burden of Proof.

 As the insured, Quaker State bears the burden of proving that its claim comes within the broad meaning of "occurrence" and thus comes within the coverage under an insurance policy. *See, e.g., Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Sur. Co.,* 817 F.Supp. 1136, 1143–44 (D.N.J. 1993) (definition of "occurrence" in CGL policy constitutes grant of basic coverage under policy, and insured bears the burden of proving all elements of the definition); *see generally, Blair v. Metropolitan Life Ins. Co.,* 974 F.2d 1219, 1221 (10th Cir.1992) (Oklahoma law); *McGee v. Equicor–Equitable HCA Corp.,* 953 F.2d 1192, 1205 (10th Cir.1992); *E–Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.,* 106 Wash.2d 901, 906, 726 P.2d 439, 443 (1986). *See also Morris v. Farmers*

**22.** Prior to 1966, the language employed to achieve a similar "exclusion" objective had been, generally, "bodily injury or property damage caused intentionally by or at the direction of the insured." The courts had experienced difficulties with this latter language insofar as it was being used to clarify the

concepts of "accident" and "accidental means," as those concepts appeared in policies prior to 1966.
Annotation, *Construction and Application of Provision of Liability Insurance Policy Expressly Excluding Injuries Intended or Expected by Insured,* 31 A.L.R.4th 957, 972 (1984).

*Home Mutual Ins. Co.,* 28 Utah 2d 206, 500 P.2d 505 (1972). The burden does not shift to the insurer to prove that an occurrence was intended or expected, though the insurer may interpose evidence of insured's knowledge to prevent the insured from meeting its burden. *Cf. Adams–Arapahoe Joint Sch. Dist. No. 28–J v. Continental Ins. Co.,* 891 F.2d 772, 778–79 (10th Cir.1989) (all-risk policy; Colorado law); *Queen City Farms, Inc. v. Central National Ins. Co. of Omaha,* 64 Wash.App. 838, 827 P.2d 1024, 1040–41 (1992); *but see Broderick Inv. Co. v. Hartford Accident & Indem. Co.,* 954 F.2d 601, 606 (10th Cir.1992) ("The district court properly assigned [insurer] the burden of proving [insured] knew its disposal practices would cause environmental damage.") (Colorado law).[23]

### D. "Neither expected nor intended ..."

Citing a string of authorities extending back to Cardozo,[24] Quaker State argues that "occurrence" depends upon whether the *property damage* was expected or intended, disputing the defendants' contention that there was no "occurrence" at the Ekotek Site because the *discharge* of pollutants was intended or expected by the operators at the Ekotek Site. Quaker State also argues that the question of point of view is decisive: emphasizing the language defining "occurrence" in terms of "property damage *neither expected nor intended from the standpoint of the insured,*" Quaker State submits that "[e]nvironmental damage to third-party property that occurs unbeknownst to the insured, and which the insured did not intend or expect, ... constitutes a covered 'occurrence.'" *Id.* at 12 (emphasis added in memorandum).[25] In effect, Quaker State contends that defendants have failed to carry their burden under Rule 56 to "point to any evidence in the record that [Quaker State] expected or intended to cause property damage

at the Ekotek site," or for that matter, intended any specific acts which resulted in property damage. *Id.*

Courts in other jurisdictions, considering the "neither expected nor intended" language in other factual contexts, are divided on the degree to which the insured must "intend" the harm, *viz.,* whether specific intent to cause the particular injury is required, or whether natural and probable consequences, or foreseeability of the harm is sufficient. *See* Annotation, *Construction and Application of Provision of Liability Insurance Policy Expressly Excluding Injuries Intended or Expected by Insured,* 31 A.L.R.4th 957, 983–999 (1984). While courts disagree as to the reading of "intended," they more consistently read "expected" to require "a high degree of certainty or probability." *Id.* at 999–1002.

The Utah Supreme Court has not yet addressed the meaning of "occurrence" in the context of a CGL policy. Recently, however, in *State Farm Fire & Casualty Co. v. Geary,* 869 P.2d 952 (Utah Ct.App.1994), the Utah Court of Appeals considered the meaning of "occurrence" in the context of a loss involving intentional conduct resulting in allegedly unintended harm. The issue arose under a homeowners liability policy providing coverage "for damages because of bodily injury or property damage ... caused by an occurrence." The policy defined "occurrence" as "an accident, including exposure to conditions, which results in" bodily injury or property damage. Under this definition, *Geary* said, coverage extends to "only those injuries to property or person resulting from an 'accident,' and not an intentional occurrence." *Id.* at 954. With "accident" as the starting point, the existence of a covered "occurrence" is determined first with reference to the conduct or event causing the injury (in *Geary,* the discharge of a shotgun in the victim's

**23.** The burden to establish coverage remains upon the insured even where the insurer commences a declaratory judgment action to resolve the question.. *See Utah Farm Bureau Inc. Co. v. Dairyland Ins. Co.,* 634 F.2d 1326 (10th Cir. 1980).

**24.** Quaker State quotes *Messersmith v. American Fidelity Co.,* 232 N.Y. 161, 165, 133 N.E. 432,

433 (1921) (Cardozo, J.): "Injuries are accidental or the opposite, for the purpose of indemnity, according to the quality of the results rather than the quality of the causes."

**25.** *Cf.* Liberty Mutual Mem. at 49 ("The 'occurrence' definition requires an analysis of whether pollution-caused 'property damage' was expected or intended from the standpoint of the insured.")

direction) rather than solely the injury itself (victim struck in the head, neck and chest with 132 pellets). Where the *act* causing injury is deliberate, there is no "accident" and therefore, no "occurrence;" it does not matter that the resulting *injury* was not intended or expected. *Id.*

Following the reasoning of *Geary,* intentional or deliberate conduct is not an "accident" and cannot constitute an "occurrence." That reasoning is decisive here, however, only if Quaker State cannot come forward with any evidence from which a reasonable fact finder could find the existence of one or more "accidents" that may constitute a covered "occurrence." Where there is significant probative evidence in the record from which a fact finder may conclude that Quaker State did not engage in intentional discharge of hazardous waste at the Ekotek Site,[26] defendants are not entitled to summary judgment under *Geary.*

Nor can the term "accident" be read in total isolation from the remainder of the policy definition of "occurrence." After all, "occurrence" was incorporated into CGL policy language to replace—and broaden—coverage which previously had been defined solely in terms of "accident." *See* Part III.B *supra.*

"Occurrence," as used in a CGL policy, should be construed more broadly than *Geary*'s reading of a homeowner's policy might suggest. Significant case authority supports the proposition that to be excluded from the definition of "occurrence," the *injury* must be intended or expected, rather than merely the specific conduct which causes the injury.[27] Several courts have held that "expected" and "intended" as used in the defini-

tion of "occurrence" are nearly synonymous, so that for all practical purposes the evidence must establish an insured's subjective intent to cause harm in order to defeat coverage. *See, e.g., City of Johnstown v. Bankers Standard Ins. Co.,* 877 F.2d 1146, 1150–51 (2d Cir.1989) ("Recovery will be barred only if the insured intended the damages, ... or ... the insured knew that the damages would flow directly and immediately from its intentional act, ..." [citations omitted]); *Queen City Farms, Inc. v. Central National Ins. Co. of Omaha,* 64 Wash.App. 838, 827 P.2d 1024, 1033–40 (1992); *United Services Auto Ass'n v. Elitzky,* 358 Pa.Super. 362, 517 A.2d 982 (1986); *Patrons–Oxford Mutual Ins. Co. v. Dodge,* 426 A.2d 888, 890–91 (Me.1981); *State Farm Fire & Casualty Co. v. Muth,* 190 Neb. 248, 207 N.W.2d 364, 366 (1973) ("The term 'expected' when used in association with 'intended' carries the connotation of a high degree of certainty or probability ..."); 7A J. APPLEMAN, INSURANCE LAW AND PRACTICE § 4492.02, at 26–38 (Berdal ed. 1979). *See also* Annotation, *Liability Insurance Coverage for Violations of Antipollution Laws,* 87 A.L.R.4th 444, 502–15 (1991).[28]

The Court is satisfied that insofar as CGL policy coverage of "occurrences" is concerned, a broader reading is appropriate, and Quaker State "is entitled to coverage under its policies unless it has specific and subjective intent to cause the pollution giving rise to the CERCLA claims." *Brown Foundation,* 814 S.W.2d at 278. *See also* 7A J. APPLEMAN, INSURANCE LAW AND PRACTICE § 4492.02 (Berdal ed. 1979) (expected and intended injuries flowing from intentional acts are excluded from coverage). "The 'expected or intended' exception is inapplicable

---

**26.** Indeed, Quaker State itself asserts the contrary proposition: "[T]here is no evidence whatsoever that [Quaker State] either knew or intended that any of the used oil it sent to the Ekotek Site would result in property damage.... There is likewise no evidence that [Quaker State] intentionally or otherwise discharged any pollutants onto the ground or into the environment." Quaker State Mem. at 22.

**27.** *See, e.g., Patrons–Oxford Mutual Ins. Co. v. Dodge,* 426 A.2d 888 (Me.1980); *International Minerals & Chem. Corp. v. Liberty Mutual Ins. Co.,* 168 Ill.App.3d 361, 371, 119 Ill.Dec. 96, 101, 522 N.E.2d 758, 764 (1988); *see also,* J. O'Leary,

*Current Trends in CGL Insurance Coverage for Environmental Claims: An Introduction to Some Key Coverage Issues,* in ENVIRONMENTAL COVERAGE: FROM INTERPRETATION TO LITIGATION, 1991 A.B.A. Sec. Tort. & Ins. 95, 104–08, and cases cited therein.

**28.** At least one case holds that there is no "occurrence" where prior to issuance of policy, the insured had received EPA letter advising insured of existence of contamination and possible liability. *Time Oil Co. v. Cigna Property & Casualty Ins. Co.,* 743 F.Supp. 1400 (W.D.Wash.1990) (Washington law).

unless the insured specifically and subjectively intends the injury giving rise to the claim." *Brown Foundation*, at 278.[29]

The Court has examined the defendants' citations to materials in the record (*see* Fireman's Fund Mem. at 44–50) which purport to show that the discharge of hazardous waste and resulting property damage at the Ekotek Site were the product of "intentional and, to a large extent, criminal conduct." Defs. Joint Mem. at 13. The referenced "intentional ... conduct" is almost exclusively that of the operators of the Ekotek Site, particularly principals in Ekotek, Inc., not Quaker State or its principals. There was no "accident" in *Geary* because the insured himself intentionally fired the shotgun, causing the injury and loss. Nothing in defendants' memoranda points to any incident at the Ekotek Site in which, in effect, Quaker State deliberately squeezed the hazardous waste discharge "trigger," causing the property damage at the Ekotek Site. Nor have defendants raised a genuine issue of material fact concerning whether the property damage at the Ekotek Site was "expected" or "intended" from the standpoint of Quaker State.[30]

While Quaker State may be held legally accountable for the actions of the Ekotek Site operators under CERCLA, it does not necessarily follow that the operators' intent or expectations are imputed to Quaker State for purposes of liability insurance coverage: "One who is statutorily vicariously liable for the intentional act of another cannot be denied coverage since the defendant does not possess the requisite intent to do injury."

*Brown Foundation*, 814 S.W.2d at 277 (citing 1A R. Long, The Law of Liability Insurance § 5.06, at 5–54 (1990)); *accord, Morrisville Water & Light Dept. v. United States Fidelity & Guar. Co.*, 775 F.Supp. 718 (D.Vt.1991) (while insured's delivery of PCBs to site operator was an intentional act, operator's mishandling of waste was not "expected"); *Centennial Ins. Co. v. Lumbermens Mutual Casualty Co.*, 677 F.Supp. 342 (E.D.Pa.1987). CERCLA imposes *strict* liability jointly and severally upon "responsible parties," imposing legal responsibility upon hazardous waste generators regardless of their subjective intent. Based upon the present record, it does not appear that a reasonable fact-finder could find that *Quaker State* "ha[d] specific and subjective intent to cause the pollution giving rise to the CERCLA claims" at the Ekotek Site, or that Quaker State expected with "a high degree of certainty or probability" (31 A.L.R.4th at 999), that "the damages would flow directly and immediately from" Quaker State's own conduct in the disposition of its hazardous waste under contract with the operators of the Ekotek Site. *City of Johnstown v. Bankers Standard Ins. Co.*, 877 F.2d at 1150–51.[31]

## E. "Occurrences" Within Periods of Coverage.

"Occurrence" is important to the question of coverage for another reason: defendants contend that no "occurrence," properly defined, took place during the periods of coverage under their respective policies. *See*

29. Particularly where, as here, the insured asserts that "neither expected nor intended from the standpoint of the insured" should be measured according to a subjective standard, "the burden of proof as to an insured's own subjective intent and expectation rightfully should be on the insured." *Queen City Farms, Inc. v. Central National Ins. Co. of Omaha*, 64 Wash.App. 838, 827 P.2d 1024, 1041 (1992). As the Washington court explains, "That the insured must bear the burden of proving his or her own subjective state of mind does no violence to our notions of equity and fairness." Where an objective standard comes into play, "shifting the burden of proof to the insurer would seem justified. The insurer could then show what a 'reasonable person' would have expected." *Id.*, 827 P.2d at 1041 & n. 19.

30. Defendants do not controvert Paragraph 23 of Quaker State's "Statement of Facts," which avers, *inter alia*, that "[Quaker State]'s employees had no knowledge of activities at the Ekotek Site." Quaker State Mem. at 9. Paragraph 23 would thus be deemed admitted for purposes of summary judgment pursuant to D.Ut.Rule 202(b)(4).

31. The question of whether a pattern of events "[w]here discharges of waste materials or contaminants are routinely made over a course of many years" cannot "be said to be sudden and accidental" for purposes of the pollution exclusion clause (Fireman's Fund Mem. at 44), is a distinctly different one. *See* Part V, *infra*.

Defs. Joint Mem. at 51–64.[32] The "occurrence" concept applies not only to identify *what* kind of event may represent a covered loss, but also to identify *when* the loss is deemed to have "occurred" for purposes of determining coverage. Quaker State bears the burden of showing that an "occurrence" triggering coverage under defendants' policies took place during the policy period. *See New Hampshire Ins. Co. v. Martech USA, Inc.*, 993 F.2d 1195, 1199–1200 (5th Cir.1993) (Texas/admiralty law).

Courts around the country have formulated various tests for determining *when*, in the context of claims for indemnification for costs of environmental clean-up, an "occurrence" has taken place within the meaning of a liability insurance policy. *See* Annotation, *Liability Insurance Coverage for Violations of Antipollution Laws*, 87 A.L.R.4th 444, 515–27 (1991); F. Powell, *Insuring Environmental Cleanup: Triggering Coverage for Environmental Property Damage Under the Terms of a Comprehensive General Liability Insurance Policy*, 71 Neb.L.Rev. 1194 (1992). These tests include (1) the "exposure" trigger, (2) the "actual injury" or "injury-in-fact" trigger; (3) the "manifestation" or "discovery" trigger, and (4) the "continuous" trigger.[33] *See, e.g., Dow Chem. Co. v. Associated Indem. Corp.*, 724 F.Supp. 474, 478 (E.D.Mich.1989). The Utah courts have not yet adopted one of these tests to determine when an "occurrence" has taken place under a CGL insurance policy.

#### 1. The "exposure" trigger.

■ According to courts adopting the "exposure" trigger, liability under a CGL policy is triggered at the time that the property is exposed to the hazardous substance. F.

Powell, *supra; see, e.g., Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.*, 811 F.2d 1180, 1190 (8th Cir. 1987), *aff'd in part, rev'd in part on other grounds en banc*, 842 F.2d 977, 984 (8th Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) ("*NEPACCO* "). The "exposure" trigger is thought to reflect a commonly held view that environmental "property damage" occurs "at the moment that hazardous wastes are improperly released into the environment ... [W]here improper disposal of hazardous wastes immediately results in release into the environment, this trigger is justified. Hazardous wastes are by definition harmful, and exposure and injury in fact occur simultaneously in such cases." F. Powell, *supra.*

In *NEPACCO*, exposure occurred when

NEPACCO disposed of about eighty-five 55–gallon drums of hazardous wastes by burying them in a trench on a farm near Verona.... Many of the drums had deteriorated and were in poor condition at the time of disposal; many broke open when they were dumped into the trench. A strong chemical odor persisted in the immediate area of the Denney farm site for several months thereafter.

In 1971 or 1972 NEPACCO hired Independent Petrochemical Corp. (IPC) to dispose of more hazardous wastes containing dioxin.... [IPC's employee] allegedly transported and sprayed the hazardous wastes, mixed with waste oil, as a dust suppressant on the grounds of the Bubbling Springs Stables in Fenton, Missouri, and on the roads of Times Beach, Missouri....

---

**32.** Neither Liberty Mutual nor the Fireman's Fund defendants raised this argument in their initial summary judgment memoranda; instead, they chose to assert the theory in their common response to Quaker State's motion, and then as one "relevant only if the Court rejects the grounds upon which the defendants base their motions for summary judgment...." Defs. Joint Mem. at 52 n. 24. As the "trigger" issue bears upon Quaker State's threshold burden to show the existence of one or more "occurrences" within policy coverage, it seems more logical to address it at this point.

**33.** The referenced A.L.R. annotation identifies a fifth theory, the "negligent act" trigger, citing a single case, *Detrex Chem. Indus. v. Employers Ins. Co.*, 681 F.Supp. 438 (N.D.Ohio 1987), *reconsideration denied*, 746 F.Supp. 1310, 1322–24 (N.D.Ohio 1990). *See* 87 A.L.R.4th at 524. The later opinion in *Detrex*, however, expressly "adopt[s] the injury in fact trigger of coverage," citing to several cases applying the same theory. 746 F.Supp. at 1324–25. In the absence of other authority, one may reasonably conclude that the "negligent act" trigger does not exist.

842 F.2d at 979. "Under the specific facts presented," the Eighth Circuit continued, "the crucial events—the improper disposal of the hazardous wastes (wrongful act), the release of hazardous wastes into the environment (exposure), the contamination of the environment (injury-in-fact),—all happened virtually simultaneously." *Id.* at 984.

### 2. The "actual injury" trigger.

■ The "actual injury" or "injury-in-fact" trigger invokes coverage at the point when actual injury or damage to the person or property occurs. "Under this theory, an actual injury must occur during the time the policy is in effect in order to be indemnifiable." F. Powell, *supra.* The "actual injury" or "injury-in-fact" trigger is premised upon the literal language of the standard CGL policy's definition of "occurrence:"

> The plain language of the definition of "occurrence" used in the CGL policy requires exposure that 'results, *during the policy period,* in bodily injury' in order for an insurer to be obligated to indemnify the insured. The unambiguous meaning of these words is that an *injury*—and not mere exposure—must result *during the policy period.* The CGL policies expressly distinguish exposure from injury; …

*Abex Corp. v. Maryland Casualty Co.,* 790 F.2d 119, 127 (D.C.Cir.1986) (emphasis in original); *accord, Detrex Chem. Indus. v. Employers Ins. Co.,* 746 F.Supp. 1310, 1323 (N.D.Ohio 1990) ("an actual injury must occur during the time the policy is in effect in order to be indemnifiable or compensable"); *Triangle Publications, Inc. v. Liberty Mutual Ins. Co.,* 703 F.Supp. 367, 370 (E.D.Pa. 1989) ("the plain language of the CGL contract supports only one construction: the injury-in-fact analysis").

Where a release results in immediate contamination, the distinction between "exposure" and "injury-in-fact" is largely semantic. Reasoning from the premise that "environmental contamination caused by improper disposal of hazardous wastes constitutes 'property damage'" within the meaning of a CGL policy, the Eighth Circuit observed in *NEPACCO* that "application of either the 'exposure' or 'injury-in-fact' theory of coverage would make little difference because of the specific facts presented" in that case; "the improper disposal of the hazardous wastes immediately resulted in their release into the environment.… Because by definition hazardous wastes are extremely harmful, there was clearly both 'exposure' and 'injury-in-fact' during the first policy period.…" 842 F.2d at 984.

"In cases where disposal of hazardous wastes into the environment causes the release of hazardous wastes at some point in the future, however, the exposure theory may not accurately reflect the moment in time when injury occurs." F. Powell, *supra.*

### 3. The "manifestation" trigger.

The "manifestation" trigger invokes coverage when, *e.g.,* in one "landmark" asbestos contamination case, an asbestos-related disease becomes "reasonably capable of medical diagnosis" during the policy period. *See, e.g., Eagle–Picher Indus., Inc. v. Liberty Mutual Ins. Co.,* 523 F.Supp. 110 (D.Mass. 1981), *modified,* 682 F.2d 12, 17 (1st Cir. 1982), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983).[34]

In the context of property damage resulting from contamination by hazardous wastes, the "manifestation" trigger appears to have more reasoned application in instances where the time that actual injury begins to occur cannot be discerned. "[I]t is often very difficult to determine as a factual matter when the 'injury' occurred, especially in property damage cases where the damage results from a slow, gradual process like underground seepage of hazardous substances." F. Powell, *supra.* Where "the existence or scope of damage remains concealed or uncertain for a period of time even though damage is occurring," it follows that "[d]etermining exactly when the damage begins can be difficult if not impossible." *Mraz v. Canadian Universal Ins. Co.,* 804 F.2d 1325, 1328 (4th Cir. 1986). "In such cases," the Fourth Circuit counsels, "we believe that the better rule is that the occurrence is deemed to take place when the injuries first manifest themselves." *Id.*

---

**34.** Defs. Joint Mem. at 57 ("The landmark decision of *Eagle–Picher Industries, Inc. v. Liberty Mutual Insurance Co.,* … is particularly instructive." [citation omitted] ).

Of course, in such cases the "exposure" and "injury-in-fact" triggers are both unavailable, as a practical matter; the "manifestation" itself represents the first opportunity to determine that there has been an "occurrence" within insurance policy coverage. *See Armotek Indus., Inc. v. Employers Ins. of Wausau,* 952 F.2d 756, 762–63 (3rd Cir.1991); *Centennial Ins. Co. v. Lumbermens Mutual Casualty Co.,* 677 F.Supp. 342, 346–47 (E.D.Pa.1987).

The manifestation rule has been justified in other property damage cases where it is difficult, if not impossible, to determine the point in time when damage began. However, an interpretation of the "occurrence" language of the CGL policy that triggers liability under a manifestation rule, holding that property damage doesn't occur until the owner knows of the injury, contradicts the actual language of the policy. The policy mandates coverage when injury or damage occurs, not when it becomes apparent. Inserting an element of knowledge of the occurrence into the definition of occurrence in a CGL policy makes it simpler to identify the point in time when coverage is triggered, but the standard policy language makes no reference to an insured's actual knowledge of the occurrence as a requirement of triggering coverage under the policy....

F. Powell, *supra* (footnote omitted).[35]

#### 4. The "continuous" trigger.

■ Courts adopting the "continuous" trigger hold that coverage is continuously triggered from the moment that, *e.g.,* a person is exposed to hazardous materials through the time when the injury manifests itself. *See, e.g., J.H. France Refractories Co. v. Allstate Ins. Co.,* 396 Pa.Super. 185, 578 A.2d 468, 472 (1990) (asbestos exposure); *Keene Corp. v. Insurance Co. of North America,* 667 F.2d 1034 (D.C.Cir.1981) (same);[36] *Lac d'amiante du Quebec v. American Home Assurance Co.,* 613 F.Supp. 1549 (D.N.J.1985) (same); *but see Abex Corp. v. Maryland Casualty Co.,* 790 F.2d 119 (D.C.Cir.1986) (rejecting "continuous" trigger).[37]

Application of the "exposure," "injury-in-fact" or "manifestation" triggers limits the available insurance coverage, each in its own way:

The injury in fact rule and the exposure rule limit insurer liability in some cases because [they] exclude[ ] insurer liability under CGL policies in effect after exposure or actual release of hazardous substances occurred. The manifestation rule limits insurer liability in some cases because it excludes liability under policies in effect prior to the time the contamination manifested itself....

F. Powell, *supra.* The "continuous" trigger may perhaps be understood as an attempt to avoid the evidentiary problems inherent in the other trigger theories, propelled by an underlying public policy assumption favoring insurance coverage. *Id.*

In *Montrose Chem. Corp. v. Admiral Ins. Co.,* 3 Cal.App.4th 1511, 5 Cal.Rptr.2d 358

---

35. Nor does the standard definition of occurrence refer to an injured third party's knowledge or detection of the injury, as where hazardous waste seeps onto neighboring property. *Cf. Allstate Ins. Co. v. Quinn Constr. Co.,* 713 F.Supp. 35 (D.Mass.1989) (third party's discovery of underground gasoline seepage into adjacent property does not trigger coverage).

36. With some disdain, the defendants relate that "the result-oriented and generally discredited 'continuous trigger' theory" was "first 'invented' in *Keene Corp. v. Insurance Co. of North America,* ..." and argue that "it abandons logic in favor of a 'result-oriented' effort to maximize coverage...." Defs. Joint Mem. at 52–53 (citations omitted). Notably, in one case relied upon by defendants as discrediting the "continuous" trigger, the Second Circuit adopted the "actual injury" trigger, not the "manifestation" trigger urged by defendants. *See American Home Products Corp. v. Liberty Mutual Ins. Co.,* 565 F.Supp. 1485, 1490–91 n. 1, 1510 (S.D.N.Y.1983), *aff'd in part,* 748 F.2d 760, 765 (2d Cir.1984).

37. "Courts are more likely to adopt a 'continuous trigger' in property damage cases where damage occurs as a result of a slow and gradual process, as in cases where leaching from a waste disposal landfill ultimately contaminates neighboring property." F. Powell, *Insuring Environmental Cleanup: Triggering Coverage for Environmental Property Damage Under the Terms of a Comprehensive General Liability Insurance Policy,* 71 Neb.L.Rev. 1194 (1992) (citing *New Castle County v. Continental Casualty Co. (CNA),* 725 F.Supp. 800 (D.Del.1989)).

(Ct.App.1992), *review granted*, 862 P.2d 661 (Cal.1992), the court held that the "continuous" trigger applies to property damage caused by seeping industrial chemical waste. The insurers had urged the adoption of the "manifestation" trigger, which would have limited coverage to four CGL policies in force between October 13, 1982 and March 20, 1986, with no coverage under subsequent policies notwithstanding the fact that property damage continued. 5 Cal.Rptr.2d at 362–65. Based upon its conclusions that the definition of "occurrence" is ambiguous, and that ambiguities should be resolved against the insurer and in favor of coverage to protect the "objectively reasonable expectations of the insured," the *Montrose* court applied the "continuous" trigger. *Montrose* found the "continuous" trigger to be consistent with occurrence-based coverage where the intent was to provide coverage for long-term, de-layed-manifestation "occurrences" which may result in injuries continuing through the coverage periods of several CGL policies. *Id.* 5 Cal.Rptr.2d at 365–69. At one site, property damage occurred beginning in 1947 and continued to the present. *Id.* 5 Cal.Rptr.2d at 360–61.[38]

In *Prudential–LMI Commercial Ins. v. Superior Court*, 51 Cal.3d 674, 274 Cal.Rptr. 387, 798 P.2d 1230 (1990), the California Supreme Court adopted a "manifestation" trigger theory in the context of a *first* -party claim involving a property loss occurring over several policy periods, one which was not discovered until several years after the loss began. However, *Prudential–LMI* expressly reserved the question of the coverage trigger in the context of a third-party claim. Whether the California Supreme Court will approve of the *Montrose* "continuous" trigger theory in third-party cases remains to be seen.[39] Cf. *Houston General Ins. Co. v. AG Prod. Co. and Chemurgic Agric. Chem., Inc.*, 840 F.Supp. 738, 742 (E.D.Cal.1993) (declining to apply *Montrose* "continuous" trigger theory).

### 5. The coverage trigger applicable to "occurrences" at the Ekotek Site.

■ Defendants argue vigorously for the application of the "manifestation" trigger to the facts of this case; with equal enthusiasm, they resist the application of the "continuous" trigger. *See* Defs. Joint Mem. at 52–64. In response, Quaker State asserts that application of any coverage trigger except the manifestation trigger results in coverage under the pertinent policies, and that the "manifestation" trigger is inconsistent with the unambiguous language and the history of the "occurrence" definition. Quaker State Reply Mem. at 33, 38–40. The Court has reviewed the parties' arguments and the authorities cited therein.

Defendants rely on cases such as *Transamerica Ins. Co. v. Safeco Ins. Co.*, 189 Mich. App. 55, 472 N.W.2d 5 (1991), which involved successive homeowners complaining of injuries from urea-formaldehyde insulation, as supporting the application of the "manifestation" trigger.[40] In *Transamerica*, the court held that coverage was triggered as to each

---

**38.** Where the release of hazardous waste is continuous, the "injury-in-fact" theory may also operate to trigger coverage on a continuing basis. *See, e.g., Industrial Steel Container Co. v. Fireman's Fund Ins. Co.*, 399 N.W.2d 156 (Minn.App. 1987).

**39.** In California, the Supreme Court has not yet decided the trigger of coverage for bodily injury claims under third party liability policies.... We note that the Supreme Court presently has the issue before it. (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1992) 15 Cal.App.4th 975, 5 Cal.Rptr.2d 358, (review granted May 21, 1992 (S026013) [third party bodily injury and property damage claims]; and see *Stonewall Ins. Co. v. City of Palos Verdes Estates* (1992) 18 Cal.App.4th 1234, 9 Cal.Rptr.2d 663, review granted Aug. 27, 1992 (S027319) issues on review limited Oct. 1, 1992 [third party property damage claims].) *Armstrong World Indus., Inc. v. Aetna Casualty & Sur. Co.*, 20 Cal.App.4th 296, 350, 26 Cal.Rptr.2d 35, 52 (Ct.App.1993).

**40.** Other cases cited by defendants arise in factual contexts other than the release of hazardous wastes. *See Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56, 61–62 (3d Cir.1982) (discriminatory employment practices); *Bartholomew v. Insurance Co. of North America*, 502 F.Supp. 246 (D.R.I.1980), *aff'd sub nom. Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27 (1st Cir.1981); *United States Fidelity & Guar. Co. v. American Ins. Co.*, 169 Ind.App. 1, 345 N.E.2d 267 (1976) (house built using defective bricks).

injured homeowner at the point when that homeowner's injuries manifested themselves:

> [W]e find that bodily injury, for purposes of triggering coverage, occurs when the symptoms manifest themselves to the homeowner.... If ... a subsequent homeowner was exposed and injured, the carriers of the risk at the time that the homeowner's injuries manifested themselves would be liable. The same must be said of property damage....

472 N.W.2d at 7. The court in *Transamerica* was attempting to apportion liability among multiple insurers for claims asserted by multiple plaintiffs for toxic exposure injuries occurring in different years.

The reasoning of *Transamerica* does not readily extend to cases involving liability under CERCLA for hazardous waste contamination. As the Sixth Circuit explained in *Ray Indus., Inc. v. Liberty Mutual Ins. Co.,* the circumstances in *Transamerica* "differed from a CERCLA case in which one release of toxic waste can render the insured liable for the entire cleanup of the release site...."

> Moreover, this court recently refused to follow *Transamerica* in *Inland Waters Pollution Control, Inc. v. National Union Fire Ins. Co.,* 943 F.2d 52 (6th Cir.1991) (unpublished). In that case, we noted that
>
> > [t]he manifestation theory generally has been applied in cases involving a latent disease, such as asbestosis, where, due to the length of time between initial exposure to the harmful substance and diagnosis of the disease, there are multiple insurance carriers who are potentially liable. Similar factors were present in *Transamerica* and made application of the manifestation theory appropriate in that case. However, those factors are not present in this case, and their absence counsels against application of the manifestation theory.

*Ray,* 974 F.2d at 766. Relying upon the policy language defining "occurrence" with reference to property damage, and "property damage" as "physical injury to ... tangible property *which occurs during the policy period,"* *(id.* at 765 (emphasis added by the court)), the Sixth Circuit in *Ray* concluded

that "an 'occurrence' within the meaning of the policies issued by Liberty took place during each of the years [of policy coverage] in question." *Id.* at 766.

> [N]o one disputes that drums containing resin were constantly dumped in Metamora between 1966 and 1979; thus contamination occurred every year in question. The "injury to ... tangible property," if such there was, occurred throughout the period. We hold, therefore, that the plain language of the policies indicates that every policy written during the period was triggered by the events at Metamora, unless the pollution exclusion prevented such a result.
>
> Our holding on this issue coincides with numerous cases involving Michigan law....

*Id.* at 765–66. *Ray,* cites to *Dow Chem. Co. v. Associated Indem. Corp.,* 724 F.Supp. 474, 478 (E.D.Mich.1989), and *Detrex Chemical Industries v. Employers Ins. of Wausau,* 746 F.Supp. 1310, 1324–25 (N.D.Ohio 1990), both cases applying the "injury-in-fact" trigger, and *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 685 F.Supp. 621, 626 (E.D.Mich.1987), which follows *NEPACCO* in applying the "exposure" trigger.

Following the reasoning of the Sixth Circuit in *Ray,* application of the "injury-in-fact" or "exposure" triggers would be more consistent with the pertinent policy language, at least in the context of continuous or frequently occurring releases of hazardous wastes resulting in contamination of property—"property damage" in the language of the policies—where, for example, barrels of toxic resin are hauled to a landfill and crushed by heavy equipment, releasing their hazardous contents, as was the case in *Ray.* The injury occurs almost instantaneously upon the release, and is not latent or concealed.

From a review of the fact statements set forth in the parties' summary judgment memoranda, it appears that the release or discharge of hazardous waste at the Ekotek Site was visible, identifiable, obvious,

known.[41] The pooling of acid sludge residue, the piling of oil-soaked filter clay, the frequent runover of tanks, trucks and other containers, the leaking or breaking hoses, pumps, and other equipment—almost all were events taking place on the surface. *See* Quaker State Mem. at 4–9, ¶¶ 10–22; Defs. Joint Mem. at 3–9, ¶¶ 3, 4(a)–(g), 6–8; Quaker State Reply Mem. at 3–10, ¶¶ 3, 4(a)–(g), 6–8; Liberty Mutual Mem. at 16–27, ¶¶ 17–23, 24, 25–26, 28, 33, 36, 37, 39, 40, 43, 46; Fireman's Fund Mem. at 8–19, ¶¶ 15, 17, 19–22, 23–24, 25–26, 28, 32, 35, 36–39, 40. Under these circumstances, the actual injury occurred in plain view, and was readily discernable rather than latent, or hidden. *See, e.g.,* Fireman's Fund Mem. at 16, ¶ 32 ("Oil was constantly discharged onto the roadbase throughout the site until the workers would 'just about slip on the stuff.'"). As in *Ray,* application of an "injury-in-fact" trigger comports with both the policy language and factual circumstances material to this case.

■ Moreover, just as there is little practical difference between "exposure" and "injury-in-fact" in instances where contamination occurs almost immediately upon release, (*see NEPACCO,* 842 F.2d at 984), there is likewise little practical distinction between "injury-in-fact" and "manifestation" of the injury, particularly where "property damage" refers to the contamination of property by hazardous waste. Where the release or discharge of hazardous waste into the environment is identifiable, or even obvious, "manifestation" occurs simultaneously with "exposure" and "injury." Unless the effort is to cut off coverage after the *first* manifestation of hazardous waste contamination,[42] which would plainly be error where there have been a chain of discrete "occurrences," [43] applying a "manifestation" theory would make little or no practical difference.

This Court has concludes that the Utah courts, under the facts of this case, would adopt the "injury-in-fact" or "actual injury" trigger. Using an actual injury trigger, an "occurrence" for purposes of CGL insurance policy coverage took place each time hazardous waste such as drain oil was discharged onto the Ekotek Site property and, by definition, inflicted "property damage" at that site. *See NEPACCO,* 842 F.2d at 983–84; *Centennial Ins. Co. v. Lumbermens Mutual Casualty Co.,* 677 F.Supp. 342, 346–47 (E.D.Pa. 1987); *Upjohn Co. v. New Hampshire Ins. Co.,* 178 Mich.App. 706, 444 N.W.2d 813 (1989). This reading seems most closely consistent with both the policy language and the particular factual circumstances at issue in this case; where property damage, *i.e.,* hazardous waste contamination, is known to have occurred because of a release, an "occurrence" has taken place.[44] Where releases resulting in contamination are continuing, "injuries-in-fact" triggering coverage are also continuing.

While the "manifestation" trigger may provide a meaningful starting point in a case of hidden, gradual, and probably underground hazardous waste contamination, the Ekotek Site does not present such a case. Nor is the Court persuaded that a "continuous" trigger

**41.** *See, e.g.,* Liberty Mutual Mem. at 6, ¶ 5 ("'Aerial photographs taken at this location dating from 1950 indicate the presence of stained soil'") (quoting EPA Findings, ¶ I, in *id.,* Exhibit 7); Fireman's Fund Mem. at 18, ¶ 40 ("Spillage and heavy stains on the ground were visible from 1972 through 1988 and some of the spillage was observed leaving the site ... in 1979, 1984 and 1988") (citing EPA Aerial Photographic Analysis of the Petrochem Site (November 1988), *id.* at Exhibit 9).

**42.** *Cf.* Defs.Joint Mem. at 52 ("Defendants urge this Court to adopt a manifestation trigger of coverage theory which ... holds that coverage is triggered only when the contamination is first discovered.").

**43.** Defendant Liberty Mutual appears to have advanced a somewhat similar argument in the *Ray* case, where application of the "manifestation" theory purportedly would not have triggered coverage until policies were in effect containing Liberty Mutual's pollution exclusion; "[s]ince each policy covered only property damage that occurred 'during the policy period,' Liberty reasons that it could thus escape all liability for the Metamora site." 974 F.2d at 765. In adopting an "exposure"/"injury-in-fact" trigger, *Ray* rejected Liberty Mutual's analysis.

**44.** The argument that the event triggering coverage of an "occurrence" must be determined according to the circumstances of the particular case rather than a generalized theory, (*see* Quaker State Reply Mem. at 33–34, and cases cited therein), carries considerable persuasive force.

represents a fair reading of the definition of "occurrence" in the defendants' policies.[45]

### F. Apportionment of CERCLA liability among different coverage periods.

■ At the hearing, defendant Liberty Mutual contended that at most, only an insignificant amount of Quaker State's drain oil "product" was present at the Ekotek Site during the period of coverage under Liberty Mutual's policies, viz., from October 1, 1985 to October 1, 1986, and that Quaker State cannot raise a genuine issue of material fact as to the existence of an "occurrence" during the period of coverage that involved oil obtained from Quaker State. Transcript of Hearing, March 29, 1993 ("Tr."), at 35:4–36:14. Quaker State concedes as much,[46] but argues that the presence or absence of Quaker State drain oil at the Ekotek Site during the period of coverage is irrelevant; the policy covers sums which Quaker State becomes legally obligated to pay because of damage to property occurring during the policy period. Quaker State avers that "[t]here is no requirement whatever in the policy that the property damage originate from [Quaker State]'s product," (Tr. at 44:9–11), and that as a potentially responsible party, Quaker State is jointly and severally liable for damage resulting from "occurrences" taking place during the period of coverage, regardless of the spilled oil's original source. Tr. at 43:10–45:3.

■ Under CERCLA, even where its individual role in creating the hazardous site was small, a responsible party may be held jointly and severally liable for the entire cost of response and clean-up at a site if the harm or damage at the site is "indivisible." *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 570–71 n. 2 (6th Cir.1991); *id.*, 889 F.2d 1497, 1506–08 (6th Cir.1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990).[47] Were Quaker State's liability under CERCLA limited to only that property damage traceable to Quaker State's own hazardous waste, (which it is not), it would make sense to focus on whether a specific "occurrence" involved Quaker State's oil, as Liberty Mutual would suggest. But that is a question different from the one presented here.

A CGL policy insulates the insured against the risk of liability for property damage resulting from "occurrences" during the policy period. To the extent that liability may be imposed upon the insured under CERCLA for all "occurrences" taking place at the Ekotek Site during the period of coverage, the insured thereby becomes legally obligated to pay the resulting response costs. Under these circumstances, indemnity should obtain under the policy regardless of whether each "occurrence" during the coverage period directly involved the insured's drain oil.

Liberty Mutual has litigated the apportionment of CERCLA liability for covered and non-covered periods before. *See, e.g., Ray Industries, Inc. v. Liberty Mutual Ins. Co.*, 974 F.2d at 769–71. That Liberty Mutual is obligated to indemnify the insured up to its policy limits for damages arising out of "occurrences" during the period of coverage under its policies should come as no surprise.[48]

---

**45.** To the extent that the *Montrose* case depended upon the "reasonable expectations" doctrine, that rule is not available to the construction of insurance policy language under Utah law. *See Allen v. Prudential Property & Casualty Ins. Co.*, 839 P.2d 798, 801–07 (Utah 1992) (extensive analysis by Zimmerman, J.); *but cf. id.* at 807–12 (Stewart, J., concurring in the result); *id.* at 812–18 (Durham, J., dissenting). Nor is the Court persuaded that the definition of "occurrence" is ambiguous as to timing, requiring construction against the insurer.

**46.** THE COURT: Do you have any evidence that they sent anything during the policy period? MR. MAYNE: No. No. Indeed, we do not dispute that [Quaker State]'s product was shipped elsewhere before Liberty Mutual's policy started, ...

Tr. at 44:2–6.

**47.** *See also United States v. Alcan Aluminum Corp.*, 990 F.2d 711 (2d Cir.1993); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252 (3d Cir. 1992); *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir.1992); *O'Neil v. Picillo*, 883 F.2d 176, 179 (1st Cir.1989) (burden on responsible party under CERCLA to show divisibility of harm), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1991); *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 808–810 (S.D.Ohio 1983).

**48.** To the extent that the absence of Quaker State's hazardous waste with reference to a particular occurrence may be raised under CERCLA as a basis for apportioning liability (*see, e.g.*,

For the reasons set forth above, the Court determines that on the present record, Quaker State is entitled to summary judgment on the issue of whether it engaged in intentional conduct not constituting an "accident," and therefore not an "occurrence" within the meaning of defendants' CGL policies, and whether the property damage which occurred at the Ekotek Site was "neither expected nor intended from the standpoint of the insured" within the meaning of those same policies.

Quaker State asserts that it is uncontroverted that "substantial quantities of oil were spilled during each policy period and that the Ekotek site is heavily contaminated with oil," (Quaker State Reply Mem. at 30–31; *see also* Quaker State Mem. at 8–9, ¶¶ 17–22), from which it may be inferred that one or more covered "occurrences" took place during the period of coverage of each of the policies at issue in this case. The defendants' fact statements appear roughly consistent with this position. *See, e.g.*, Defs. Joint Mem. at 4–6, ¶ 4(a)–(g); Fireman's Fund Mem. at 7–19, at ¶¶ 12, 13 & n. 11, 15, 17–22, 24, 27, 32–45; Liberty Mutual Mem. at 11–26, ¶¶ 8–11, 18, 19–22, 24, 26, 27, 30, 32, 34–35, 37, 39–40, 43.[49] Curiously, the defendants assert that "the issue of if and when property damage took place is a question of law for the court to decide...." Defs. Joint Mem. at 8, ¶ 6. While the Court has determined according to law and policy language construed as a matter of law what *category* of facts operates to trigger coverage (*viz.*, facts evidencing "injury-in-fact," the occurrence of property damage through the release of hazardous waste at the Ekotek Site), proof of a particular "occurrence" still presents an evidentiary problem—a question of fact. At least for purposes of the present motions, defendants appear to have conceded those evidentiary

facts as set forth by Quaker State in its moving papers. Consequently, in addressing the remaining issues, the Court will deem it established that one or more "occurrences" causing property damage at the Ekotek Site took place during the period of coverage under each insurance policy at issue in this case.

## IV. THE DEFENDANT INSURERS' DUTY TO DEFEND.

 Under the policies issued by the defendants to Quaker State, the defendants have the "right and duty to defend any suit against the insured" seeking to recover damages on account of property damage. Like "damages," the policies do not specially define "suit." Quaker State points to a December, 1988 EPA "Special Notice" identifying Quaker State as a "potentially responsible party" under CERCLA, followed by a June 12, 1989 EPA letter demanding Quaker State's participation in response work at the Ekotek Site. *See* Exhibit 16 to Quaker State Mem. According to Quaker State, CERCLA

granted EPA enormous power to demand information and documents under threat of civil and criminal penalties, to issue unilateral administrative orders forcing [potentially responsible parties] to undertake remedial actions at a site, and to recover EPA's own response costs incurred at the site under theories of strict, joint and several liability.

*See* CERCLA §§ 104, 106, 107, 42 U.S.C. §§ 9604, 9606, 9607.

Quaker State Mem. at 67. Quaker State contends that the exercise of these expansive powers, as embodied in an EPA notice to a "potentially responsible party" (or "PRP") demanding remedial action, is "in many ways

---

*United States v. Alcan Aluminum Corp.*, 964 F.2d at 267–70), an insurer may seek to reduce its exposure and its insured's liability by undertaking to assert the defense.

**49.** While Paragraph 6 of the defendants' "Statement of Material Facts in response to QSML's Statement of Facts" states that "[d]efendants dispute that portion of paragraph 17 of [Quaker State]'s statement of facts which seeks to speculate and characterize certain events or spills as causing property damage during each of the poli-

cies at issue," (Defs.Joint Mem. at 6), defendants do not specifically controvert Quaker State's fact statements through reference "with particularity to those portions of the record upon which the opposing party relies" as required by D.Ut.Rule 202(b)(4). *Consequently, those paragraphs of Quaker State's fact statements having particularized record support shall be deemed admitted for purposes of the present motions, as provided by D.Ut.Rule 202(b)(4).*

far more threatening, and certainly more coercive, than an ordinary civil lawsuit." *Id.*

The defendants argue that the EPA's administrative action concerning the Ekotek Site does not constitute a "suit" for purposes of triggering the insurers' duty to defend, particularly where Quaker State's participation in response action is voluntary and where the "response" sought by EPA is not the payment of damages but participation by PRPs in affirmative clean-up efforts. *See* Defs.Joint Mem. at 41–48 (citing *Aetna Casualty & Sur. Co. v. General Dynamics Corp.,* 968 F.2d 707, 714 (8th Cir.1992), *Ray Indus., Inc. v. Liberty Mutual Ins. Co.,* 974 F.2d 754 (6th Cir.1992), and *Upjohn Co. v. Aetna Casualty & Sur. Co.,* 768 F.Supp. 1186 (W.D.Mich.1990)).[50]

As defendants assert, some courts have taken the view that "suit" refers to formal legal action taken in a judicial forum, and cannot fairly be extended to reach administrative action by EPA or corresponding state agencies. *See, e.g., Ray Indus., Inc. v. Liberty Mutual Ins. Co.,* 974 F.2d at 759–64; *Aetna Casualty & Sur. Co. v. Gulf Resources & Chemical Corp.,* 709 F.Supp. 958, 960 (D.Idaho 1989).

At least one case, *Detrex Chemical Indus. v. Employers Ins., Inc.,* 746 F.Supp. 1310, 1316–17 (N.D.Ohio 1990), has attempted to draw a distinction between EPA remedial orders and EPA letters seeking voluntary compliance, pointing to the relative coerciveness of the remedial order mechanism. *See also Ryan v. Royal Ins. Co. of America,* 916 F.2d 731, 738 (1st Cir.1990) ("there must be some cognizable degree of coerciveness or adversariness in the administrative body's actions").[51]

The insurers' position raises a public policy quandary of its own: to avail themselves of the insurers' duty to defend, an insured "potentially responsible party" must refuse to cooperate with EPA's remedial actions to the point that EPA files a civil action in court to force the insured's compliance with CERCLA. The defendants' reading of their own duty to defend would encourage insureds to resist EPA administrative actions and defy the CERCLA mandate concerning the duties of responsible parties in order to avail themselves of their rights under their policies. Ironically, as Quaker State points out, where an insured's antagonism precipitates a formal EPA lawsuit triggering the insurer's duty to defend, "the insured ... has exposed itself and its insurer not only to the lawsuit but also to statutory penalties or fines, as well as joint and several liability for the entire costs of cleanup"—with the insured thus becoming liable for fines and penalties which typically are *not* covered under liability policies. Quaker State Mem. at 67 (citing 42 U.S.C. §§ 9606(b)(1), 9607(c)(3)). *See also Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672–73 (5th Cir.1989).

CERCLA imposes joint and several, strict liability for cleanup costs on potentially responsible parties, including: present and past owners and operators of hazardous waste facilities; those who arrange for disposal of hazardous substances; and transporters of hazardous waste. Additionally, the EPA may recover damages for injury, destruction, or loss of natural

---

**50.** Defendants also argue that Quaker State's own understanding of the policy language was that it covered only claims for "legal damages that might be brought by a lawsuit for bodily injury or property damage." Defs. joint Mem. at 45 (quoting Deposition of Wanda M. Hall, vol. II, at 21).

**51.** As one commentator has observed, "Whether agency action against the insured will be sufficient to trigger the insurer's duty to defend appears to depend on two factors, the degree of coercion or seriousness of the agency action, and the jurisdiction's choice of interpretive doctrine." G. Reynolds, Comment, *Comprehensive General Liability Policy Coverage of CERCLA Cleanup Costs: A Proposed Guide to Interpretation,* 2 MD.J.CONTEMP.LEGAL ISSUES 33 (1991). It appears that the more coercive the administrative action, the easier the judicial finding that the action constitutes a "suit" triggering the duty to defend. *Id.* Where a court applies the "reasonable expectations" doctrine, it may well find the duty to defend to be triggered; "[a]n insured may well reasonably expect his liability insurer to defend against hostile Administrative actions when large amounts of money are at stake." *Id.* Where a court applies the plain meaning doctrine, it may find "suit" to be an ambiguous term requiring interpretation, or "the layperson's common understanding of the meaning of the term 'suit' " as used in the context of the policy may be dispositive. *Id.*

resources, caused by the pollution. CERCLA also empowers the EPA to issue administrative orders, to compel PRPs to clean up sites when necessary to protect public health, welfare and the environment.

G. Reynolds, Comment, *Comprehensive General Liability Policy Coverage of CERCLA Cleanup Costs: A Proposed Guide to Interpretation,* 2 MD.J.CONTEMP.LEGAL ISSUES 33, 43 (1991) (footnotes omitted). CERCLA specifically provides that any party failing to comply with such an order is subject to severe fines and, if the EPA attempted to clean up the site itself, that PRPs could be liable for three times the cost of clean-up as punitive damages, in addition to actual clean-up costs. "Thus, in most cases, insureds are forced by the threat of ruinous liability to begin clean-up efforts prior to the final determination of coverage." *Id.*

Indeed, the EPA's "PRP" letters are not trifling matters. If the PRP letter requires disclosure of information and the responsible party fails to respond, the EPA can seek civil penalties of up to $25,000 per day. 42 U.S.C. § 9604(e)(5)(B). Further, the EPA may issue an administrative order requiring a PRP to take specific action, violation of which "may result in civil penalties of up to $25,000 per day and punitive damages up to three times the amount of costs incurred by EPA as a result of the violation." *Browning–Ferris Indus. v. Muszynski,* 899 F.2d 151, 153 (2d Cir.1990). Arguably, if a PRP wants to present its defense, it must begin submitting evidentiary materials as the EPA develops its administrative record, well before an EPA court action is ever filed.

▇ Resistance to EPA efforts to obtain voluntary compliance may be factored into the apportionment of a responsible party's share of cleanup costs in subsequent litigation. *See, e.g., United States v. R.W. Meyer, Inc.,* 932 F.2d 568, 571 (6th Cir.1991) ("The trial court observed further that appellant 'neither assisted nor cooperated with the EPA officials during their investigation and eventual cleanup of the ... site' "). On the other hand, voluntary compliance with EPA response efforts may serve to insulate the insured against contribution claims later brought by nonsettling parties. *See* 42 U.S.C. § 9613(f)(2); *United States v. Cannons Engineering Corp.,* 899 F.2d 79, 92 (1st Cir.1990).

As the Second Circuit recognized in *Avondale Indus., Inc. v. Travelers Indem. Co.,* 887 F.2d 1200, 1206 (2d Cir.1989), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990), the public interest, as well as the economic interests of both the insured and the insurer, would counsel cooperation at early stages of remedial action under CERCLA: "Common sense argues that for Travelers to proffer a defense now is better for it, Avondale and the public interests in a prompt cleanup of the hazardous waste." In *Avondale,* a demand letter from the Louisiana Department of Environmental Quality had an effect equivalent to filing of a civil lawsuit in triggering the insurer's duty to defend under its policy.

Several other cases have held that an EPA or other administrative order or other notice of potential liability under CERCLA comes within the meaning of "suit" as used in liability policies. *See, e.g., Aetna Casualty & Sur. Co. v. Pintlar Corp.,* 948 F.2d 1507, 1516–18 (9th Cir.1991) (Idaho law); *Higgins Indus. v. Firemen's Fund Ins. Co.,* 730 F.Supp. 774, 776–79 (E.D.Mich.1989); *A.Y. McDonald v. Indus., Inc. v. Insurance Co. of North America,* 475 N.W.2d 607, 628 (Iowa 1991); *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Engineering Co.,* 326 N.C. 133, 153, 388 S.E.2d 557, 569–70 (1990); *United States Fidelity & Guar. Co. v. Specialty Coatings Co.,* 180 Ill.App.3d 378, 129 Ill.Dec. 306, 314, 535 N.E.2d 1071, 1079, *app. denied,* 127 Ill.2d 643, 136 Ill.Dec. 609, 545 N.E.2d 133 (1989); *Polkow v. Citizens Ins. Co. of America,* 180 Mich.App. 651, 447 N.W.2d 853, 856 (Ct.App. 1989), *rev'd on other grounds,* 438 Mich. 174, 476 N.W.2d 382 (1991);[52] *United States Aviex Co. v. Travelers Ins. Co.,* 125 Mich. App. 579, 590, 336 N.W.2d 838, 843 (1983). As the Illinois court explained in *Specialty*

---

**52.** In *Ray Indus., Inc. v. Liberty Mutual Ins. Co.,* 974 F.2d 754 (6th Cir.1992), the Sixth Circuit concluded that "the Michigan Supreme Court would reject *Polkow* ... and would adopt a narrow definition of the word 'suit.' " 974 F.2d at 761.

*Coatings,* where an agency has sought "voluntary" compliance by potentially responsible parties:

> It may be presumed that a potentially responsible party responding to the U.S. EPA's letter will be requested to undertake voluntarily such actions as the agency could choose to require through an action in the court. The fortuitous choice to first seek voluntary compliance instead of court action does not eliminate the specter of potential liability for clean-up costs and damages to be incurred by defendants. Indeed, it is the very threat of available formal legal action that is expected to motivate the recipient of a PRP letter into responding acceptability to the government's suggestions.

180 Ill.App.3d at 383, 129 Ill.Dec. at 314, 535 N.E.2d at 1079. *See also Hazen Paper Co. v. United States Fidelity & Guar. Co.,* 407 Mass. 689, 555 N.E.2d 576, 581–82 (1990) (insured "had no practical choice other than to respond actively to the letter" from EPA requesting voluntary action).

■ The concept of "suit" as the trigger of the insurers' duty to defend an insured "potentially responsible party" is not without logical or practical limits. "Suit" first connotes a formal effort to impose legal liability through a civil action, a judicial proceeding. In *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 75 (E.D.Mich.1987), the court observed that "coverage does not hinge on the form of action taken or the nature of the relief sought, but on an actual or threatened use of legal process to coerce payment or conduct by the policyholder." A "suit" according to *Ex–Cell–O,* "includes any effort to impose on the policyholders *a liability ultimately enforceable by a court,* . . . *Id.* (emphasis added). It seems immaterial whether the relief sought is characterized as equitable or legal, whether EPA seeks injunctive relief compelling remedial action, (*see* 42 U.S.C. § 9606), or chooses to undertake remediation itself and later sue responsible parties for the costs incurred under 42 U.S.C. § 9607(c)(3). *Cf. United States Aviex Co. v. Travelers Ins. Co.,* 125 Mich.App. at 590, 336 N.W.2d at 843 (1983) ("It is merely fortuitous . . . that the state has chosen to

have plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean-up itself and then suing plaintiff to recover those costs.").

A contingent liability that is purely hypothetical or speculative as to incidence and amount likely would not qualify as a "suit" triggering an insurer's duty to defend. Nor is the duty to defend triggered where under the facts as pleaded or as ascertained, it is not even arguable that, *e.g.,* the release of pollutants was "sudden and accidental." *See Grant–Southern Iron & Metal Co. v. CNA Ins. Co.,* 669 F.Supp. 798 (E.D.Mich.1986) (no duty to defend where complaint "does not arguably present" a covered claim and no evidence suggests that a covered claim "could be found by 'looking behind the complaint' "), *reversed on other grounds,* 905 F.2d 954 (6th Cir.1990). It has also been suggested that the duty to defend does not extend to EPA actions under CERCLA that are preventative, *i.e.,* that concern property damage that is threatened rather than actual. *See, e.g., Hazen Paper Co. v. United States Fidelity & Guar. Co.,* 407 Mass. 689, 555 N.E.2d 576, 580 (1990) (a letter which "claims only a threat of release of hazardous material . . . does not allege the occurrence of any damage that falls within the policy coverage").

Moreover, under Utah law the duty to defend does not arise only upon the pursuit of formal litigation against the insured:

> The duty to defend is broader than the duty to indemnify, but the insurer's obligation is not unlimited; the duty to defend is measured by the nature and kinds of risks covered by the policy and *arises whenever the insurer ascertains facts which give rise to the potential of liability under the policy* . . . .

*Deseret Fed. Sav. & Loan Co. v. United States Fidelity & Guar. Co.,* 714 P.2d 1143, 1146 (Utah 1986) (citing *Gray v. Zurich Insurance Co.,* 65 Cal.2d 263, 275–77, 54 Cal. Rptr. 104, 113, 419 P.2d 168, 177 (1966)).

An EPA potentially responsible party letter that seeks a binding commitment from a PRP to pay CERCLA response costs, accompanied by the threat of entry of compulsory orders or the commencement of litigation and the imposition of statutory penalties if

the PRP does not comply, plainly enables "the insurer [to] ascertain[ ] facts which give rise to the potential of liability under the policy," thus triggering the insurer's duty to defend. *Deseret Fed. Sav. & Loan Co.*, 714 P.2d at 1146.

■ Courts have distinguished "between groundless suits giving rise to the duty to defend, and actions which, even if successful, would not be within the policy and against which the insurer has no duty to defend." *Great Lakes Container Corp. v. National Union Fire Ins. Co.*, 727 F.2d 30, 34 (1st Cir.1984). They have also acknowledged that the insurer is duty-bound to defend its insured only "until it can confine the possibility of recovery to claims outside the coverage of the policy." *American Mutual Liability Ins. Co. v. Neville Chemical Co.*, 650 F.Supp. 929, 931 (W.D.Pa.1987). So long as there is the possibility that liability with policy coverage exists, however, the insurer remains obligated to defend the insured against the threatened imposition of such liability.

The insured's need for effective defense at the pre-litigation stage of CERCLA has been noted elsewhere: "Unlike the garden variety demand letter, which only exposes one to a potential threat of future litigation, a PRP notice carries with it immediate and severe implications...." *Aetna Casualty & Sur. Co. Pintlar Corp.*, 948 F.2d at 1516.

> Throughout the investigation process, the EPA develops an administrative record for the site and makes decisions that may seriously affect the cost of cleanup. A PRP may not seek judicial review of the EPA's actions until the EPA sues for cost recovery pursuant to 42 U.S.C. § 9607(a).... Even after a PRP gets to court, 42 U.S.C. § 9613(j)(1) limits judicial review of the EPA's actions to an administrative record that is prepared by the EPA itself, according to 42 U.S.C. § 9613(k). Ray argues that if a PRP wants to present its side of the story, it must begin submitting evidence for the administrative record immediately upon receipt of the PRP letter ... [and] that crucial discovery takes place between the receipt of a PRP letter and the filing of an actual complaint....

*Ray Indus., Inc. v. Liberty Mutual Ins. Co.*, 974 F.2d at 759.

The administrative action in this case reflects a tangibly coercive effort to obtain the "cooperation" of Quaker State (and other PRPs connected with the Ekotek Site) in defraying environmental response costs, costs representing a liability ultimately enforceable by a court under CERCLA. The June 12, 1989 letter from the EPA supplied Quaker State with draft copies of an "Administrative Order on Consent (AOC)" and a "Unilateral Administrative Order (UAO)," and further advised that "[i]f the AOC is not memorialized by all appropriate parties by July 7, 1989, the UAO will be signed into effect and immediately implemented by EPA." Exhibit 16 to Quaker State Mem., at 2. "The latter event," the letter warns, "may lead to the assessment of treble penalties on Responsible Party(ies) during subsequent cost recovery actions." *Id.*

Insureds in the position of Quaker State should not be put in the position of having to elect to incur far greater potential liability under CERCLA by forcing matters into traditional civil litigation before being able to avail themselves of the benefits of insurance coverage, including the insured's affirmative duty to defend the insured under the terms of the policy. Nothing in the CGL policy language requires such a result. According to its commonly understood meaning, "any suit against the insured" seeking to recover damages on account of property damage embraces coercive legal proceedings regardless of the particular forum chosen by legislature, be it a judicial or a "quasi-judicial" administrative one. The need for and purpose of the defense of the insured is the same in either setting. So is the scope of the insurer's duty to defend. Coverage of an enforceable legal liability for property damage cannot fairly be denied merely because the mechanism created to determine that liability is procedurally unusual or structurally unique. *Cf. Ray Indus., Inc. v. Liberty Mutual Ins. Co.*, 974 F.2d at 764 ("PRP letters may even represent a unique legal creation, with no true parallel in any other area of administrative law."). *See generally,* Barr, *CERCLA Made Simple: An Analysis of Cases Under the Comprehensive Environmental Response,*

*Compensation and Liability Act of 1980*, 45 Bus.Law. 923, 968–83 (1990).

Had the defendants desired a narrower, more particularized definition of that duty, they could have written one into their policies. Even after the enactment of CERCLA in 1980, however, the policy language remained unaltered in the defendants' policies. Unless coverage is defeated as a matter of law by the operation of the pollution exclusion (*see* Part V, *infra*), or as a matter of fact by the insured's alleged delay in giving notice under the policy terms, (*see* Part VII, *infra*), defendants' duty to defend has been triggered by the EPA actions taken with reference to the Ekotek Site.

## V. APPLYING THE POLLUTION EXCLUSION CLAUSE IN THE DEFENDANTS' CGL POLICIES TO RELEASES OF HAZARDOUS WASTE AT THE EKOTEK SITE; CONSTRUCTION AND APPLICATION OF THE "SUDDEN AND ACCIDENTAL" EXCEPTION.

### A. The Pollution Exclusion and the "Sudden and Accidental" Exception.

Defendants' CGL policies include language providing that coverage does not apply:

[t]o bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Liberty Mutual Comprehensive General Liability Policy No. LG1–161–028200–065, at Section 1, Exclusion (f) (annexed as Exhibit "A" to Affidavit of Joseph P. Covert, dated January 6, 1993, Exhibit 18 to Liberty Mutual Mem.).[53] "The standard form of the pollution exclusion was introduced in 1970, when it became a mandatory endorsement to the 1966 revision of the CGL, and it is part of the 1973 revision of the CGL." 7A John A. Appleman, Insurance Law and Practice § 4524 (Berdal ed. 1979 & Supp.1993).[54] "Faced with greater potential liability as a result of new federal environmental laws, the insurers adopted the above standard exclusion in an effort to limit their liability." *United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 734 F.Supp. at 445 (citing Note, *Insurance Coverage for Superfund Liability: A Plain Meaning Approach to the Pollution Exclusion Clause*, 27 Washburn L.J. 161, 170–71 (1987)), *aff'd*, 999 F.2d 489 (10th Cir.1993).[55]

---

**53.** The standard pollution exclusion language is found in other policies as well. *See, e.g.,* Liberty Mutual Umbrella Excess Liability Policy No. LE1–161–028200–085, Section I, exclusion (g) (annexed as Exhibit "B" to Affidavit of Joseph P. Covert, dated January 6, 1993, Exhibit 18 to Liberty Mutual Mem.); Fireman's Fund Comprehensive General Liability Policy # MXP 5670727, (annexed as Exhibit 19 to the Fireman's Fund Mem.). *See also* Fireman's Fund Mem. at 26–32, ¶¶ 57–68 & Exhibit 19. The defendants' "garage policies" contain similar exclusion language. *See* Unigard Mem. at 3–6, ¶¶ 6–11; Affidavit of Craig M. Brookman, dated January 15, 1993, Exhibit 2 to Unigard Mem. *See also* Part VI, *infra*.

**54.** The Florida Supreme Court summarized the "drafting history" of the standard pollution exclusion language in CGL policies:

Before 1966, the standard CGL policy covered only property and personal injury damage that was caused by "accident." *Broadwell Realty Servs., Inc. Fidelity & Casualty Co.*, 218 N.J.Super. 516, 528 A.2d 76, 84 (1987). In 1966 the insurance industry switched to "occurrence-based" policies in which the term "occurrence" was defined as " 'an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.' " *Broadwell*, 528 A.2d at 84 (quoting 3 Rowland H. Long, The Law of Liability Insurance App–53 (1966)). Beginning in 1970, the pollution exclusion clause at issue in this case [containing the sudden and accidental exception] was added to the standard policy. Finally, the policy was again changed in 1984 by the addition of what has been called an "absolute exclusion clause," which totally excludes coverage for pollution clean-up costs that arise from governmental directives. Kenneth S. Abraham, Environmental Liability Insurance Law 161 (1991).

*Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.*, 636 So.2d 700, 703 (Fla.1993); *see also id.* at 708–709 (Overton, J., dissenting).

**55.** Viewed in a light more favorable to the insurers, the pollution exclusion has been read to reflect a purpose "to prevent industries from seeking insurance coverage rather than stop pol-

Since the early 1980s, many insurers have included "absolute" pollution exclusions in their CGL policies, eliminating coverage for liability arising out of the discharge or clean-up of pollutants, with no exception for "sudden and accidental" releases. 7A JOHN A. APPLEMAN, INSURANCE LAW AND PRACTICE § 4525 (Berdal ed. 1979 & Supp.1993). *See, e.g., Union Mutual Fire Ins. Co. v. Hatch,* 835 F.Supp. 59, 64–65 (D.N.H.1993).[56] The CGL policies at issue in this case, however, were drafted with the prior standard language, including the "sudden and accidental" exception.

## B. Burden of Proof.

■ The defendants contend that it is Quaker State's burden to show the applicability of the "sudden and accidental" exception. Defs.Joint Mem. at 15 n. 9 (citing *Northern Ins. Co. v. Aardvark Assoc., Inc.,* 942 F.2d 189, 194–95 (3d Cir.1991); *A. Johnson & Co. v. Aetna Casualty & Sur. Co.,* 933 F.2d 66, 75 n. 4 (1st Cir.1991); *Park–Ohio Indus., Inc. v. Home Indemnity Co.,* 975 F.2d 1215 (6th Cir.1992)). While under Utah law, the burden is placed upon the insurer to prove that the insured's claim falls within an exclusion from coverage, (*see, e.g., Draughon v. CUNA Mutual Ins. Soc.,* 771 P.2d 1105, 1108 (Utah Ct.App.1989),[57] it is not clear whether under Utah law the insurer also bears the burden to show that *exceptions* to an exclusion do not apply. Some courts, applying the law of other states, have so held. *See, e.g., New Castle County v. Hartford Accident & Indem. Co.,* 933 F.2d 1162, 1181–82 (3d Cir. 1991) (Delaware law); *Remington Arms Co.*

*v. Liberty Mutual Ins. Co.,* 810 F.Supp. 1406, 1413 n. 2 (D.Del.1992) (Connecticut law); 19 G. COUCH, COUCH ON INSURANCE § 79:385, at 338 (M. Rhodes rev. ed. 1983). The better rule appears to be that the insured bears the burden of showing that discharge of pollutants was "sudden and accidental" as an aspect of proving coverage under a CGL policy. *See Aardvark,* 942 F.2d at 194–95; *Dakhue Landfill, Inc. v. Employers Ins. of Wausau,* 508 N.W.2d 798, 803 (Minn.Ct.App.1993); *Just v. Land Reclamation, Ltd.,* 151 Wis.2d 593, 445 N.W.2d 683, 688 (Ct.App.1989); *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 702 F.Supp. 1317, 1328–29 (E.D.Mich.1988), *Fischer & Porter Co. v. Liberty Mutual Ins. Co.,* 656 F.Supp. 132, 140 (E.D.Pa.1986). This would also seem consistent with the proposition "that in civil cases the burden rests as a general rule 'on the party who substantially asserts the affirmative of the issue.'" *State in the Interest of N.H.B.,* 777 P.2d 487, 491 (Utah Ct.App.1989) (quoting *Lilienthal v. United States,* 97 U.S. 237, 266, 24 L.Ed. 901 (1878)).

Many of the numbered paragraphs set forth in the parties' statements of uncontroverted facts describe particular events, or series of events, in which drain oil, acid sludge or other materials were discharged onto the land or into the water at the Ekotek Site. Defendants contend that these occurrences fall squarely within the terms of the pollution exclusion, and that as a consequence, they owe no duty to defend or indemnify Quaker State in connection with its liability under CERCLA. Quaker State, on the other hand, characterizes many of these

---

luting the environment," (*Grant–Southern Iron & Metal Co. v. CNA Ins. Co.,* 669 F.Supp. 798, 800 (E.D.Mich.1987)); "[b]y exposing them to uninsured liability for intentional pollution," the pollution exclusion clause "was also designed to motivate insureds into reducing or stopping such pollution." *United States Fidelity & Guar. Co. v. Morrison Grain Co.,* 734 F.Supp. at 445 (citing *Grant–Southern* ). *See also American States Ins. v. Maryland Casualty Co.,* 587 F.Supp. 1549 (E.D.Mich.1984); *Niagara County v. Utica Mutual Ins. Co.,* 80 A.D.2d 415, 439 N.Y.S.2d 538 (1981).

**56.** *See, e.g., Alcolac, Inc. v. California Union Ins. Co.,* 716 F.Supp. 1546, 1549 (D.Md.1989); *Guilford Indus., Inc. v. Liberty Mutual Ins. Co.,* 688

F.Supp. 792 (D.Me.1988) (coverage excluded for fuel oil tanks ruptured during a flood); *Vantage Dev. Corp. v. American Environment Technologies Corp.,* 251 N.J.Super. 516, 598 A.2d 948 (1991) (coverage excluded for oil deposited on property by trespasser); *Budofsky v. Hartford Ins. Co.,* 147 Misc.2d 691, 556 N.Y.S.2d 438 (1990) (pollution caused by illegal activities of tenants not covered); *American States Ins. Co. v. Skrobis Painting & Decorating, Inc.,* 182 Wis.2d 445, 513 N.W.2d 695 (1994).

**57.** *See also LDS Hospital v. Capitol Life Ins. Co.,* 765 P.2d at 859–60; *MacKenzie v. Mutual Benefit Life Ins. Co.,* 528 P.2d 150, 151 & n. 1 (Utah 1974); *Whitlock v. Old Am. Ins. Co.,* 21 Utah 2d 131, 442 P.2d 26, 27 (1968).

events as "sudden and accidental" releases which are excepted from the operation of the pollution exclusion by its express terms. *See* Quaker State Mem. at 4–9, ¶¶ 10–22; Defs. Joint Mem. at 3–9, ¶¶ 3, 4(a)–(g), 6–8; Quaker State Reply at 3–10, ¶¶ 3, 4(a)–(g), 6–8; Liberty Mutual Mem. at 16–27, ¶¶ 17–23, 24, 25–26, 28, 33, 36, 37, 39, 40, 43, 46; Fireman's Fund Mem. at 8–19, ¶¶ 15, 17, 19–22, 23–24, 25–26, 28, 32, 35, 36–39, 40. Whether Quaker State has met its burden to show coverage must be measured according to the proper construction of the pollution exclusion and the "sudden and accidental" exception.

### C. Rules of Construction re: Exclusions From Coverage.

It seems helpful at this point to recall the rules of construction applicable under Utah law to exclusions from coverage under insurance policies:

> The scope of such an exclusion will be interpreted according to its clear and unambiguous language. *Dautel v. United Pac. Ins. Co.,* 48 Wash.App. 759, 740 P.2d 894 (1987), (exclusionary clauses are narrowly construed, particularly when the insurer has expressed coverage in broad, inclusive terms). Unless there is some ambiguity or uncertainty in the language of the policy, it should be enforced according to its terms. *St. Paul Fire and Marine Ins. v. Commercial Union Assurance,* 606 P.2d 1206 (Utah 1980). We presume that the language used by Bear River Mutual was included for the purpose stated and to give effect according to its usual and ordinary meaning. *Marriot v. Pacific Nat. Life Assurance Co.,* 24 Utah 2d 182, 467 P.2d 981 (1970). In the absence of a clear and unambiguous definition in the policy, the term "automobile" should be given its common sense, plain meaning....

*Bear River Mutual Ins. Co. v. Wright,* 770 P.2d 1019, 1020–21 (Utah Ct.App.1989) (foot-

note omitted, citing *Deseret Sav. Bank v. Francis,* 62 Utah 85, 88, 217 P. 1114, 1115 (1923)).[58] *See also Matlock v. Government Employees Ins. Co.,* 546 P.2d 903 (Utah 1976) (Tuckett, J.) (discussing "[t]he common ordinary meaning to be attributed to the policy's language....").

While "ordinary contract rules should be followed"[59] when "construing the meaning of an insurance policy term," including an exclusion,

> It should also be kept in mind that "the purpose of insurance is to insure," and clauses excluding activities from coverage are to be strictly construed against the insurer. *LDS Hosp. v. Capitol Life Ins. Co.,* 765 P.2d 857, 859 (Utah 1988). Parties to an insurance policy, however, "are free to define the exact scope of the policy's coverage and may specify the losses or encumbrances the policy is intended to encompass." *Valley Bank & Trust Co. v. U.S. Life Title Ins. Co.,* 776 P.2d 933, 936 (Utah App.1989) (quoting *Brown v. St. Paul Title Ins. Corp.,* 634 F.2d 1103, 1107 (8th Cir.1980)). The insurer may avoid assuming the risk of loss associated with a particular activity or place by using "language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided." *Village Inn Apartments v. State Farm Fire & Casualty Co.,* 790 P.2d 581, 583 (Utah App. 1990) (quoting *Reserve Ins. Co. v. Pisciotta,* 30 Cal.3d 800, 180 Cal.Rptr. 628, 640 P.2d 764, 769 (1982)). If the policy terms excluding coverage are unambiguous, then "we interpret those terms in accordance with their plain and ordinary meaning." *Valley Bank,* 776 P.2d at 936.

*Dawson v. Dawson,* 841 P.2d 749, 750 (Utah Ct.App.1992). "[P]rovisions that limit or exclude coverage should be strictly construed against the insurer." *United States Fidelity*

---

**58.** The issue in *Bear River* concerned whether a "motorcycle" was an "automobile" as defined by the policy or as a matter of law. Noting that "under a common understanding of the terms a 'motorcycle' is not an 'automobile'" and that the policy included no more expansive definition, the Utah Court of Appeals held that a provision ex-

cluding coverage for unlisted "automobiles" does not exclude coverage for injuries incurred while operating an unlisted motorcycle. 770 P.2d at 1020–21.

**59.** *See, e.g., Bergera v. Ideal Nat'l Life Ins. Co.,* 524 P.2d 599, 600 (Utah 1974).

& *Guar. Co. v. Sandt,* 854 P.2d 519, 523 (Utah 1993) (citations omitted).

## D. Construction of the "Sudden and Accidental" Exception.

### 1. *Hartford* and the objective temporal element.

The insurance policy exclusion language now at issue, with its "sudden and accidental" exception, was previously addressed by this Court in *Hartford Accident & Indem. Co. v. U.S. Fidelity & Guar. Co.,* 765 F.Supp. 677 (D.Utah 1991), *affirmed,* 962 F.2d 1484 (10th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992). The *Hartford* case was an action for declaratory judgment brought by Hartford Accident & Indemnity Co. ("Hartford") to determine whether Hartford's comprehensive general liability (CGL) insurance policy issued to El Paso Natural Gas Co. ("El Paso") excluded coverage for continuous pollution. The Hartford policy included a pollution exclusion with a "sudden and accidental" exception. El Paso periodically discharged waste lubricating oil which later proved to contain a polychlorinated biphenyl (PCB) into unlined earthen disposal pits. El Paso argued that their Hartford policy covered the damage caused by the PCBs because the damage was unexpected and unintended, and the damage therefore fell within the sudden and accidental exception to the pollution exclusion.

There being no controlling Utah Supreme Court precedent, the Court approached interpretation of the "sudden and accidental" exception as a question of first impression, reviewing decisions from courts in other circuits and other states: [60]

The courts are divided as to the proper interpretation of the terms sudden and accidental in the context of liability insurance. Some courts interpret the phrase to mean "unexpected and unintended." *See e.g., Anderson & Middleton Lumber Co. v. Lumbermen's Mutual Casualty Co.,* 53 Wash.2d 404, 333 P.2d 938 (1959); *New England Gas & Electric Ass'n v. Ocean Accident & Guarantee Corp.,* 330 Mass. 640, 116 N.E.2d 671, 680–81 (1953). Other courts find that the terms sudden and accidental mean "happening without notice and occurring by chance." *See e.g., U.S. Fidelity & Guaranty v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir.1988); *Great Lakes Container Corp. v. National Union Fire Ins. Co.,* 727 F.2d 30 (1st Cir.1984).

765 F.Supp. at 680.[61] This Court concluded in *Hartford* that "the more well-reasoned case law gives the phrase sudden and accidental its plain and simple meaning," *viz.,* that coverage is excluded "unless the contamination occurs abruptly, without notice, and such events happen by chance," unexpectedly. *Id.*

Applied in the context of repeated discharges of hazardous material into the environment in that case, the phrase "sudden and accidental" was not ambiguous:

The court finds that the words sudden and accidental have plain, discrete and readily ascertainable meanings. Such language cannot give rise to any reasonable expecta-

---

**60.** Addressing the same issue at about the same time, the Third Circuit observed:

Although the cases assembled by the parties are legion, we discern neither a noticeable trend nor a majority position. Rather, the authority appears to be evenly divided between the parties' competing constructions of the pollution exclusion clause, with about half of the cases holding that the clause bars coverage, and with the other half holding that it does not.... [L]engthy string cites provide us with little guidance....

*New Castle County v. Hartford Accident & Indem. Co.,* 933 F.2d 1162, 1195–96 (3d Cir.1991) (footnotes, heavily laden with citations, omitted).

**61.** The Tenth Circuit discussed the split of authority on this issue more recently in *United*

*States Fidelity & Guaranty Co. v. Morrison Grain Co., Inc.,* 999 F.2d 489 (10th Cir.1993):

Morrison Grain and Morrison Coal contend in this action that "sudden and accidental" is ambiguous and means the unforeseen, the unintended, or the unexpected *from the viewpoint of the insured.* This proposition has support in a number of state and federal district court decisions, such as *Pepper's Steel & Alloys, Inc. v. United States Fidelity & Guar. Co.,* 668 F.Supp. 1541 (S.D.Fla.1987) and *Payne v. United States Fidelity & Guar. Co.,* 625 F.Supp. 1189 (S.D.Fla.1985). Insurers, on the other hand, urge that "sudden and accidental" is unambiguous and has an *objective temporal* meaning. They cite an equally extensive line of cases in support of that position, ...

999 F.2d at 492–93 (emphasis in original).

tion of coverage for claims arising from repeated and continuous polluting events. A casual reading of the policy as a whole by the ordinary insured should negate any expectation of coverage with respect to such claims. *Great Lakes,* 727 F.2d at 34. As persuasively noted by the Sixth Circuit, the sudden and accidental "language is clear and plain, something only a lawyer's ingenuity could make ambiguous … It's strange logic to perceive ambiguity in this clause." *U.S. Fidelity,* 856 F.2d at 34 (citations omitted).

765 F.Supp. at 681. This Court also emphasized that the focus of the inquiry under the "sudden and accidental" exception clearly relates to the nature of the "discharge, dispersal, release or escape" of the pollution itself, not to the nature of the damages caused. If the *discharge* is not sudden and accidental, the exclusion is applicable, and the resultant injury or damage is not within policy coverage. *Id.* (citing *Fischer & Porter Co. v. Liberty Mutual Ins. Co.,* 656 F.Supp. 132, 140 (E.D.Pa.1986)).

In affirming this Court's grant of summary judgment in favor of the insurer, the Tenth Circuit accorded the terms "sudden" and "accidental" distinct meanings: the word "accidental" means "unexpected or unintended." *Hartford,* 962 F.2d at 1488. The term "sudden" must be given its conventional temporal definition; "sudden" in this context "cannot mean 'gradual,' 'routine' or 'continuous.'" *Id.* at 1489. It, therefore, means abrupt or instantaneous. *Id.* at 1490. The Tenth Circuit ruled that "the temporal element of 'sudden' when joined with 'accidental' is unambiguous," (*id.*), and that the terms of the exception must be read together: "'sudden and accidental' in the pollution exclusion means abrupt or quick *and* unexpected or unintended in the context of Utah law." *Id.* at 1492 (emphasis in original).

### 2. *Anaconda, Morrison Grain* and *Gridley.*

The Tenth Circuit agreed with this Court's reading of the "sudden and accidental" exception in *Hartford.* It still does. In *Anaconda Minerals Co. v. Stoller Chemical Co.,* 990 F.2d 1175 (10th Cir.1993), the Tenth

Circuit declined either to overrule *Hartford*'s reading of the "sudden and accidental" exception or to certify the question to the Utah Supreme Court. Noting that "[t]he Court will certify only questions which are both unsettled and dispositive," the court of appeals declared that "[i]t is clear from our analysis in *Hartford* that the controlling law is not unsettled." 990 F.2d at 1177. The court of appeals rejected the argument that "sudden and accidental" is ambiguous and "that the word 'sudden' should be construed against the insurer to mean unexpected or unintended instead of abrupt or instantaneous[:]"

First, the term "sudden and accidental" is unambiguous. The word "accidental" means unexpected or unintended. *Hartford,* 962 F.2d at 1488. The term "sudden" must be given its conventional temporal definition. *Id.* at 1489. It, therefore, means abrupt or instantaneous. *Id.* at 1490.

990 F.2d at 1178–79.

More recently, in *United States Fidelity & Guaranty Co. v. Morrison Grain Co., Inc.,* 999 F.2d 489 (10th Cir.1993), the Tenth Circuit affirmed the district court's ruling that "sudden and accidental" is measured by an objective temporal standard:

In granting the Insurers' motion for summary judgment, the District Court, in its lengthy, thorough opinion, agreed with the reasoning of the latter line of authorities, concluding that "'sudden and accidental' should be [construed] *objectively* from the circumstances surrounding the actual release or discharge of the pollutants." 734 F.Supp. at 449 (emphasis added). According to the District Court:

The terms, "sudden and accidental," are unambiguous. As commonly used, the meaning of "sudden" combines both the elements of without notice or warning and quick or brief in time. *C.L. Hauthaway & Sons [v. American Motorists Ins. Co.],* 712 F.Supp. [265], 286 [ (D.Mass.1989) ]; *United States Fidelity & Guar. Co. v.] Murray Ohio Mfg. Co.,* 693 F.Supp. [617,] 621 [ (M.D.Tenn. 1988) ]. "Accidental" is typically defined from the subjective viewpoint of happen-

ing unexpectedly or by chance, while "sudden" has an objective definition. *General Host Corp.*, 667 F.Supp. at 1428. Sudden connotes "a temporal aspect of immediacy, abruptness, swiftness, quickness, instantaneousness, and brevity." *C.L. Hauthaway & Sons*, 712 F.Supp. at 268.

[ ... ]

If the discharge of pollutants is brief or short, unexpected or unanticipated, not gradual or sustained, and not intended or expected, then the "sudden and accidental" exception applies.

*Id.* at 446–47. We agree....

999 F.2d at 493 (emphasis added by court). The construction of the "sudden and accidental" exception thus does not present a question of first impression before this Court or in this circuit.[62]

The Utah Court of Appeals has also addressed the question.[63] In *Gridley Assocs., Ltd. v. Transamerica Ins. Co.*, 828 P.2d 524 (Utah Ct.App.1992), that court adopted a like reading of "sudden" for purposes of the pollution exclusion clause. In *Gridley*, plaintiffs operated a self-service gasoline station. In or about November 1985, a pipe connecting an underground gasoline storage tank to the customer service pumps broke, causing gasoline to be discharged underground each time the pumps were operated. Uncontroverted facts established that the pipe had experienced a "clean break," as opposed to "corrosion or deterioration which would have resulted in a gradual drip or trickle of gasoline from the line." 828 P.2d at 525, 527. After first affirming the district court's ruling that "sudden" is not ambiguous as used in Gridley's garage policy, the Utah Court of Appeals expressly adopted the reasoning of cases such as *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31 (6th Cir.1988), and *United States Fidelity &*

*Guar. Co. v. Morrison Grain Co.*, 734 F.Supp. 437 (D.Kan.1990), and held that "while the word connotes a sense of unexpectedness, 'sudden' within the 'sudden and accidental' clause cannot be defined without reference to a temporal element, specifically immediacy, abruptness, and quickness." 828 P.2d at 527 (footnote omitted).

With respect to the particular facts of *Gridley*, the court of appeals concluded, "[t]he clean break certainly resulted in an unexpected as well as an immediate and abrupt flow of gasoline from the severed line every time the pump was activated. Accordingly, the trial court correctly concluded that the discharge was "sudden" under Gridley's policy." *Id.* That spillage occurred over a period of time between November 1985 and detection and repair of the leak in February 1986 did not compel a different conclusion:

[T]he explicit language of Gridley's policy only requires that the discharge itself be "sudden" in order to be covered under the policy. The "length of time that elapse[s] before the leak [is] discovered is irrelevant, as to the suddenness of the discharge." *Wagner v. Milwaukee Mut. Ins. Co.*, 145 Wis.2d 609, 427 N.W.2d 854, 857 (Wis.App. 1988), overruled on other grounds, *Just v. Land Reclamation, Ltd.*, 155 Wis.2d 737, 456 N.W.2d 570 (Wis.1990). For instance, if an accident causes a break in a very large oil line in a remote area which spills large amounts of oil onto the ground, the fact that the oil spill remains undetected for a period of time does not render the discharge of oil any less "sudden." Accordingly, ... where there was damage to a line which caused an immediate spill of gasoline into the ground that remained undiscovered by Gridley for some months, the discharge itself was still "sudden" as

---

**62.** Quaker State urges that this case is indeed one of first impression at least as to two issues: "(1) the correct point of view for interpreting the sudden and accidental exception to the pollution exclusion, and (2) the applicability of the exclusion where, as here, there is undisputed evidence of discrete, sudden and accidental spills." Quaker State Reply Mem. at 15. *See* Parts V.E, V.F and V.I, *infra*.

**63.** "[W]here a state Supreme Court has not addressed an issue 'we may consider all available resources, including [that state's] appellate court decisions, other state and federal decisions, and the general trend of authority, to determine how the [state] Supreme Court would construe the law....' " *Anaconda*, 990 F.2d at 1177 (quoting *Hartford*, at 1487–88 n. 3).

contemplated by the exception to the pollution exclusion.

*Id.* at 527–28.

As the Tenth Circuit concluded in *Hartford,* 962 F.2d at 1490, *Gridley* reinforces the view that the Utah Supreme Court would construe "sudden" as including an objective, temporal element: "It, therefore, means abrupt or instantaneous." *Anaconda,* 990 F.2d at 1178–79 (citing *Hartford,* 962 F.2d at 1490). Of necessity, then, the Court must approach the "sudden and accidental" exception in light of the construction adopted in *Hartford, Anaconda, Morrison Grain* and *Gridley.*[64]

### 3. "Sudden and accidental:" the *Pennsylvania National* example.

■ Reading both terms together, and in light of the existing case law, the phrase "sudden and accidental" may well be understood to mean "discrete" and "isolated;"[65] in the district court opinion in *Morrison Grain,* Judge Crow remarked that "the pollution exclusion restricts coverage *to accidents distinct in time and place.*" 734 F.Supp. at 447 (emphasis added). Following *Hartford* and *Anaconda,* the phrase plainly does *not* mean "regular" and "continuous" and "gradual,"[66] or "repeated,"[67] or "routine."[68]

Another recent Tenth Circuit case sheds some additional light on the kind of occurrence which may properly be characterized as a "sudden and accidental" discharge or release. In *Westchester Fire Insurance v. City of Pittsburg, Kansas,* 794 F.Supp. 353 (D.Kan.1992), motorists Ernest and Brandon Radell were injured when the mosquito pesticide fogging equipment on an adjacent municipal vehicle abruptly began operating, spraying the plaintiffs with a toxic mixture of malathion and diesel fuel. In the district court's opinion, Chief Judge O'Connor noted that "[i]t is uncontroverted that the fogging apparatus activated suddenly as the City truck passed the Radells' vehicle, and there is no evidence to suggest that the City expected or intended the discharge to occur." 794 F.Supp. at 355. In light of the "sudden and accidental" nature of the release, the district court held that based upon the "sudden and accidental" exception to the insurer's pollution exclusion, the discharge was covered under the insurer's policy. *Id.* The court appeals affirmed the district court's denial of the insurer's motion for summary judgment, pointing to the uncontroverted testimony of Ernest Radell "which clearly demonstrated the fogging equipment was not operating until the city's truck came abreast of the Radell car." *Pennsylvania National Mutual Casualty Ins. Co. v. City of Pittsburg, Kansas,* 987 F.2d 1516, 1520 (10th Cir. 1993). Noting that "normally an operator could not activate the equipment without leaving the truck and manually throwing a switch," and that no evidence had been adduced that the switch had been thrown, "[t]he evidence is uncontroverted that the

---

**64.** *Broderick Inv. Co. v. Hartford Accident & Indem. Co.,* 954 F.2d 601, 605 (10th Cir.1992), simply follows the Colorado Supreme Court's decision in *Hecla Mining Co. v. New Hampshire Ins. Co.,* 811 P.2d 1083 (Colo.1991), that under Colorado law, "sudden and accidental" means "unexpected and unintended." 811 P.2d at 1092.

**65.** *See, e.g., Independent Petrochemical Corp. v. Aetna Casualty and Sur. Co.,* 842 F.Supp. at 583 (D.D.C.1994) ("it becomes clear that the sprayings [of hazardous waste] were not **isolated, discrete** events because each was done within the regular course of Bliss' business over a period of at least two years.... "[T]he discharges at issue in this case were not "sudden" within the meaning of the pollution exclusion clause." [emphasis added] ).

**66.** "The more relevant fact is El Paso's **regular** and **continuous** business practice of discharging

waste products directly into the environment. While the meaning of 'sudden and accidental' may include the unexpected, it plainly cannot comprehend unexpected, unintended and **gradual.** " *Hartford,* 962 F.2d at 1492) (emphasis added). "[B]ecause the discharge[s] themselves were **gradual** and intended the pollution exclusion bars coverage." *Anaconda,* 990 F.2d at 1179 (emphasis added).

**67.** Such language cannot give rise to any reasonable expectation of coverage for claims arising from **repeated** and continuous polluting events." *Hartford,* 765 F.Supp. at 681 (emphasis added).

**68.** "In El Paso's case, the disposal of liquid wastes into the pits was neither abrupt not unexpected but a continuous and **routine** operating practice over many years." *Hartford,* 962 F.2d at 1492 (emphasis added).

incident was sudden and accidental." *Id.* (footnote omitted).

*Pennsylvania National* illustrates the application of what the Tenth Circuit in *Morrison Grain* referred to as the "objective temporal meaning" of "sudden" as used in the "sudden and accidental" exception: the release in question was an isolated, extraordinary, one-of-a-kind, nonrecurring, nonforeseeable event.

### 4. Recent cases from other circuits have also found "sudden and accidental" to have an objective temporal meaning.

In *Smith v. Hughes Aircraft Co.*, 10 F.3d 1448 (9th Cir.1993), the Ninth Circuit observed that

> "[t]he district court properly (1) looked to the language of the exclusion and concluded that "sudden" "unmistakably connotes a temporal quality" (otherwise, it would simply be a synonym for "accidental"); (2) concluded that requiring temporal brevity furthered public policy by excluding deliberate indifference on the part of a polluting insured; and (3) analyzed the purpose of the transaction and, noting that Hughes is not an unsophisticated consumer, concluded that "an interpretation of 'sudden' that fails to recognize its temporal quality" would frustrate the parties' intent by forcing the Insurers to buy into the risk of insuring a pollution-prone operation."

10 F.3d at 1452. The Ninth Circuit also noted that California courts have concluded that "sudden and accidental" is not an ambiguous phrase, and that " 'sudden' connotes a temporal quality," citing three 1993 California appellate cases. *Id.*[69] In *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal.App.4th 715, 15 Cal.Rptr.2d 815, 841 (1993), one California court of appeals explained:

> [A]ccidental conveys the sense of an unexpected or unintended event, while "sudden" conveys the sense of an unexpected event that is abrupt or immediate in nature. "Sudden and accidental" is not am-

biguous if we give words their full significance. A court should not make a phrase ambiguous by unreasonably truncating a word's meaning.

15 Cal.Rptr.2d at 841.

In *Bureau of Engraving, Inc. v. Federal Ins. Co.*, 5 F.3d 1175 (8th Cir.1993), the plaintiff-insured shipped its toxic and hazardous chemical wastes to a firm known as Ecolotech, Inc., "based upon Ecolotech's representations that it would recycle the wastes using environmentally safe processes to recover usable metals." 5 F.3d at 1175. State environmental officials discovered that Ecolotech had stored the toxic chemicals rather than recycling them and that the toxic chemicals had contaminated groundwater surrounding the Ecolotech storage facility. The state demanded that the insured and other generators clean up the spills. *Id.* at 1176. The Eighth Circuit affirmed summary judgment in favor of the insurers under the pollution exclusion clause, rejecting arguments by the insured "that 'sudden and accidental' is ambiguous, since it can mean 'unexpected and unintended' as well [as] 'abrupt and unintended[:]' "

> BE further contends that the policy term "sudden" should be interpreted to mean "unexpected" because: (1) a reasonable layperson would so construe it based upon dictionary definitions and common usage; (2) the term has been so construed for many years in boiler and machinery policies; (3) numerous cases from other jurisdictions have so construed it; and (4) the insurance industry represented to insurance regulators that the exclusion would not bar coverage except for pollution "expected or intended" by the insured.

5 F.3d at 1177. The Eighth Circuit relied on a 1992 Minnesota appellate opinion holding "sudden and accidental" to be unambiguous on this point:

> " 'Sudden' in the context of the policies carries the temporal connotation of 'abruptness.' 'Sudden' means the incident at issue occurs relatively quickly rather

---

**69.** *See Shell Oil Co. v. Winterthur Swiss Ins. Co.,* 12 Cal.App.4th 715, 15 Cal.Rptr.2d 815, 841 (Ct. App.1993); *Truck Ins. Exch. v. Pozzuoli,* 17 Cal. App.4th 856, 21 Cal.Rptr.2d 650, 651 (Ct.App.

1993); *ACL Technologies, Inc. v. Northbrook Prop. & Casualty Ins. Co.,* 17 Cal.App.4th 1773, 22 Cal.Rptr.2d 206, 213–14 (Ct.App.1993).

than gradually over a long period of time.... 'Unexpected' is not a reasonable interpretation [of 'sudden'] in the context of the policies because 'unexpected' is conveyed by the term 'accidental.' If 'sudden' meant 'unexpected,' 'sudden' would become superfluous and repetitious in the policies use of the phrase 'sudden and accidental.'"

*Id.* (quoting *Sylvester Bros. Dev. Co. v. Great Central Ins. Co.,* 480 N.W.2d 368, 375–76 (Minn.Ct.App.1992)). "In our view," the Eighth Circuit concluded, "*Sylvester I* construed the 'sudden and accidental' language consistent with the better reasoned authorities in other jurisdictions." *Id. Accord, Aetna Casualty & Sur. Co. v. General Dynamics Corp.,* 968 F.2d 707, 710 (8th Cir.1992) (same conclusion under Missouri law). Thus, under *Bureau of Engraving,* "in order to qualify for the 'sudden and accidental' exception to [the pollution] exclusion under Minnesota law the insured must show that its release of a contaminant was abrupt." *Bituminous Casualty Corp. v. Tonka Corp.,* 9 F.3d 51, 53 (8th Cir.1993).[70]

### 5. The "sudden and accidental" exception and "extended" or "continuous" pollution.

In *American Motorists Ins. Co. v. General Host Corp.,* 946 F.2d 1482, 1486 (10th Cir. 1991), the Tenth Circuit noted "[t]here is a sharp division of authority on the issue of whether pollution that occurs over an extended period of time is 'sudden' within the mean-

ing of the pollution exclusion...." Tenth Circuit cases since *General Host* appear to have answered that question in the negative, as have courts in several other circuits.

Following Pennsylvania appellate case law,[71] the Third Circuit in *Northern Ins. Co. of New York v. Aardvark Assocs., Inc.,* 942 F.2d 189 (3d Cir.1991), concluded that the plain meaning of the "sudden and accidental" exception embraces "'the temporal meaning of sudden, i.e., abruptness or brevity.'" 942 F.2d at 192 (quoting *Lower Paxton Township v. United States Fidelity & Guar. Co.,* 383 Pa.Super. at 577, 557 A.2d at 402). Distinguishing its earlier opinion applying Delaware law in *New Castle County v. Hartford Accident and Indem. Co.,* 933 F.2d 1162 (3d Cir.1991), the *Aardvark* panel commented that the Pennsylvania decisions "are well-reasoned and are supported by a substantial body of precedent from many other jurisdictions." *Id.* at 193. Further, the court held that where "there was abundant evidence in the summary judgment record showing that discharges occurred over extended periods," summary judgment under the pollution exclusion was proper:

> There is of course no dispute that the CERCLA claims were based on pollution and thus fell within the policies' general exclusion. In order to avoid summary judgment, Aardvark [(the insured)] was required to show—that is, to "point[ ] out to the district court" (*Celotex Corp.,* 477

**70.** A growing number of state courts have adopted a similar analysis. *See, e.g., Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 476 N.W.2d 392 (1991):

> We conclude that when understood in its plain and easily understood sense, "sudden" is defined with a "temporal element that joins together conceptually the immediate and the unexpected." [*United States Fidelity & Guaranty Co. v.] Star Fire Coals, supra* [856 F.2d 31] at 34 [ (6th Cir.1988) ]. The common, everyday understanding of the term "sudden" is "happening, coming, made or done quickly, without warning or unexpectedly; abrupt." *FL Aerospace [v. Aetna Casualty & Surety Co.], supra* [897 F.2d 214] at 219 [ (6th Cir.1990) ]. "Accidental" means "[o]ccurring unexpectedly and unintentionally; by chance." The American Heritage Dictionary: Second College Edition, p. 72.

438 Mich. at 207–08, 476 N.W.2d at 397–98. *See also Hybud Equip. Corp. v. Sphere Drake Ins. Co.,* 64 Ohio St.3d 657, 597 N.E.2d 1096 (1992) (pollution exclusion not ambiguous; "sudden" includes a temporal meaning); *Lumbermens Mutual Casualty Co. v. Belleville Indus., Inc.,* 407 Mass. 675, 555 N.E.2d 568 (1990); *Waste Management of the Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374 (1986); *see generally* S. Murphy, Note, *The "Sudden and Accidental" Exception to the Pollution Exclusion Clause in Comprehensive General Liability Insurance Policies: The Gordian Knot of Environmental Liability,* 45 VAND.L.REV. 161 (1992).

**71.** *Techalloy Co., Inc. v. Reliance Ins. Co.,* 338 Pa.Super. 1, 487 A.2d 820 (1984), *allocatur denied,* 338 E.D. Allocatur Dkt.1985 (Pa. Oct. 31, 1985); *Lower Paxton Township v. United States Fidelity & Guar. Co.,* 383 Pa.Super. 558, 557 A.2d 393 (1989), *allocatur denied,* 93 M.D.Allocatur Dkt.1989 (Pa. Sept. 22, 1989).

U.S. at 325, 106 S.Ct. at 2554)—facts that if proven at trial would establish that the CERCLA claims were based on "sudden and accidental" discharges. Aardvark failed to make this showing. . . .

942 F.2d at 195.

Similarly, in *New York v. AMRO Realty Corp.*, 936 F.2d 1420 (2d Cir.1991), the insured "had engaged in pollution from the 1950's through 1981, by improperly disposing solvents including tetrachloroethylene and trichloroethylene into a drainage ditch, into groundwater via a septic system, and by dumping the solvents directly onto the ground." 936 F.2d at 1422. The Second Circuit, following *Technicon Electronics Corp. v. American Home Assurance Co.*, 141 A.D.2d 124, 533 N.Y.S.2d 91 (2d Dept.1988), *affirmed*, 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989), held that the improper disposal of industrial waste "for close to thirty years cannot be understood to allege a 'sudden' release." 936 F.2d at 1428. " 'For a release or discharge to be sudden, it "must occur[ ] over a short period of time." ' " *Id.* (quoting *Ogden Corp. v. Travelers Indem. Co.*, 924 F.2d 39, 42 (2d Cir.1991) (quoting *Technicon*, 141 A.D.2d at 137, 533 N.Y.S.2d at 99)).

In *Ray Indus., Inc. v. Liberty Mutual Ins. Co.*, 974 F.2d 754 (6th Cir.1992), the Sixth Circuit followed the Michigan Supreme Court's reading of "sudden" in *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392 (1991), and its own prior opinions in holding that the regular disposal of waste resin barrels at a landfill where the barrels were crushed, releasing their contents, did not fall within the "sudden and accidental" exception:

Whatever the other facts may have been, the parties clearly stipulated that the barrels were routinely crushed on a regular basis. We believe that this fact outweighs all others, and that Ray's actions therefore cannot fit the definition of "sudden and

accidental" adopted by the Sixth Circuit and the Michigan Supreme Court:

We conclude that when considered in its plain and easily understood sense, "sudden" is defined with a "temporal element that joins together conceptually the immediate and the unexpected." *Star Fire Coals*, supra at 34. The common, everyday understanding of the term "sudden" is " 'happening, coming, made or done quickly, without warning or unexpectedly; abrupt.' " *FL Aerospace*, supra at 219. "Accidental" means "[o]ccurring unexpectedly and unintentionally; by chance." The American Heritage Dictionary: Second College ed., p. 72. . . . Thus, we find that the terms "sudden" and "accidental" used in the pollution-exclusion clause are unambiguous.

*Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 207–08, 476 N.W.2d 392, 397–98 (1991) (footnote omitted).

974 F.2d at 768.[72] The *Ray* court held coverage to be barred by the pollution exclusion.

██ The foregoing cases harmonize with the view expressed by the Tenth Circuit in *Hartford*: "sudden" in the context of the pollution exclusion "cannot mean 'gradual,' 'routine' or 'continuous.' " 962 F.2d at 1489. Quaker State attempts to circumnavigate this rule, asserting that *Hartford* and similar cases may be distinguished from this case because when considered on a discharge-by-discharge basis, the occurrences at the Ekotek Site were each "sudden and accidental"—particularly when viewed from Quaker State's standpoint. *See, e.g.,* Quaker State Reply Mem. at 14–15; Tr. at 2:22–11:6, 12:4–19:3, 19:21–20:22, 42:8–14.

### E. The "Sudden and Accidental" Exception and Discharge-by-Discharge Analysis.

██ Emphasizing language in *Hartford* pointing out that "it is the discharge which must be sudden and accidental to qualify for

---

**72.** Cases taking a contrary position included *Jonesville Products, Inc. v. Transamerica Ins. Group*, 156 Mich.App. 508, 512, 402 N.W.2d 46, 48 (1986) (even where "continuous" negligent discharge of waste is alleged, "[i]t is possible that the releases could have been sudden, *i.e.,* unex-

pected, and accidental, *i.e.,* unintended, and thus outside the exclusion."). As the Sixth Circuit noted in *Ray, Jonesville's* approach was rejected by *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392 (1991). *See* 974 F.2d at 768.

coverage, not the pollution damage," (962 F.2d at 1491), Quaker State contends that the question whether occurrences at the Ekotek Site were "sudden and accidental" must be analyzed on a discharge-by-discharge basis. Approached in that fashion, "[e]vidence of discrete, temporally abrupt spills, leaks, and other discharges of oil is clearly sufficient to meet the 'suddenness' requirement of the exception ... even if those spills, leaks or discharges occurred often and over the course of several years." Quaker State Mem. at 25–26. Further, Quaker State submits that even if particular releases were not "sudden" or "accidental," many others *were*, and coverage should extend to cover the entire indivisible property damage loss. Quaker State Opp. Mem. at 60–61.

The single incident of release of hazardous materials described in *Pennsylvania National,* (*see* Part V.D.3, *supra*) was one which readily could be characterized as "sudden and accidental." The phrase does not lend itself nearly so easily to the description of a series, or pattern of similar releases of hazardous materials. As this Court observed in *Hartford:*

> The courts adopting the plain and simple definition of "sudden and accidental" have uniformly found the regular and repeated discharge of waste to be excluded from coverage by the pollution exclusion. For example, in *Great Lakes Container,* the insured was alleged to have routinely discharged waste chemicals onto the site of its barrel-reconditioning facility as an aspect of its business operations. The court held that the insured's clean up cost recovery claim against its carrier fell "squarely" within the exclusion, and that no coverage existed. 727 F.2d at 33–34. Similarly, in *U.S. Fidelity,* the court found that coal dust waste generated by the normal opera-

tion of the insured, which was discharged on a routine, continuing basis, was excluded from coverage. 856 F.2d at 32. In both *Great Lakes* and *U.S. Fidelity,* the courts found that such routine and repeated discharges were not sudden and accidental.

765 F.Supp. at 680 (citing *U.S. Fidelity & Guaranty v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir.1988), and *Great Lakes Container Corp. v. National Union Fire Ins. Co.,* 727 F.2d 30 (1st Cir.1984)).[73]

Other circuits have concluded that a continuing pattern of temporally abrupt releases is not "sudden and accidental," notwithstanding the fact that individual releases, considered in isolation, may seem abrupt, or "sudden."

In *A. Johnson & Co. v. Aetna Casualty & Sur. Co.,* 933 F.2d 66, 75 (1st Cir.1991), the First Circuit concluded that "[m]ere speculation under these circumstances that any individual instance of disposal, including leaks, occurred 'suddenly' cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a 'sudden and accidental' occurrence."

In *Ray Indus., Inc. v. Liberty Mutual Ins. Co.,* the Sixth Circuit followed *A. Johnson & Co.,* rejecting the insured's argument that each instance of spillage of the contents of numerous barrels of resin disposed of in a landfill, considered by itself, was "sudden and accidental:"

> We are not convinced that the discharges in this case were brief or momentary. Ray has argued that each release was sudden, when viewed in isolation. But under this theory, *all* releases would be sudden; one can always isolate a specific moment at which pollution actually enters the environment. Rather than pursuing such meta-

**73.** *See also Ogden Corp. v. Travelers Indem. Co.,* 924 F.2d 39 (2d Cir.1991) (where contamination "occurred continuously during the years 1950 through 1983" discharge could not be "sudden") (applying New York law); *Continental Ins. Co. v. Beecham, Inc.,* 836 F.Supp. 1027, 1039 (D.N.J. 1993) ("under Pennsylvania law the 'sudden and accidental' language has been interpreted to mean that the pollution exclusion clause will apply except where discharges 'are abrupt and last a short time.' *Northern Ins. Co. v. Aardvark*

*Assoc., Inc.,* 942 F.2d 189, 193 (3d Cir.1991) ..."); *Outboard Marine Corp. v. Liberty Mutual Ins. Co.,* 212 Ill.App.3d 231, 156 Ill.Dec. 432, 446, 570 N.E.2d 1154, 1166 (1991) (there is "nothing sudden about discharging pollutants over an 11-year period"). *See generally* Annotation, *Construction and Application of Pollution Exclusion Clause in Liability Insurance Policy,* 39 A.L.R.4th 1047, 1049–62 (1985 & Supp.1993), and cases cited therein.

physical concepts, we choose to recognize the reality of Sea Ray's actions in this case. We agree with the First Circuit that

> [m]ere speculation under these circumstances that any individual instance of disposal, including leaks, occurred "suddenly" cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a "sudden and accidental" occurrence.

*A. Johnson & Co. v. Aetna Casualty and Sur. Co.*, 933 F.2d 66, 75 (1st Cir.1991). Thus, following the passage from *Upjohn* cited above, as well as the Sixth Circuit cases cited by Ray, we hold that the discharges in this case were not "sudden," even if they involve numerous discrete events. Thus, we hold that the pollution exclusion applies to this case, and Liberty has no obligation under the facts of this case on any of the policies it issued to Ray containing the exclusion.

974 F.2d at 768–69 (emphasis in original).[74]

More recently, in *Smith v. Hughes Aircraft Co.*, the Ninth Circuit expressly rejected Hughes' argument that "certain 'sudden' polluting events partially caused the injuries" at issue in that case:

> These "sudden" polluting events caused TCE and other toxic chemicals to be dumped directly into Hughes' unlined ponds. They occurred when the waste treatment plant broke down or was overcapacitated or when TCE was spilled onto the work floor and was pushed down the drain that bypassed the treatment plant. *The district court properly rejected Hughes' effort to "break down its long*

term waste practices into temporal components in order to find coverage where the evidence unequivocally demonstrates that the pollution was gradual."* . . .

10 F.3d at 1453 (emphasis added). *Smith* affirmed the district court's grant of summary judgment in favor of the insurers on the pollution exclusion issue.

Similarly, in *Bureau of Engraving*, the Eighth Circuit expressly rejected the insured's contention that a genuine issue of material fact existed as to "whether any individual discharges at the site were abrupt[;]" under the insured's "discharge-by-discharge inquiry," the court said, " 'all releases would be sudden,' and 'the "sudden and accidental" exception essentially would swallow the "rule" of the pollution exclusion.' " 5 F.3d at 1177–78 (quoting *Sylvester Bros. Dev. Co. v. Great Central Ins. Co.*, 503 N.W.2d 793, 797 (Minn.Ct.App.1993)).[75] *See also New York v. AMRO Realty Corp.*, 936 F.2d at 1428 (allegations "that an industrial operation disposed of its manufacturing waste by certain improper methods for close to thirty years, cannot be understood to allege a 'sudden' release"); *Northern Ins. Co. v. Aardvark Assocs., Inc.*, 942 F.2d at 195 (discharges which "occurred over extended periods" were not "sudden and accidental"); *Harrow Products, Inc. v. Liberty Mutual Ins. Co.*, 833 F.Supp. 1239 (W.D.Mich.1993) (releases of trichloroethylene (TCE) that occurred "routinely and intentionally in the regular course of business," as well as "occasional accidental spills" occurring "in the regular course of business" cannot "reasonably be characterized as abrupt or sudden events;" summary

---

**74.** The Massachusetts Supreme Court rejected a similar argument in *Liberty Mutual Insurance Co. v. SCA Services, Inc.*, 412 Mass. 330, 588 N.E.2d 1346 (1992), in which it was alleged that the insured conducted "routine business activity lasting over several months" in which it would bring barrels to a landfill, where they "were either emptied into open trenches or dumped into trenches and flattened with a bulldozer." 588 N.E.2d at 1349–50.

> SCA contends that the discharges were "sudden" within the meaning of that description, i.e., as the barrels were crushed or emptied, the commencement of the release from each barrel was abrupt. We reject this strained interpretation. As we stated elsewhere in the *Lumbermens* case, a discharge that "continues

for an extended period . . . would likely cease to be accidental or sudden." . . . The only reasonable reading of the underlying complaint is, as we have stated, that the pollution of the landfill occurred gradually over several months of repeated activity and not as the result of a "sudden and accidental" discharge. 588 N.E.2d at 1350 (footnote omitted).

**75.** The court also rejected the insured's suggestion that a fact issue existed concerning "whether the pollution exclusion bars claims by insureds who did not actively pollute the environment," affirming "the district court's judgment that these are appropriate issues for summary disposition." 5 F.3d at 1177. *See* Part V.F., *infra*.

judgment on pollution exclusion proper); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 842 F.Supp. 575, 582 (D.D.C.1994) ('[E]ach discharge must nevertheless be viewed in context. Otherwise the pollution exclusion clause would be reduced to a toothless absurdity because all releases could be deemed 'sudden'.... 'One can always isolate a specific moment at which pollution enters the environment', but that doesn't mean it is either reasonable or logical to do so." (quoting *Ray*, 974 F.2d at 768)).

Following this reasoning, the question then becomes *how many* abrupt releases of hazardous waste comprise a course of conduct which, when viewed as a whole, cannot be said to be "sudden and accidental." In *Grant–Southern Iron & Metal Co. v. CNA Ins. Co.*, 669 F.Supp. 798 (E.D.Mich.1986), the district court granted summary judgment in favor of the insurer, holding that where "Grant–Southern's pollution equipment malfunctioned, by both parties' account, at least sporadically and may be continuously," (*id.* at 801), discharge of pollutants was not "sudden and accidental:"

> The language of the complaint clearly indicates that the alleged pollution was not "sudden", it was continuous and ongoing. Neither was it "accidental" because according to the complaint Grant–Southern had notice of the problem but the polluting continued....
>
> Grant–Southern properly should assume liability for damages which they had knowledge of and permitted to occur.

*Id.* at 800, 801. On appeal, however, the Sixth Circuit reversed, finding a genuine issue of material fact concerning whether the damages "caused by its discharges of pollutants may have been the result of a few discrete polluting events, each of which was short in duration and accidental in nature." *Grant–Southern Iron & Metal Co. v. CNA Ins. Co.*, 905 F.2d 954, 957 (6th Cir.1990). The Sixth Circuit found that "[t]here is conflicting evidence on the question of whether Grant–Southern's pollution was ongoing and continuous or consisted of *discrete and isolated events.*" 905 F.2d at 957–58 (emphasis added).

If, as the Tenth Circuit indicated in *Anaconda, Hartford* and *Morrison Grain,* the "sudden and accidental" character of an occurrence turns on the nature of the release rather than the resulting property damage, a pattern of temporally abrupt pollution events would at least in some sense still represent "sudden," though not isolated occurrences. This seems to be the question raised by the Sixth Circuit in the *Grant–Southern* case. It also represents the core of Quaker State's argument, both in its papers and at the hearing.

As the Ninth Circuit explained in *Smith v. Hughes Aircraft Co.,* however, defining "sudden" in terms of brief, discrete, isolated or nonrecurring releases finds its roots in public policy considerations: "requiring temporal brevity further[s] public policy by excluding deliberate indifference on the part of a polluting insured; ..." 10 F.3d at 1452. The Ninth Circuit also points to the underlying bargain between insurer and insured: a failure to require temporal brevity in construing the term "sudden" would "frustrate the parties' intent by forcing the Insurers to buy into the risk of insuring a pollution-prone operation." *Id.*

The First Circuit elaborated on the "bargain" factor in *Lumbermens Mutual Casualty Co. v. Belleville Indus.*, 938 F.2d 1423 (1st Cir.1991):

> Our reading of the two pollution provisions in the policy suggests that in the "ordinary" case, i.e., a case involving a "clean" operation, such as an office building housing company headquarters, insurers were willing to commit to covering a possible but unlikely event resulting in the release of pollutants. *A coverable occurrence would be clearly identifiable as "sudden and accidental" because it would be a marked departure from normal operations.* But in the case of a pollution-prone operation, where the emission of pollutants is part and parcel of the daily conduct of business, there is the possibility of infinite variations on the usual theme; i.e., pollution incidents are likely to occur that are on the fringe of normal operations but that the company seeks to characterize as sudden and accidental.... We think it

illogical to believe that insurers intended through the sudden and accidental exception to buy into a risk and/or litigation package of this nature. . . .

938 F.2d at 1427–28 (emphasis added & citation omitted).

If the history of releases of pollutants at a site evidences "deliberate indifference," or the conduct of "a pollution-prone operation," [76] in contrast to an isolated occurrence representing "a marked departure from normal operations," [77] perhaps the issue would be more accurately analyzed as a question concerned with "accidental" occurrences as much or more accurately analyzed as a question concerned with "accidental" occurrences as much or more than with "sudden" ones.[78] Whether a release or discharge is "accidental" depends on whether the event can "be considered to have occurred 'unexpectedly and unintentionally' from the standpoint of the polluter"—whether or not the "polluter" also happens to be the "insured." *Matakas v. Citizens Mutual Ins. Co.*, 202 Mich.App. 642, 651, 509 N.W.2d 898 (1993). Where a discernable pattern of releases of hazardous waste has occurred at the same site over a period of time, it becomes difficult to maintain that those releases were "unexpected," even if they were not deliberate or intentional. Similar releases or discharges of hazardous material may become a foreseeable, if not probable consequence of the polluter's regular course of business. "Sudden" or not, such discharges are not "accidental." *See,*

e.g., *Liberty Mutual Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1157–58 (4th Cir.1992); *Lumbermens Mutual Casualty Co. v. Belleville Indus., Inc.*, 938 F.2d at 1429 (summarizing "the strong body of case law rejecting insurance coverage where a company has for a lengthy period of time purposefully and regularly been carrying on operations involving continual pollution"). Where a polluter attempts to " 'break down its long term waste practices into temporal components,'" (*Hughes*, 10 F.3d at 1453), it may succeed in identifying numerous releases which individually are abrupt or "sudden," but which taken together cannot fairly be said to be "unexpected," or "accidental." *See, e.g., Matakas*, 509 N.W.2d at 651 ("the release of pollutants that mandated EPA response was occurring over a period of time, with warning, and fully expected from the standpoint of the polluters").

In any event, the Tenth Circuit, the First, Second, Third, Sixth, Eighth and Ninth Circuits, and other courts as well, analyze the issue of multiple releases in terms of the temporal quality inherent in the term "sudden," meaning "brief," or "of short duration," as referring to "accidents distinct in time and place." *Morrison Grain*, 734 F.Supp. at 447. Under that analysis, Quaker State's effort to divide up the "long-term waste practices" at the Ekotek Site into "temporal components" by way of a "discharge-by-discharge inquiry" is soundly rejected.[79] The argument

---

**76.** For example, in *Grant–Southern* the Sixth Circuit that notices of emissions violations reflecting corrective action taken by the insured "suggest isolated polluting events," but that the insured's receipt of several pollution violation notices "within close chronological proximity of each other, suggest[s] ongoing pollution. The violation notices are thus consistent with both theories[:] that the pollution was continuous and regular and that the polluting occurred in isolated and discrete polluting events." 905 F.2d at 958.

Of course, evidence of "corrective action" would tend to rebut an inference of deliberate indifference, while a series of such notices "within close chronological proximity" would tend to show "a pollution-prone operation."

**77.** *See, e.g., Pennsylvania National*, 987 F.2d at 1520, discussed *supra*.

**78.** Quaker State suggests as much at page 25 of its initial memorandum: "While *a pattern of rou-*

tine discharges may be probative of the question whether those discharges were 'accidental,' it is not probative of the question whether they were temporally 'sudden.'" (Emphasis added.)

**79.** Nor on this record does it appear practicable to apportion the property damage between one or more nonrecurring "sudden and accidental" releases, *e.g.*, the spillage of oil and chemicals during the 1981 refinery fire at the Ekotek Site, or the two 12,000–gallon "rail car releases" (*see* Quaker State Mem. at 4–5, ¶ 10; Quaker State Reply Mem. at 3–4, ¶ 3), and contamination caused by the more commonplace releases at the site, even if one assumes that the pollution exclusion allows for such apportionment in the first place. *Cf. Lumbermens Mutual Casualty Co. v. Belleville Indus., Inc.*, 938 F.2d at 1428–29. Nor should proof of one instance of a nonrecurring "sudden and accidental" release operate to extend coverage to property damage caused by a myriad of more routine spills; "the result would

"amounts essentially to speculation that, within the routine operations" at the Ekotek Site, "any single discharge may have occurred suddenly and accidentally. Such a theory, even if accepted as true, 'cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a sudden and accidental occurrence.'" *Liberty Mutual Ins. Co. v. SCA Services, Inc.*, 412 Mass. 330, 338, 588 N.E.2d 1346, 1351 (1992) (quoting *A. Johnson & Co.*, 933 F.2d at 75).

### F. The "Sudden and Accidental" Exception and "the Standpoint of the Insured."

■ At least as to the temporal component of the phrase, whether the discharge is "sudden and accidental," as distinguished from whether a discharge is an "occurrence," is an objective inquiry, not one required to be made from the standpoint of the insured. *See, e.g., Matakas v. Citizens Mutual Ins. Co.*, 202 Mich.App. 642, 651, 509 N.W.2d 898 (1993) (language of pollution exclusion "unambiguously links the terms 'sudden and accidental' with the release as opposed to the knowledge, intent or expectation of the insured.") *Cf.* Part III, *supra.*

Quaker State argues that "accidental" as used in the "sudden and accidental" exception is identical to "accidental" as read in the context of the policy definition of "occurrence"—*i.e.*, "that accident means from the standpoint of the insured." Quaker State Mem. at 28–46; Tr. at 8:17–18, 12:4–11, 42:4.[80] At page 17 of its Reply Memorandum, Quaker State points to language in the Tenth Circuit's opinions in *Hartford* and *American Motorists Ins. Co. v. General Host Corp.*, 946 F.2d 1482 (10th Cir.1991), *vacated in part on reh'g*, 946 F.2d 1489 (10th Cir. 1991), stating that "'[t]he courts have interpreted "accidental" to refer to pollution which is not expected or intended by the insured.'" *Hartford*, 962 F.2d at 1488 (quoting *General Host*, 946 F.2d at 1486). *General Host* itself cites to *EAD Metallurgical,*

*Inc. v. Aetna Casualty & Sur. Co.*, 905 F.2d 8, 11 (2d Cir.1990), as support for the quoted proposition; *EAD Metallurgical* in turn relies on *Powers Chemco, Inc. v. Liberty Mutual Ins. Co.*, 74 N.Y.2d 910, 549 N.Y.S.2d 650, 548 N.E.2d 1301 (1989) (pollution exclusion precludes coverage even where liability arises out of conduct of party other than the insured).

Quaker State's reading of the "standpoint of the insured" language was not squarely addressed in *Hartford, General Host, EAD Metallurgical* or *Anaconda Minerals, Co. v. Stoller Chem. Co., Inc.*, 773 F.Supp. 1498, 1505 (D.Utah 1991), because in each of those cases the "insured" and the polluter were one and the same. It *was* addressed and rejected in *Powers Chemco* as to releases caused by the insured's predecessor in interest, upon which *EAD Metallurgical* and others rely. Quaker State's position was also considered in *Matakas v. Citizens Mutual Ins. Co.*, 202 Mich.App. 642, 509 N.W.2d 898 (1993), and soundly rejected:

Any reference to the insured's expectations of the release or injury to the property, regardless of whether they were the actual polluters, is not dispositive when faced with the task of evaluating the pollution exclusion clause. While it may be relevant for the purposes of determining whether an "occurrence" has taken place, See *Arco Industries Corp. v. American Motorists Ins. Co.*, 198 Mich.App. 347, 351–352, 497 NW2d 190 (1993), the inquiry does not end there and the terms from the "occurrence" clause are not synonymous with the terms of the pollution exclusion clause. Our reading of the policy is that the two clauses are mutually exclusive and in order for coverage to be provided there must be both an "occurrence" and a "sudden and accidental" release so as to escape application of the pollution exclusion clause. See *Liberty [Mutual Ins. Co. v. Triangle Industries, Inc.*, 957 F.2d 1153 (4th Cir.1992) ] supra* at 1160.

---

be that of a very small tail wagging a very large dog." *Id.* at 1429.

**80.** From the standpoint of Quaker State as the insured, "[e]very event of contamination, every release at the Ekotek site, was unexpected," according to counsel. Tr. at 9:18–19.

*Id.* 509 N.W.2d at 902. Whether the discharge is "accidental" depends on whether the event can "be considered to have occurred 'unexpectedly and unintentionally' from the standpoint of the polluter"—whether or not the "polluter" also happens to be the "insured." *Id.*, 509 N.W.2d at 902.

This reading is consistent with decisions holding that application of the pollution exclusion is not limited to "active" polluters, "*i.e.*, those who 'actually release pollutants[;]' ... The clause unambiguously withholds coverage for injury or damage 'arising out of *the* discharge, dispersal, release or escape' of pollutants (emphasis added), not merely the insured's discharge, dispersal, release or escape 'of pollutants.'" *Northern Ins. Co. v. Aardvark Assocs.*, 942 F.2d at 194 (emphasis in original). *See also Park–Ohio Indus., Inc. v. The Home Indem. Co.*, 975 F.2d 1215, 1223 (6th Cir.1992); *K.J. Quinn & Co, Inc. v. Continental Casualty Co.*, 806 F.Supp. 1037, 1044 (D.N.H.1992); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 842 F.Supp. at 582 (D.D.C.1994); *Borg–Warner Corp. v. Insurance Co. of North America*, 174 A.D.2d 24, 577 N.Y.S.2d 953 (App.Div. 1992).

The language of the "sudden and accidental" exception also proves instructive concerning what it does *not* say; as the district court points out in *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 702 F.Supp. 1317, 1326 (E.D.Mich.1988), "If the drafters had meant 'unexpected and unintended from the standpoint of the insured', it is reasonable to assume that they would have said so explicitly (as in the definition of 'occurrence')...." (Citation omitted.) This view was echoed by the Massachusetts Supreme Court in *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 610 N.E.2d 912 (1993):

> The policy language does not call for the assessment of "accidental" or "sudden" from the insured's perspective. Policy language does, however, define an "occurrence" by referring to "property damage neither expected nor intended *from the standpoint of the insured*" (emphasis supplied). The distinctive absence from the pollution exclusion of the words "from the standpoint of the insured" is significant for

our purposes. See *Lumbermens Mutual Casualty Co. v. Belleville Indus., supra*, 407 Mass. at 679, 555 N.E.2d 568. If a third person who discharged a pollutant did so intentionally, the pollution exclusion denies coverage, even to an innocent insured, for any resulting property damage. The point of view of the insured is immaterial. See *A. Johnson & Co. v. Aetna Casualty & Sur. Co.*, 933 F.2d 66, 74 (1st Cir. 1991) (Maine law); *Powers Chemco, Inc. v. Federal Ins. Co.*, 74 N.Y.2d 910, 911, 549 N.Y.S.2d 650, 548 N.E.2d 1301 (1989).

414 Mass. at 752, 610 N.E.2d at 915–16 (citation omitted).

*United States Fidelity & Guaranty Co. v. Morrison Grain Co., Inc.*, 734 F.Supp. 437 (D.Kan.1990), involved the discharge of pollutants at two sites by the insureds' joint venture partner, Cropland Chemical Company and its principal, Robert Trowbridge. *Morrison Grain*, 734 F.Supp. at 439. Before the district court, the insureds argued that "they knew nothing about the dumping of chemicals at Meredosia or the abandonment of chemicals at Latham," where the releases of hazardous waste had occurred. *Id.* at 447. The district court rejected the insureds' contention that "the issue of whether the release of pollutants was 'sudden and accidental' is to be determined from the insured's viewpoint," concluding that the approach taken in *Powers Chemco* was the appropriate one: " 'there is nothing in the language of the pollution exclusion clause to suggest that it is not applicable when liability is premised on the conduct of someone other than the insured.' ... See also *Avondale Indus., Inc. v. Travelers Indem. Co.*, 894 F.2d 498, 499–500 (2d Cir.1990)." 734 F.Supp. at 447–48 (quoting *Powers Chemco*, 74 N.Y.2d at 911, 549 N.Y.S.2d at 651, 548 N.E.2d at 1302). The district court granted summary judgment in favor of the insurers.

The Tenth Circuit affirmed, emphasizing that "[t]he term 'sudden and accidental' is unambiguous and has an objective temporal meaning. *What the insured intends or foresees is of no consequence*." 999 F.2d at 493 (emphasis added). The Tenth Circuit expressly rejected the insureds' contention that " 'sudden and accidental' is ambiguous and

means the unforeseen, the unintended, or the unexpected *from the viewpoint of the insured,*" (*id.* (emphasis added)), at the same time affirming the district court's adoption of the reasoning of the line of cases including *Northern Ins. Co. of New York v. Aardvark Assocs., Inc.,* 942 F.2d 189 (3d Cir.1991), and *New York v. AMRO Realty Corp.,* 936 F.2d 1420 (2d Cir.1991), holding the phrase "has an *objective temporal* meaning." *Id.* at 492 (emphasis in original).

The import of *Morrison Grain* is clear: whether a release, or a series of releases, is "sudden and accidental" is not required to be determined from the standpoint of the insured.[81] "Sudden" invokes an objective temporal standard; "accidental," which must read together with "sudden," invokes considerations of foreseeability and intention which must be measured with reference to the party causing or allowing the release; the pollution exclusion bars coverage of a party's conduct of a "pollution-prone operation," whether or not that party is the insured.[82]

### G. "Sudden and Accidental" vs. "Occurrence."

██ Nor is the construction of the "sudden and accidental" exception rendered ambiguous because of the broader reading afforded the policy definition of "occurrence."

*LDS Hospital v. Capitol Life Ins. Co.* instructs that "[t]he interpretation of a written contract may be a question of law determined by the words in the agreement. . . . [A] cardinal rule in construing the contract is to give effect to the intentions of the parties and, if possible, these intentions should be gleaned from an examination of the text of the contract itself." 765 P.2d at 858 (citing *Buehner Block Co. v. UWC Assocs.,* 752 P.2d 892, 895 (Utah 1988)). "Additionally," the

court said, "it is axiomatic that a contract should be interpreted so as to harmonize all of its provisions and all of its terms, which terms should be given effect if it is possible to do so." *Id.*

Arguing from these rules of construction, Quaker State contends that "accidental" in the exception to the pollution exclusion must be read as identical to "accident" as used in the "occurrence" definition, which includes "continuous or repeated exposure to conditions, *i.e.,* gradual events." Quaker State Reply Mem. at 20; *see* Quaker State Mem. at 44–46.

Neither Utah law nor the pertinent policy language compels this conclusion.

As this Court explained in *Hartford,*

The occurrence definition and the pollution exclusion serve distinct purposes. No ambiguity is created merely because an exclusion eliminates coverage from an insuring agreement. *See Occidental Fire and Casualty Co. v. Lumbermens Mutual Casualty Co.,* 667 F.Supp. 679, 683 (N.D.Cal. 1987). Policies are generally written to first define the scope of the agreement, and then to exclude the specific risks which the insurer does not cover. *Id. See also Crawford v. Ranger Ins. Co.,* 653 F.2d 1248, 1250–51 (9th Cir.1981) (insuring agreement's preconditions to coverage may be narrowed by other policy terms).

The broad sweep of the occurrence definition is restricted by the pollution exclusion. Specifically, the exclusion provides that the policy does not apply to injuries or damage arising from the discharge or release of pollutants. Accordingly, the exclusion relieves Hartford of any obligation to provide coverage in cases where the damage is caused by the continuous and repeated discharge of PCBs. The Liabili-

---

81. Some courts have held that the pollution exclusion is ambiguous as to its application to discharge or release of hazardous waste by third parties other than the insured. *See, e.g., United States Fidelity & Guar. Co. v. Specialty Coatings Co.,* 180 Ill.App.3d 378, 129 Ill.Dec. 306, 535 N.E.2d 1071 (1989) (where insured delivered hazardous waste to third parties for disposal, pollution exclusion is ambiguous as to whether it applies to releases of pollutants by the third parties rather than the insureds and as to wheth-

er particular releases were "sudden and accidental").

82. "Since 'accidental' refers to an unexpected release of pollutants, it necessarily follows that expectations must be judged from some perspective." *Morrison Grain,* 734 F.Supp. at 447. The most logical point of view would seem to be that of a party having actual possession or control of the hazardous materials, or some degree of control over their discharge or release.

ty Policy should not be viewed as ambiguous merely because the pollution exclusion excludes coverage for certain risks that the occurrence definition potentially includes. 765 F.Supp. at 677. The Tenth Circuit's view is substantially in accord. *See Anaconda*, 990 F.2d at 1179 ("We found in *Hartford* as we do here that '[i]f the loss "arises out of the discharge of pollution," the pollution exclusion, not the more generous coverage of the "occurrence" provision, governs.' *Id.* at 1490 (footnote omitted)."); *Hartford*, 962 F.2d at 1490 ("While an accidental 'occurrence' may be gradual, the discharge of pollution has more precise requirements for coverage."). *See also Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 702 F.Supp. at 1323–24 ("sudden and accidental" not defined according to meaning of "accident" in "occurrence" definition).

### H. "Drafting History" of the CGL Pollution Exclusion Clause.

The Court has reexamined the so-called "drafting history" of the CGL policy pollution exclusion clauses, including the treatment given the subject by the detailed dissenting opinion in *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.*, 636 So.2d 700 (1993), and the majority opinion in *Morton International, Inc. v. General Accident Ins. Co. of America*, 134 N.J. 1, 629 A.2d 831 (1993), at least to the extent that those references to "drafting history" illuminate those

courts' reasoning in reaching the conclusions they did.[83] *Morton*, for example, admittedly adopted a narrower reading of the "sudden and accidental" exception than the literal language of the clause would suggest, based upon representations made by the insurance industry in the course of obtaining regulatory approval in New Jersey for the language of the pollution exclusion, particularly the representation that it was drafted merely to "clarify" the definition of "occurrence" to exclude intentional polluters:

> notwithstanding the literal terms of the standard pollution exclusion clause, that clause will be construed to provide coverage identical to that provided under the prior occurrence-based policy, except that the clause will be interpreted to preclude coverage in cases in which the insured intentionally discharges a known pollutant, irrespective of whether the resulting property damage was intended or expected.

134 N.J. at 78, 629 A.2d at 875 (emphasis in original). *See also Continental Ins. Co. v. Beecham, Inc.*, 836 F.Supp. 1027, 1039 (D.N.J.1993).[84]

As it did in *Hartford*, 962 F.2d at 1492, the Tenth Circuit in *Anaconda* declined "to consider the drafting history of the pollution exclusion. Under Utah law extrinsic evidence will not be considered where a contract is unambiguous. *Williams v. First Colony Life Ins. Co.*, 593 P.2d 534, 536 (Utah 1979)."

---

**83.** Defendants object to Quaker State's reference to "drafting history" materials, arguing that the references to "drafting history" are outside the record in this case and constitute inadmissible parol evidence; extrinsic evidence, defendants argue, should not be admitted to interpret an unambiguous term. Defs. Joint Mem. at 23–24, 26 & n. 13 (citing *Hartford*, 962 F.2d at 1492). Indeed, Quaker State has not presented authenticated documentation of CGL policy "drafting history" in the context of approval by Utah insurance regulators. *See generally*, Quaker State Mem. at 37–41, 47, 57; Quaker State Reply Mem. at 21 & n. 9. Rather, Quaker State asserts that because the drafting history "evidence has been collected and reproduced in countless published opinions and articles," and that the defendants' CGL policies "are standard-form contracts used throughout the industry," Rule 56(c) does not foreclose consideration of the materials discussed in other courts' opinions. Quaker State Reply Mem. at 22. While judicial notice is available to the court in the context of summary

judgment, (*see, e.g., Clemmons v. Bohannon*, 918 F.2d 858 (10th Cir.1990); *Anderson v. Cramlet*, 789 F.2d 840 (10th Cir.1986); *St. Louis Baptist Temple v. Federal Deposit Insurance Corp.*, 605 F.2d 1169 (10th Cir.1979)), the Court is not convinced that judicial notice of the "drafting history" materials *as extrinsic evidence* is warranted, based upon the present record. *See* Fed.R.Evid. 201. However, as a key to understanding the New Jersey Supreme Court's reasoning in *Morton*, for example, those same materials are essential.

**84.** One recent survey observed that courts which have examined the drafting history of the pollution exclusion tend to construe the "sudden and accidental" exception in favor of the insured. *See* Eugene R. Anderson & Paul H. Liben, *Why the Courts are Finding that Insurance Covers Environmental Damage*, ALI–ABA Course of Study: Hazardous Wastes, Superfund, and Toxic Substances (C864) 335, 370–92 (October 1993) (includes extensive treatment of drafting history).

990 F.2d at 1179. While the arguments advanced in Quaker State's authorities, *e.g.*, *Morton,* are not without some force, the Court is not persuaded that it should—or even may—now depart from the analysis of the "sudden and accidental" exception reflected in the Tenth Circuit and Utah case law, or for that matter, even conclude that "sudden and accidental" is ambiguous under the circumstances of this case.[85]

## I. Releases of Hazardous Waste at the Ekotek Site Were Not "Sudden and Accidental."

■ The court has reviewed the arguments presented by Quaker State, giving careful consideration to factual context. Based upon the foregoing analysis of the pertinent insurance policy language, this Court concludes that the pattern of frequent, even routine occurrences involving the release or discharge of hazardous waste upon or into the ground at the Ekotek Site, detailed at some length in the parties' summary judgment materials,[86] cannot fairly be described as "sudden and accidental." It is undisputed that the alleged property damage at the Ekotek Site arose in large part from the operators' discharge of drain oil, acid-treated oil, acid sludge residue, solvents and other hazardous waste onto the land and into the surface and underground water at the site. While Quaker State argues that many of the individual incidents—spills, really— occurred "suddenly," the fact that those spills became toxic discharges upon the land resulting in environmental contamination was the result of continuing business practices engaged in by Ekotek and others at the Ekotek Site for many years.[87] Leaking pumps, leaking or broken hoses, overflowing tanks or overfilled trucks are obvious operational and maintenance problems, easily observed and readily foreseeable to those involved in handling the drain oil, acid sludge and other hazardous materials.

Other releases occurring at the Ekotek site, such as the piling of oil-soaked filter clay upon the property,[88] the dumping of acid

85. That a word or phrase is found to be unambiguous in one context is not decisive as to its meaning in *all* contexts. The Eighth Circuit in *Bureau of Engraving* followed two 1992 and 1993 Minnesota appellate cases, distinguishing an earlier 1988 Minnesota appellate opinion, *Grinnell Mutual Reinsurance Co. v. Wasmuth,* 432 N.W.2d 495 (Minn.App.1988). *Grinnell* acknowledged that "sudden and accidental" is unambiguous in the context of a "typical pollution claim," but held the phrase to be ambiguous in the "unusual" context of release of formaldehyde gas from improperly installed home insulation. In that instance, *Grinnell* concluded, the claim would be deemed covered because under the doctrine of reasonable expectations; a lay insured would not expect improperly installed home insulation to fall within the pollution exclusion. 432 N.W.2d at 497–500.

86. A similar litany of tank overflows, a fire, bursting pipes and manifolds, rainwater runoff problems, and spills "in transferring Aroclor from tanker trucks to storage tanks" and rail cars was proffered in *Lumbermens Mutual Casualty Co. v. Belleville Indus., Inc.,* 938 F.2d at 1425 n. 2, concerning which the First Circuit observed:

> Perhaps the best evidence of the infeasibility of attempting to assess discrete "fringe" events, in the case of a company with a history of contributing over a lengthy period to a gradual accumulation of pollutants, is the catalogue of "sudden and accidental" discharges submitted by Belleville. *See* note 2, *supra.* Other similar litigable possibilities would include an employee tripping and spilling Aroclor oil, a drip pan giving way, a pipe breached.... The prospect is limitless.

*Id.* at 1428.

87. *Cf.* "EPA Findings of Fact," at ¶¶ 11–12, EPA Administrative Order on Consent for Remedial Investigation/Feasibility Study, dated July 10, 1992, (Docket No. CERCLA (106) VIII–92–21) (annexed as Exhibit 5 to the Fireman's Fund Mem.), at 4–5 ("Sources and potential sources of contamination at the Site have included approximately 60 above-ground tanks, approximately 1130 drums (of which, 475 contained various substances) and 1500 smaller containers, three surface impoundments, an underground drain field, numerous piles and pits of waste material, underground tanks, ... These on-site sources were found to be poorly contained, leaking and unlined....")

88. Quaker State avers that *after oil and filter clay* were mixed together and processed through a rotary vacuum filter, "[t]he spent clay was accumulated on the ground in the refinery area and periodically carted to landfills. Witnesses differed on the amount of oil remaining in the spent clay and whether oil leaked out of the pile." Quaker State Mem. at 7, ¶ 15; Quaker State Reply Mem. at 7 (same). *See also* Fireman's Fund Mem. at 8 ¶ 15 ("This process generated a spent clay waste that contained as much as 20 to 30 percent oil. *See* Deposition of J.B. Hancock, dated October 21, 1992 ... at 38–39.... This

sludge into unlined earthen pits,[89] the dumping of oil- and waste-contaminated water into unlined holding ponds or the sewer system,[90] or the transfer of hazardous waste into tanks or containers having obvious leaks,[91] under any definition cannot be deemed "sudden and accidental." *See, e.g., Liberty Mutual Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d at 1158 ("the open dumping of a sludge on the ground, particularly when performed as part of a regular business activity, cannot be considered an accidental discharge of the contaminant"); *City of Maple Lake v. American States Ins. Co.*, 509 N.W.2d 399 (Minn.Ct. App.1993) (conscious decision to dump waste treatment plant effluent into a lake was "the antithesis of an accident"); *Anaconda*, 990 F.2d at 1179 ("because the discharge[s] themselves were gradual and intended the pollution exclusion bars coverage"); *A.Y. McDonald Indus. Inc. v. Insurance Co. of North America*, 842 F.Supp. 1166 (N.D.Iowa 1993) ("Clearly the Plaintiff expected the foundry waste sand to be deposited on the property. Since the discharge was expected, the discharge was not 'accidental.' "). *See also EAD Metallurgical, Inc. v. Aetna Casualty & Sur. Co.*, 905 F.2d 8, 11 (2d Cir.1990); *Powers Chemco, Inc. v. Federal Ins. Co.*, 74 N.Y.2d 910, 549 N.Y.S.2d 650, 548 N.E.2d 1301 (1989).

To site operators who construct earthen barriers in a minimal attempt to anticipate and contain quantities of spilled oil or other toxic materials which they know would otherwise flow across the road onto adjoining property, (*see* Defs. Joint Mem. at 6, ¶ 4(g)),

the release of those hazardous liquids is not "unexpected." [92] Quite the contrary.[93] As in *Morrison Grain*, the release or discharge of hazardous waste here "was not sudden and accidental, but a gradual dispersal or release of toxic chemicals or waste materials which ought to have been anticipated and avoided." 999 F.2d at 493 (footnote omitted). No matter how strictly one construes the pollution exclusion against the insurers, (*see* Part V.C., *supra*), one simply cannot change the pertinent facts.

A similar site history was addressed in *Industrial Indem. Ins. Co. v. Crown Auto Dealerships, Inc.*, 731 F.Supp. 1517 (M.D.Fla.1990). In *Crown Auto*, the insureds, two automobile dealerships, sold "used crankcase oil" they had collected to a third party, Peak Oil Company, "which recycled the oil at its plant in Hillsborough County, Florida for sale as used oil. Peak reprocess used oil from 1954 until 1979." 731 F.Supp. at 1518. In 1983, the EPA notified the insureds of their PRP status under CERCLA with respect to the release of hazardous substances at the Peak site; in turn, the auto dealers looked to their insurer to defend and indemnify them under their CGL policy against their potential CERCLA liabilities. The district court summarized the Peak site history:

> Peak Oil [C]ompany operated from the mid 50's until it was closed in 1986, and during that time it reprocessed used oil until 1979. Pollution resulted primarily from chemicals from the waste sludge

---

spent clay was disposed of and dumped in piles on the bare ground in the plant's east tank area.... These piles were eventually hauled offsite for disposal after sitting on the ground for as long as weeks or months at a time...." [footnote & citations omitted]); *id.* at 13 ¶¶ 23–24.

**89.** *See* Fireman's Fund Mem. at 11–13, ¶¶ 19–22 ("Beginning in November, 1980, acid sludge from the oil dehydration process was discharged directly into the ground in a large unlined, earthen pit north of the plant's Administration building." [¶ 20]).

**90.** *See* Fireman's Fund Mem. at 7, 9–10, ¶¶ 12, 17–18.

**91.** *See, e.g.,* Liberty Mutual Mem. at 27, ¶ 46 ("Waste oil was also observed being discharged

into an underground storage tank which had the bottom end rotted off...."").

**92.** Quaker State replies that "Mr. Adair's testimony that a berm was installed illustrates that efforts were made at the Site to contain spills that would occur. It does not imply that the spills were not accidental." Quaker State Reply Mem. at 9.

**93.** *See also* Fireman's Fund Mem. at 7 n. 11 ("Any of the routine spillage from the transfer of product into the tanks would run onto the bare ground under the tanks.... While concrete was eventually placed *around* the containment area tanks in the late 1980's, concrete was never placed directly *under* the tanks to prevent seepage into the ground...." [emphasis in original]).

leaching into the soil and aquifer. In addition, other environmental damage also occurred from "accidental spills and leaks of used oil and other substances at the site" and surface runoff of contaminants from the process area and sludge retention ponds during precipitation events...."
... [A]s of 1985, contaminants were continuing to leach into the ground water....

In 1983, EPA conducted a "Hazardous Waste Site Inspection" of Peak and found "spills everywhere." ... These spills of oil on the surface were, at least in later years, considered common occurrences.... To be sure, the operators of Peak did not intend to deliberately contaminate the site, but an "occasional accident did occur ..."
...

*Id.* at 1520–21 (citations to the record omitted). Describing the "accidents" which had occurred at the Peak site, one former Peak vice-president recalled:

[A] number of accidental overflows occurred during the filling of the used oil holding tanks, some of which resulted in fairly large spills.... There were also occasional spills due to leak[ing] hose and pipe connections.... Also despite our efforts to impress on our employees the need for safety at all times, occasional carelessness by employees resulted in accidental spills during the transfer of used oil from trucks to storage tanks. I recall a number of accidental spills that occurred when a byproduct of the distillate process was pumped to a storage tank.... Many of these accidental spills and leaks occurred when we were in the rerefining business, prior to 1980. •

94. The Court agrees with plaintiff, and finds that sudden has a temporal meaning to it as well as a sense of the unexpected. *See C.L. Hauthaway & Sons v. American Motorists Ins.,* 712 F.Supp. 265, 268 (D.Mass.1989) (ordinary and common usage of term "sudden" includes temporal aspect of immediacy, abruptness, swiftness and quickness as well as unexpected). That is, the Court defines "sudden" to mean pollution which occurs abruptly, instantly, or within a very short period of time. An "accident" may be defined as an event which is unexpected or unintended and does not take place within the usual course.
731 F.Supp. at 1520 (footnote omitted).

95. As certified, the question was: "WHETHER, AS A MATTER OF LAW, THE POLLUTION EX-

*Id.* at 1521 (quoting "Doc. # 35, Exhibit D, p. 5"). Adopting a construction of the "sudden and accidental" exception consistent with that of the Tenth Circuit and other courts,[94] the district court concluded:

These spills and leaks appear to be common place events which occurred in the course of daily business, and therefore cannot, as a matter of law, be classified as "sudden and accidental." That is, these "occasional accidental spills" are recurring events that took place in the usual course of recycling the oil. As one court observed: "contamination ... by disposing of chemicals in the lagoon, or by annual careless spillage onto the ground surface cannot be sudden, or unexpected and accidental ..." *American Mutual Liability Ins. v. Neville Chemical,* 650 F.Supp. 929, 933 (W.D.Pa.1987);

. . . . .

*Id.* at 1521 (citation omitted). On appeal, the Eleventh Circuit certified the question of construction of the "sudden and accidental" exception [95] to the Florida Supreme Court. *Industrial Indem. Ins. Co. v. Crown Auto Dealerships, Inc.,* 935 F.2d 240 (11th Cir. 1991). Answering the certified question in the affirmative, the Florida Supreme Court in *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.,* 636 So.2d 700 (Fla.1993), construed "sudden" to include "a temporal aspect with a sense of immediacy or abruptness.... As expressed in the pollution exclusion clause, the word sudden means abrupt and unexpected." 636 So.2d at 704 (footnote omitted).[96] The Florida Supreme

CLUSION CLAUSE CONTAINED IN THE COMPREHENSIVE GENERAL LIABILITY INSURANCE POLICY PRECLUDES COVERAGE TO ITS INSURED FOR LIABILITY FOR THE ENVIRONMENTAL CONTAMINATION THAT OCCURRED IN THIS CASE."

96. In support of its definition, *Dimmitt* relied upon *Hartford, Star Fire Coals,* and the Third Circuit's "well stated" analysis in *Aardvark,* as well as *Sylvester Bros., Lower Paxton Township, Hybud Equipment,* and *Lumbermens Mutual Casualty Co. v. Belleville Indus., Inc.,* 407 Mass. 675, 555 N.E.2d 568 (1990), from the state courts. 636 So.2d at 704–705.

Court expressly approved of both the analysis employed and the conclusion reached by the federal district court:

> Applying the policy language to the facts of this case, we hold that the pollution damage was not within the scope of Southeastern's policy. The pollution took place over a period of many years and most of it occurred gradually. With respect to the pollution which resulted from oil spills and leaks at the site as well as from occasional runoff of contaminated rain water, we agree with the analysis of the federal district judge in the case ... [,]

referring to the passage from page 1521 of the *Crown Auto* opinion quoted immediately above. 636 So.2d at 705.[97]

■ Quaker State does not offer a persuasive rationale distinguishing *Crown Auto,* or justifying a different result in this case.[98] While circumstances certainly exist in which coverage under a comprehensive general liability (CGL) policy will be available to help parcel out the harsh economic consequences befalling a responsible party under CERCLA, this is far less likely where intentional or foreseeable releases of pollutants have occurred. Insurers adopting the pollution exclusion language at issue in this case did not undertake to insure the risks inherent in the expected or intended release of pollutants into the environment, no matter whether the release was expected or intended by the insured, or the insured's agents or contractors.

In enacting CERCLA, Congress made the public policy decision to place the burden of the cost of remedying environmental damage upon "responsible parties," an aptly-named class defined by Congress in sweeping terms, without regard to individual intent, expectation, guilty knowledge or degree of negligence. *Strict* liability is imposed upon those whose business operations generate hazardous waste, even in cases where such "responsible parties" entrusted such materials to a contractor promising their safe handling, storage, recycling or ultimate disposal. Congress has determined, as a matter of public policy, that generators transfer their toxic byproducts to others at their own peril. Traditional liability insurance falls far short of being coextensive with the potential liability under CERCLA. "Responsible parties" bear the not-bargained-for costs of "expected" or "intended" pollution—in effect becoming the insurers of their own hazardous wastes—at the same time that their own liability insurers, by the terms of their bargain, expressly do not.

For the reasons explained above, the pollution exclusion clause set forth in defendants' CGL policies bars liability insurance coverage for damages arising out of the discharge or release of hazardous wastes at the Ekotek Site. Quaker State has failed to carry its initial burden on summary judgment to demonstrate as a matter of law that those occurrences were "sudden and accidental," and has failed to meet its burden in opposing the defendants' motion to come forward with significant probative admissible evidence from which a reasonable jury could find that those occurrences were "sudden and accidental," and therefore within coverage under the CGL policies.

Consequently, defendants are not obligated to indemnify Quaker State against claims under CERCLA arising out of response and clean-up activities at the Ekotek Site. Nor are they duty-bound to defend Quaker State against such claims because there remain no " 'allegations that arguably or potentially bring the action within the protection purchased' or a 'reasonable possibility' that cov-

---

97. In a brief concurrence, Justice Grimes of the Florida Supreme Court added a personal note: "I originally concurred with the position of the dissenters in this case.... In so doing, I departed from the basic rule of interpretation that language should be given its plain and ordinary meaning. Try as I will, I cannot wrench the words 'sudden and accidental' to mean 'gradual and accidental,' which must be done in order to provide coverage in this case." 636 So.2d at 705.

98. The July 1, 1993 *Dimmitt* opinion quoted in the text was issued following a rehearing; it superseded a contrary opinion relied upon by Quaker State at page 75 of its opposition memorandum, (*Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.*, No. 78293, 1992 WL 212008 (Fla. September 3, 1992)), which was withdrawn. 636 So.2d at 701. Indeed, not without some current irony, Quaker State argued that *"Dimmitt Chevrolet* is factually and legally directly on

erage exists." *EAD Metallurgical, Inc. v. Aetna Casualty & Sur. Co.,* 905 F.2d at 11 (quoting *Avondale Indus., Inc. v. Travelers Indem. Co.,* 894 F.2d 498, 500 (2d Cir.1990) (per curiam)).

## VI. COVERAGE UNDER THE GARAGE POLICIES

■ Quaker State argues that because the garage policies issued by Fireman's Fund and Unigard explicitly cover "property damage . . . caused by one of [Quaker State's] products sold for use in the [United States]," that coverage extends to property damage at the Ekotek Site because Quaker State's waste engine oil was a "product" sold to re-refiners. Quaker State Mem. at 57. Quaker State acknowledges that the garage policies contain an exclusion for property damage caused by the escape of "irritants, pollutants or contaminants," but argues that this exclusion either does not apply or creates an ambiguity resolvable in Quaker State's favor, citing an unpublished opinion, *Stewart v. Safeco Ins. Co.,* Civil No. 2374, slip op. at 9–10 (Idaho Dist.Ct. Dec. 24, 1991). *Id.*

The garage policies define "garage operations" as follows:

The ownership, maintenance or use of the locations and that portion of the roads or other accesses that adjoin these locations for garage business. Garage operations includes the ownership maintenance or use of the autos indicated in Part II as covered autos. Garage operations also include all operations necessary or incidental to a garage business.

Fireman's Fund Mem. at Exhibit 19.

The garage policies contain a pollution exclusion of their own, encompassing "property damage caused by the dumping, discharge or escape of irritants, pollutants or contaminants. This exclusion does not apply if the discharge is sudden and accidental." Fireman's Fund Mem. at 29, ¶ 64 & Exhibit 19; Exhibit "B" to the Affidavit of Craig M. Brookman, dated January 15, 1993, annexed as Exhibit 2 to the Unigard Mem.

■ Defendants argue that under the garage policies issued by Fireman's Fund and Unigard, coverage extends to property damage caused by an "accident" involving garage operations, and that the property damage at the Ekotek Site was not "accidental." Defs. Joint Mem. at 12 n. 5.[99] Unigard also asserts that although the collection and transfer of drain oil necessarily arises out of garage operations, its ultimate disposition by a third-party oil processor is not logically a part of Quaker State's garage operations. Tr. at 39:16–40:25.

Common sense would indicate that the proper disposition of drain oil falls among those "operations necessary or incidental to a garage business." Particularly where a garage operator may be held liable in the event of the discharge or release of that material during transfer, storage or ultimate disposal, the handling of drain oil as a "garage operation" does not end at the garage operator's doorstep; unless otherwise excluded, coverage should follow the oil.

As noted above, the garage policies at issue in this case include pollution exclusion clauses with "sudden and accidental" exceptions. The Court does not see any reason why the "sudden and accidental" exception should be read differently in a garage policy than it is in a CGL, umbrella or other liability policy. Here again, Quaker State has failed to carry its initial burden on summary judgment to demonstrate as a matter of law that those occurrences were "sudden and accidental," and has failed to meet its burden in opposing the defendants' motion to come forward with significant probative admissible evidence from which a reasonable jury could find that those occurrences were "sudden and accidental" and therefore within coverage under the garage policies. Defendants are therefore entitled to summary judgment on the coverage issue.

## VII. LATE NOTICE TO THE INSURER

Liberty Mutual contends that it is entitled to summary judgment on the question of

point and should be followed." Quaker State Opp.Mem. at 75.

99. Defendants assert a similar position concerning "occurrence" under the CGL policies. *See* Part III, *supra.*

coverage for the additional reason that Quaker State did not provide timely notice of the EPA actions affecting Quaker State as required by the terms of Liberty Mutual's policies.[100] Liberty Mutual Mem. at 80–88. Quaker State disputes this. *See* Quaker State Opp.Mem. at 101–09.

Utah law provides that late notice, if given in reasonable fashion under the circumstances, is effective (Utah Code Ann. § 31A–21–312(1)(b) (1992)), and that even a failure to give notice may not invalidate a claim "if the insurer was not prejudiced by the failure." Utah Code Ann. § 31A–21–312(2) (1992). Referring to these provisions, Liberty Mutual itself concedes that "in order to prevail because of late notice of the PRP letter and PRP agreement and no notice of the consent order, Liberty Mutual ... must demonstrate that it was prejudiced thereby." Liberty Mutual Mem. at 82. *See also State Farm Mutual Automobile Ins. Co. v. Stanley,* 966 F.2d 628, 630 (11th Cir.1992) (applying Georgia law).

While this issue, as a practical matter, has been rendered moot by the preceding ruling as to the pollution exclusion, the court notes that on this record, genuine issues of material fact exist concerning the existence of prejudice to Liberty Mutual, precluding summary judgment on the issue of late notice. *See, e.g., North Pacific Ins. Co. v. United Chrome Products, Inc.,* 122 Or.App. 77, 857 P.2d 158 (Ct.App.), *modified upon reconsideration,* 123 Or.App. 536, 858 P.2d 1361 (Ct. App.1993), *review denied,* 318 Or. 171, 867 P.2d 1385 (1993). As illustrated by this record, the insurers, including Liberty Mutual, have availed themselves of the opportunity " 'to investigate this matter, to examine the scene, take photographs, interview witnesses

or take statements ...,' " in contrast to the circumstances found in *Busch Corp. v. State Farm Fire & Casualty Co.,* 743 P.2d 1217, 1219 (Utah 1987), a case relied upon by Liberty Mutual.[101] In its statement of facts, for example, Liberty Mutual recounts that no less than eleven witnesses "(including past owners, refinery operators, supervisors, maintenance workers, and truck drivers)" have been deposed "[i]n an effort to develop a comprehensive site history of refinery operations and site conditions...." Liberty Mutual Mem. at 9–11, ¶ 7. Liberty Mutual has not undertaken to employ it " 'own counsel and defend the initial lawsuit in this matter' " (*Busch,* 743 P.2d at 1219), because it claims no "suit" has been commenced and its participation in administrative proceedings affecting Quaker State would as yet be premature under the terms of the policies. *See* Liberty Mutual Mem. at 60–65. Moreover, Liberty Mutual has not—and likely would not have—availed itself of " 'the opportunity to attempt to adjust and possibly settle,' " (*Busch,* 743 P.2d at 1219), the CERCLA claims affecting Quaker State because it has resolutely denied coverage for reasons wholly apart from timing of notice or the existence of a "suit." Liberty Mutual Mem. at 46–60, 66–80. *Cf. Maryland Casualty Co. v. Wausau Chem. Corp.,* 809 F.Supp. 680, 694–695 (W.D.Wis.1992).

For the reasons set forth above, the Court has ruled as follows:

**IT IS ORDERED** that (1) Quaker State's Motion for Partial Summary Judgment is GRANTED with respect to the issues of (a) whether CERCLA response costs are "damages" within policy coverage; (b) whether "occurrences" within the meaning of the de-

**100.** Liberty Mutual points to primary policy language requiring, *inter alia,* that "[i]f any claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons, or other process received by him or his representative." Liberty Mutual Mem. at 81.

**101.** In *Busch Corp. v. State Farm Fire & Casualty Co.,* damage to property adjoining the insureds' development occurred in 1978; suit was filed against the insureds in 1980, resulting in a $29,-000 judgment against a substitute defendant in May, 1982. The insureds did not notify the in-

surer of the suit until February 1983. The *Busch* court concluded that "the trial court could have properly concluded that because of the five-year delay in notice, the insurance companies suffered actual prejudice...." 743 P.2d at 1220. *See also AOK Lands, Inc. v. Shand, Morahan & Co.,* 860 P.2d 924, 928 (Utah 1993) ("AOK first made a claim against Utah Title in 1979. However, defendants were not notified of AOK's lawsuit against Utah Title until June 1988, after eight years of litigation had concluded and a $400,000 judgment against Utah Title was in place."; summary judgment in favor of insurer affirmed.)

fendants' policies took place at the Ekotek Site; (c) the appropriate "trigger" of coverage under the policies; and (d) the defendant insurers' duty to defend Quaker State under the terms of defendants' primary insurance policies in the context of EPA administrative enforcement action taken pursuant to CERCLA. Quaker State's Motion for Partial Summary Judgment is DENIED with respect to the application of the pollution exclusion clause, including the "sudden and accidental" exception, to claims arising out of property damage at the Ekotek Site caused by hazardous waste contamination.

IT IS FURTHER ORDERED that (2) The Motion for Summary Judgment of Fireman's Fund Insurance Company (as well as American Insurance Company and National Surety Corporation) is GRANTED with respect to the application of the pollution exclusion clause to claims arising out of property damage at the Ekotek Site caused by hazardous waste contamination. Fireman's Fund's motion is DENIED with respect to the issues of (a) whether CERCLA response costs are "damages" within policy coverage; and (b) whether EPA administrative enforcement action triggers the defendant insurers' duty to defend under its primary insurance contracts. (The Court did not reach the issue of the duty to defend under excess or umbrella coverage.)

IT IS FURTHER ORDERED that (3) Liberty Mutual Insurance Company's Motion for Summary Judgment is GRANTED with respect to the issue of application of the pollution exclusion clause in its policies to claims arising out of property damage at the Ekotek Site caused by hazardous waste contamination. Liberty Mutual's Motion for summary Judgment is DENIED with respect to the issues of (a) whether EPA administrative enforcement action pursuant to CERCLA triggers Liberty Mutual's duty to defend under the terms of its policies; (b) whether response costs under CERCLA are "damages" within policy coverage; and (c) whether a failure by Quaker State to give timely notice of the claim precludes coverage under Liberty Mutual's policies.

IT IS FURTHER ORDERED that (4) Unigard Insurance Company's Motion for Summary Judgment is GRANTED with respect to the issue of application of the pollution exclusion clause in its policies to claims arising out of property damage at the Ekotek Site caused by hazardous waste contamination. Unigard's Motion for Summary Judgment is DENIED with respect to the issues of (a) whether EPA administrative enforcement action pursuant to CERCLA triggers Unigard's duty to defend under the terms of its policies; (b) whether response costs under CERCLA are "damages" within policy coverage; and (c) whether the property damage at the Ekotek Site results from "garage operations" within the meaning of Unigard's policies.

LET JUDGMENT BE ENTERED ACCORDINGLY.